UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. <u>10-80149-CR-MARRA/HOPKINS(s)</u>
18 U.S.C. § 1962(d)
18 U.S.C. § 1956(h)
21 U.S.C. § 846
21 U.S.C. § 856
18 U.S.C. § 371
18 U.S.C. § 2

UNITED STATES OF AMERICA,

v.

Christopher Paul George,
Jeffrey George,
Derik Nolan,
Christopher Hutson,
Theodore Obermeyer,
Ethan Baumhoff,
Andrew Harrington,
Daryl Michael Stewart,
Steven Goodman,
Michael Renda,
Matthew Siss,
Pedro Martinez,
Jason Leve,
Jack Martin,
Marc Anthony Naya,
Zachary Horsley.
Gino Marquez,
Beau Boshers, M.D.,
Michael Aruta, M.D.,
Cynthia Cadet, M.D.,
Roni Dreszer, M.D.,
Patrick Graham, M.D.,
Daniel Hauser, M.D.,
Robert Meek, D.O.,
Vernon Atreidis, M.D.,
Augusto Lizarazo, M.D.,
Christine Chico-Blume, D.O.,
Dianna Pavnick George,
Denice Haggerty,

FILED by _____ D.C.

2011 AUG 11  PM 1:45

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. W.P.B.

Joseph Castronuovo, M.D.,
Irwin Beretsky, M.D.,
Jacobo Dreszer, M.D.,

_____      Defendants.      ____/

## SUPERSEDING INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At times material to this Superseding Indictment:

1.      At various times relevant to this Indictment, in the Southern District of Florida and

elsewhere, defendants Christopher Paul George, Jeffrey George, Derik Nolan, Christopher Hutson,

Theodore Obermeyer, Ethan Baumhoff, Andrew Harrington, Daryl Michael Stewart, Steven

Goodman, Michael Renda, Matthew Siss, Pedro Martinez, Jason Leve, Jack Martin, Marc Anthony

Naya, Zachary Horsley, Gino Marquez, Cynthia Cadet; entities South Beach Rejuvenation, South

Florida Pain, Hallandale Pain, American Pain, Executive Pain, East Coast Pain, Medical Arts, Inc.,

American Marketing Group, International Marketing and Finance Group, Inc., Hutson MRI,

Apurtenance Biotechologies, d/b/a Boca Drugs Pharmacy, Quick Pharm Inc., L.A. Health Inc; and

others known and unknown to the Grand Jury, were members and associates of the Enterprise, as

defined below, a criminal organization that operated principally in Broward and Palm Beach

Counties, Florida.

2.      Members and associates of the Enterprise primarily operated as a series of "Pill Mills"

where patrons procured prescription narcotics and controlled substances under the guise of medical

necessity. In addition, members and associates of the Enterprise engaged in telemarketing fraud schemes, and the illegal distribution of anabolic steroids by means of the internet.

3.     Defendants Christopher George and Jeffrey George were the leaders of the Enterprise. Members and associates of the Enterprise assisted them in, among other things, illegally distributing prescription narcotics, controlled substances, anabolic steroids, and executing the telemarketing fraud schemes at their direction.

4.     The Enterprise, including its leadership, membership and associates, constituted an "enterprise," as defined by Title 18, United States Code, Section 1961(4) (the "Enterprise"), that is, a group of individuals and legal entities associated in fact. The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise. The Enterprise was engaged in, and its activities affected, interstate and foreign commerce.

A.     ENTERPRISE ENTITIES

5.     South Beach Rejuvenation and Health, Inc. was a business involved in the sale and distribution of anabolic steroids via the Internet, telephone facility and print media and was located at the following addresses: 5405 Okeechobee Boulevard, Suite 202, West Palm Beach, Florida; 900 Osceola Drive, Suite 100A, West Palm Beach, Florida; and 1489 N. Military Trail, Suite 111, West Palm Beach, Florida. The registered owner was listed as Jeffrey Frank George.

6.     Hallandale Pain, LLC. was an alleged pain management clinic located at 621 W. Hallandale Beach Boulevard, Hallandale Beach, Florida. The registered owner was listed as Jeffrey Frank George.

3

7.      American Pain, LLC. a/k/a South Florida Pain, LLC, was an alleged pain management clinic located at the following addresses: 500 W Oakland Park Boulevard, Fort Lauderdale, Florida; 2700 W. Cypress Creek Road, Building A, Suite 100, Fort Lauderdale, Florida, 1001 W. Cypress Creek Road, Suite 206, Fort Lauderdale, Florida; 5801 N. Federal Highway, Boca Raton, Florida; and 1200 North Dixie Highway, Lake Worth, Florida.  The following people were the listed registered agents of American Pain, LLC: Ethan A. Baumhoff, Dianna Pavnick, and Denice Haggerty.

8.      Executive Pain, Inc. was an alleged pain management clinic located at 4047 Okeechobee Road, Suite 222 and/or 223, West Palm Beach, Florida.  The registered agent of Executive Pain, Inc. was listed as Dianna M. Pavnick.

9.      East Coast Pain, LLC was an alleged pain management clinic located at 4726 Okeechobee Boulevard, West Palm Beach, Florida.  The registered agent of East Coast Pain, LLC was listed as Jeffrey George.

10.     Medical Arts, Inc. ("Medical Arts") was a pharmaceutical distributor with offices located at 2950 Central Avenue, St. Petersburg, Florida.  The owner/operator of Medical Arts was Steven Goodman, R. Ph.  Medical Arts, Inc. had Drug Enforcement Administration (DEA) number RM0162925.  Medical Arts was registered to distribute Schedule II - V controlled substances.

11.     On or about April 8, 2010, personnel from the Drug Enforcement Administration presented a DEA Form 82, Notice of Inspection of Controlled Premises, to defendant Goodman at the offices of Medical Arts.

12.     Hutson MRI was a business that conducted magnetic resonance imaging (MRI's). This business was located at 4000 N. Federal Highway, Suite 201, Boca Raton, Florida. The registered agent of Hutson MRI was listed as Christopher Hutson.

13.     American Marketing Group, LLC was a business which allegedly advertised, marketed and sold time shares on behalf of customers. This business was located and/or listed a mailing address at the following locations: 4400 Northcorp Parkway, Suite 12, Palm Beach Gardens, Florida; 900 Osceola Drive, Suite 100-A, West Palm Beach, Florida; and 900 Osceola Drive, Suite 200, West Palm Beach, Florida. The registered agent of American Marketing Group was listed as Jeffrey George.

14.     International Marketing and Finance Group, Inc. was a business which allegedly advertised, marketed and sold time shares on behalf of customers. The business was located and/or listed a mailing address at the following locations: 5301 N. Federal Highway, Suite 100, Boca Raton, Florida; 5301 N. Federal Highway, Suite 110, Boca Raton, Florida; 5301 N. Federal Highway, Suite 210, Boca Raton, Florida; 2234 North Federal Highway, Boca Raton, Florida; 2007 Lynton Circle, Wellington, Florida, and 2481 Little Rock Court, Wellington, Florida. The registered agent of International Marketing and Finance Group, Inc. was listed as Christopher Hutson, and Dianna Pavnick was listed as the vice president.

15.     Appurtenance Biotechnologies, d/b/a Boca Drugs, was an alleged pharmacy located at 7400 N. Federal Highway, Suite A-10, Boca Raton, Florida. The registered agent of Appurtenance Biotechnologies was listed as Andrew W. Harrington as of April 15, 2009.

16.     QuickPharm, Inc. was an alleged pharmacy located at 114 S. Semoran Boulevard, Orlando, Florida. The registered agent of QuickPharm, Inc. was listed as Daryl Michael Stewart as of June 8, 2009.

## INTRODUCTION

17.     The discipline of pain medicine is an accepted and recognized medical sub-speciality practiced by physicians throughout the United States. Legitimate and qualified pain medicine experts have specialized knowledge, education, training, and experience and utilize a multi-disciplinary approach. Presently, the discipline of pain medicine is recognized by state regulatory boards as a sub-specialty of anesthesiology, physical medicine and rehabilitation, neurology, and psychiatry, which are recognized as primary specialties in the United States. Fellowship training programs exist for the purpose of further education in the sub-specialty of pain medicine, making graduates eligible for board certification in pain medicine.

18.     Some of the defendants ran what were in essence "Pill Mills" which involved ostensibly offering patients "Pain Management" by doing little more than writing prescriptions for narcotics and other controlled drugs the individuals requested. The prescriptions were primarily for large quantities of oxycodone in 15 and 30 mg dosages, which were diverted and/or abused by drug traffickers and addicts. Individuals seeking such prescriptions would often travel great distances, as far as one thousand miles or more, with complaints of alleged intractable pain.

19.     Members of the Enterprise, including a defendant physician and coconspirator physicians, attempted to insulate themselves through the appearance of legitimate medical practice including the use of cursory physical exams, preprinted medical forms, magnetic resonance imaging reports and urinalysis. The prescriptions issued by the defendant physician and coconspirator

6

physicians were illegal because they were not issued for a legitimate medical purpose, and not within the usual course of professional medical practice. The dispensing and distribution of controlled substances was undertaken primarily for a profit motive.

20.     Members of the Enterprise also engaged in wide-ranging criminal conduct including telemarketing fraud, kidnaping, extortion and other crimes of violence. Some of the defendants operated and managed American Marketing Group, LLC and International Marketing and Finance Group, Inc., which fraudulently alleged to advertise, market and sell time-share re-sales. Such entities, in truth and in fact, were "boiler-rooms" engaged in illegal telemarketing fraud.

## APPLICABLE FEDERAL LAW

21.     The Controlled Substances Act, Title 21, United States Code, Section 801, et seq., (hereinafter CSA) governs the distribution and dispensing of various listed drugs including narcotics that are prescribed by physicians and other licensed health care providers. Licensed physicians may distribute and dispense controlled substances if they have a DEA Registration number  and if they comply with all DEA regulations and all applicable federal laws.

22.     The CSA assigns legal authority for the regulation of controlled substances to the DEA. The statute charges DEA with the prevention, detection, and investigation of the diversion of controlled substances from legitimate channels while at the same time ensuring that adequate supplies are available to meet legitimate domestic medical, scientific and industrial needs.

23.     The DEA issues registration numbers to qualifying persons, who are authorized to dispense controlled substances. To issue a prescription for a controlled substance, a physician must be licensed to practice by a state authority and must have a DEA registration number.

24.     Under the CSA, the term "practitioner" is defined as a "physician...registered, or otherwise permitted by the United States or the jurisdiction in which the practitioner practices ...to distribute, dispense...or administer ...a controlled substance in the course of professional practice or research." Every person or entity that handles controlled substances must be registered with DEA or be exempt by regulation from registration. The DEA registration grants practitioners federal authority to handle controlled substances. However, the DEA registered practitioner may only engage in those activities that are authorized under state law for the jurisdiction in which the practice is located. In many cases, state law is more stringent than federal law, and must be complied with in addition to federal law.

25.     The practitioner (physician) is responsible for the proper prescribing and dispensing of controlled substances. The practitioner is responsible for ensuring that the prescription conforms to all requirements of the law and regulations, both federal and state.

26.     Controlled substances may only be distributed or dispensed lawfully in the manner prescribed by the mechanism created by the CSA. The legitimate distribution of controlled substances is based upon the concept of a "closed system." Such a closed system enables the DEA to monitor and track controlled substances from the manufacturer to the end user. This requires each entity in the distribution chain to obtain a registration from the DEA, to keep records, and to make reports of all controlled substances transactions. As a condition of maintaining such a registration, each registrant must take reasonable steps to ensure that the registration is not being utilized as a source of diversion.

27.     Provisions of the CSA mandate that the person or entity registered with DEA must be able to account for all controlled substances which have been received, distributed, dispensed or

8

disposed. All registrants, manufacturers, distributors, pharmacies and practitioners share responsibility for maintaining appropriate safeguards against diversion.

28.   Under the framework of the CSA, the DEA is responsible for ensuring that all controlled substance transactions take place within the "closed system" of distribution established by Congress. Under this "closed system," all legitimate handlers of controlled substances–manufacturers, distributors, physicians, pharmacies, and researchers–must be registered with DEA and maintain strict accounting for all distributions.

29.   The federal controlled substances laws are designed to work in tandem with state controlled substances laws.

## CONTROLLED SUBSTANCES

30.   The CSA and its implementing regulations set forth which drugs and other substances are defined by law as "controlled substances," and those controlled substances are then assigned to one of five schedules, Schedule I, II, III, IV, or V, depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision.

31.   The term "Schedule I" means that the drug or other substance has at least some potential for abuse; the drug has no currently accepted medical use and lacks safety under medical supervision; no prescriptions may be written for Schedule I substances; and such substances are subject to production quotas by the DEA.

32.   The term "Schedule II" means that the drug or other substance has a high potential for abuse; the drug has a currently accepted medical use with severe restrictions; and abuse of the drug or other substances may lead to severe psychological or physical dependence.

9

33.    The term "Schedule III" means the drug or other substance has a high potential for abuse less than the drugs listed in Schedule II; the drug has a currently accepted medical use with severe restrictions; and abuse of the drug or other substances may lead to severe psychological or physical dependence.

34.    The term "Schedule IV" means that the drug or other substance has a low potential for abuse relative to the drugs or other substances in Schedule III; the drug or other substance has a currently accepted medical use in treatment; and abuse of the drug or other substances may lead to limited physical dependence or psychological dependence relative to the drugs or substances in Schedule III.

35.    The term "Schedule V" means that the drug or other substance has a low potential for abuse relative to the drugs or other substances in schedule IV; the drug or other substance has a currently accepted medical use in treatment; and abuse of the drug or other substance may lead to limited physical dependence or psychological dependence relative to the drugs or other substances in Schedule IV.

36.    Pursuant to the CSA and its implementing regulations, oxycodone is the generic name for a highly addictive prescription analgesic (pain relieving medication). The use of oxycodone in any form can lead to physical and/or psychological dependence, and abuse of the agent may result in addiction. It is classified as a Schedule II Controlled Substance. It is sold generically or under a variety of brand names, including Roxicodone, OxyContin, and Percocet. If legally prescribed for a legitimate medical purpose these drugs are typically used to treat moderate to severe pain.

37.    Pursuant to the CSA and its implementing regulations, Alprazolam, is classified as a Schedule IV Controlled Substance, and is sold generically or under the brand name Xanax. When

10

prescribed for a legitimate medical purpose, it typically is used to treat anxiety disorder, panic disorder, and anxiety caused by depression.

38.     Anabolic steroids, such as the drugs Fluxymesterone, Methlytesterone, Stanozolol, Nandrolone Decanoate, Testosterone Suspension, Testosterone Propionate, Oxandrolone, Testosterone Phenylpropionate, Testosterone Isocaporate, Testosterone Decanoate, Testosterone Cypionate, and Testosterone, are Schedule III controlled substances.

39.     Demand for oxycodone has grown to epidemic proportions in South Florida and other parts of the United States including Tennessee, Kentucky and Ohio, where drug dealers can sell a 30 mg oxycodone pill on the street for $10 to $30 or more.

40.     Researchers from the Centers for Disease Control and Prevention report that Schedule II prescription painkillers, like oxycodone, now cause more drug overdose deaths than cocaine and heroin combined.

41.     Oxycodone and other Schedule II drugs have a high potential for abuse and can be crushed and snorted, or dissolved and injected, to get an immediate high. This abuse can lead to addiction, overdose, and sometimes death. The injection method of abuse of oxycodone (and other drugs) generally leaves highly visible scars and ulcers on a patient's arms.

42.     Title 21, Code of Federal Regulations, Section 1306.04(a) state that a valid prescription for a controlled substance must be "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." An Order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of Section 309 of the Act (21 U.S.C. §829) and the person knowingly filling such a prescription, as well as the person issuing it,

11

shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

43.     Title 21, United States Code, Section 829(e)(1) states, "No controlled substance that is a prescription drug as determined under the Federal Food, Drug and Cosmetic Act may be delivered, distributed, or dispensed by means of the Internet without a valid prescription."

44.     Title 21, United States Code, Section 829(e) states that a "valid prescription" means a prescription issued by a practitioner for a legitimate medical purpose in the usual course of professional practice by a physician after he has conducted at least one in-person medical evaluation. The term "in-person medical evaluation" means a medical evaluation that is conducted with the patient in the physical presence of the practitioner without regard to whether portions of the evaluation are conducted by other health professionals.  21 U.S.C. §829(e).

45.     As of October 15, 2008, a physician who prescribes a controlled substance (including anabolic steroids) for an individual based solely on that person's responses to a questionnaire which the individual filled out on the Internet, without ever having examined that individual in a face to face meeting, is acting outside the usual course of his or her professional practice, and the prescription is not for a legitimate medical purpose and therefore invalid.

46.     Title 21, United States Code of Federal Regulations:

Security Requirements:  21 CFR 1301.71 -  1301.93

A.      Physician registrants are required to store stocks of Schedule II through V controlled substances in a securely locked, substantially constructed cabinet.  Physician registrants should not employ as an agent or employee who has access to controlled substances any person who has been convicted of a felony offense related to controlled substances.

12

B.      Each physician registrant must maintain inventories and records of controlled substances listed in Schedule II separately from all other records maintained by the registrant.

47.     Inventories:  21 CFR 1304

A.      An inventory is a complete and accurate list of all stocks and forms of controlled substances in the possession of the registrant as determined by an actual physical count for Schedule II controlled substances and an estimated count or measure of the contents of a Schedule III, IV, or V controlled substance.

48.     The inventory records of Schedule II controlled substances must be kept separate from all other records of controlled substances.

49.     Initial Inventory:

A.      When issued a DEA registration, a physician registrant must take an initial inventory, which is an actual physical count of all controlled substances in their possession.

Biennial Inventory:

B.      Following the initial inventory, the physician registrant is required to take a biennial inventory (every two years), which requires the same information as the initial inventory of all controlled substances on hand.

50.     The physician registrant is responsible for the accuracy of the inventories.

51.     Ordering Schedule II Controlled Substances: 21 CFR 1305.03

A.      Schedules II controlled substances are ordered with an official order form, DEA Form 222.

B.      A DEA Form 222 is required for each distribution, purchase, or transfer of a Schedule II controlled substances.

13

52.     Power of Attorney to Sign an Official Order Form: 21 CFR 1305.05

A.     Any physician registrant may authorize one or more individuals, whether or not they are located at the registered location, to obtain and execute DEA Forms 222 by granting a power of attorney to each such individual.

53.     Transfer of Schedule II controlled substances from physician inventories. - Pursuant to Title 21, Code of Federal regulations, the inventories of controlled substances maintained by a physician at a clinic must be segregated from those of other physicians maintained at the same clinic. No medications may be dispensed from one physician's stock to another unless it is first transferred in conformance with federal law and procedure. Copies of the required DEA documents (Form 222) regarding the transfer of controlled substances must be maintained in conformance with federal law and procedure.

54.     Federal law requires pharmaceutical wholesalers to design and operate a system to disclose suspicious orders of controlled substances. The pharmaceutical wholesaler is required to inform the DEA of suspicious orders when discovered by such wholesaler. Suspicious orders include orders deviating substantially from a normal pattern and orders of unusual frequency (21 CFR 1301.74(b)).

55.     Employee screening procedures: According to the Code of Federal Regulations (C.F.R.), it is the position of the DEA that inquiry be made of employees who have access to controlled substances regarding convictions of crimes and unauthorized use of controlled substances. The DEA assumes that an employee comprehensive screening program be initiated (21 CFR 1301.90).

14

56.     Employee responsibility to report drug diversion: According to the C.F.R., it is the position of the DEA that employees who have knowledge of drug diversion committed by fellow employees have an obligation to report such information to a responsible security official of the employer (21 CFR 1301.91).

## APPLICABLE FLORIDA REGULATIONS

57.     The Florida Administrative Code, 64 B8-9.013 - Standards for the Use of Controlled Substances for the Treatment of Pain to which all licensed physicians must comply states:

(1)     Pain Management Principles:

(a)     "...The appropriate application of up-to-date knowledge and treatment modalities can serve to improve the quality of life for those patients who suffer from pain as well as reduce the morbidity and costs associated with untreated or inappropriately treated pain. The Board encourages physicians to view effective pain management as a part of quality medical practice for all patients with pain, acute or chronic, and it is especially important for patients who experience pain as a result of terminal illness. All physicians should become knowledgeable about effective methods of pain treatment as well as statutory requirements for prescribing controlled substances."

(b)     "...prescribing, dispensing or administering controlled substances including opioid analgesics, for a legitimate medical purpose and that is supported by appropriate documentation establishing a valid medical need and treatment plan."

(c)     The Board recognizes that controlled substances, including opioid analgesics, may be essential in the treatment of acute pain due to trauma or surgery and chronic pain, whether due to cancer or non-cancer origins. The medical management of pain including intractable pain should be based on current knowledge and research and includes the use of both pharmacologic and

15

non pharmacologic modalities. Pain should be assessed and treated promptly, and the quantity and frequency of doses should be adjusted according to the intensity and duration of the pain.

(d)    "...Physicians should be diligent in preventing the diversion of drugs for illegitimate purposes."

(e)    The Board will consider prescribing, ordering, administering, or dispensing controlled substances for pain to be for a legitimate medical purpose if based on accepted scientific knowledge of the treatment of pain or if based on sound clinical grounds. All such prescribing must be based on clear documentation of unrelieved pain and in compliance with applicable state or federal law.

(3)    Standards: The Board has adopted the following standards for the use of controlled substances for pain control:

(a)    Evaluation of the Patient.    A complete medical history and physical examination must be conducted and documented in the medical records.

(b)    Treatment Plan. The written treatment plan should state objectives that will be used to determine treatment success, such as pain relief and improved physical and psycho social function, and should indicate if any further diagnostic evaluations or other treatments are planned. After treatment begins, the physician should adjust drug therapy to the individual medical needs of each patient. Other treatment modalities or a rehabilitation program may be necessary depending on the etiology of the pain and the extent to which pain is associated with physical and psycho social impairment.

(c)    Informed Consent and Agreement for Treatment.    "...The patient should receive prescriptions from one physician and one pharmacy where possible."

16

(d)      Periodic Review.   At reasonable intervals based on the individual circumstances of the patient, the physician should review the course of treatment and any new information about the etiology of the pain.  Continuation or modification of therapy should depend on the physician's evaluation of the patient's progress.  If treatment goals are not being achieved, despite medication adjustments, the physician should evaluate the appropriateness of continued treatment.  The physician should monitor patient compliance in medication usage and related treatment plans.

(e)      Consultation. The physician should be willing to refer the patient as necessary for additional evaluation and treatment in order to achieve treatment objectives.  Special attention should be given to those pain patients who are at risk for misusing their medications and those whose living arrangements pose a risk for medication misuse or diversion.

(f)      Medical records.  The physician is required to keep accurate and complete records to include, but not be limited to:

1.      The medical history and physical examination, including history of drug abuse or dependence, as appropriate;

2.      Diagnostic, therapeutic, and laboratory results;

3.      Evaluations and consultations;

4.      Treatment objectives;

5.      Discussion of risks and benefits;

6.      Treatments;

7.      Medications (including date, type, dosage, and quantity prescribed);

8.      Instructions and agreements; and

17

9.    Periodic reviews.  Records must remain current and be maintained in an accessible manner and readily available for review.

(g)    Compliance with Controlled Substances Laws and Regulations.  To prescribe, dispense, or administer controlled substances, the physician must be licensed in the state and comply with applicable federal and state regulations.

Florida Statutes:

465.0276 Dispensing practitioner.-

(1)    (a)    "...a practitioner authorized by law to prescribe drugs may dispense such drugs to her or his patients in the regular course of her or his practice in compliance with this section."

(2)    A practitioner who dispenses medicinal drugs for human consumption for fee or remuneration of any kind, whether direct or indirect, must:

(b)    Comply with and be subject to all laws and rules applicable to pharmacists and pharmacies, including, but not limited to, this chapter and chapters 499 and 893 and all federal laws and federal regulations.

(c)    Before dispensing any drug, give the patient a written prescription and orally or in writing advise the patient that the prescription may be filled in the practitioner's office or at any pharmacy.

Florida Statutes:

458.326 Intractable pain; authorized treatment.-

(1)    For the purposes of this section, the term "intractable pain" means pain for which, in the generally accepted course of medical practice, the cause cannot be removed and otherwise treated.

18

(2)     Intractable pain must be diagnosed by a physician licensed under this chapter and qualified by experience to render such diagnosis.

(3)     Notwithstanding any other provision of law, a physician may prescribe or administer any controlled substance under Schedules II-V, as provided for in s. 893.03, to a person for the treatment of intractable pain, provided the physician does so in accordance with that level of care, skill, and treatment recognized by a reasonably prudent physician under similar conditions and circumstances.

58.     Florida state law (F.S. 893.04(1)(c)(6)) requires that the dispensing physician must check each prescription prepared by the drug clerk prior to dispensing to the patient. This may be accomplished by having the drug clerk seek out the physician within the clinic and have the dispensing physician check the prepared prescription, the label and the drug contents. The dispensing physician must initial the prescription at the top right hand corner on the face of the prescription, indicating that the prescription has been checked.

## DEFENDANT PHYSICIAN CYNTHIA CADET AND COCONSPIRATOR PHYSICIANS

59.     Certified Automation of Reports and Consolidated Orders System (ARCOS) is an automated, comprehensive drug reporting system which monitors the flow of DEA controlled substances from their point of manufacture through commercial distribution channels to point of sale or distribution at the dispensing/retail level. ARCOS accumulates these transactions which are then summarized into reports which give investigators in Federal and state government agencies information which can then be used to identify the diversion of controlled substances into illicit channels of distribution.

19

60.     In 2009, the United States Census reflects that Florida residents accounted for 6.0% of the total population of the United States.   The Automation of Reports and Consolidated Orders System (ARCOS) establishes that in 2009, Florida based practitioners purchased 95.8% of all oxycodone purchased by the top 100 practitioners in the United States.

61.     Defendant Cynthia Cadet was a physician licensed to practice medicine in the State of Florida. Defendant Cadet obtained DEA number BC8112637 which allowed defendant Cadet to dispense controlled substances.

62.     ARCOS records established that from in or about December 23, 2008 to in or about March 5, 2010, defendant Cadet ordered and/or received from various pharmaceutical wholesalers 876,200 dosage units of oxycodone.

63.     Coconspirator Michael Aruta was a physician licensed to practice medicine in the State of Florida.   Coconspirator Aruta obtained DEA number BA6733578 which allowed coconspirator Aruta to dispense controlled substances.

64.     Certified Automation of Reports and Consolidated Orders System (ARCOS) records established that from in or about January 22, 2009 to in or about March 5, 2010, defendant Aruta ordered and/or received from various pharmaceutical wholesalers 916,300 dosage units of oxycodone.

65.     Coconspirator Beau Boshers was a physician licensed to practice medicine in the State of Florida.   Coconspirator Boshers obtained DEA number FB0254918 which allowed coconspirator Boshers to dispense controlled substances.

20

66.     ARCOS records established that from in or about December 8, 2008 to in or about July 30, 2010, coconspirator Boshers ordered and/or received from various pharmaceutical wholesalers 1,002,620 dosage units of oxycodone.

67.     Coconspirator Roni Dreszer was a physician licensed to practice medicine in the State of Florida. Coconspirator Dreszer obtained DEA number FD1201196 which allowed coconspirator Dreszer to dispense controlled substances.

68.     ARCOS records established that from in or about January 22, 2009 to in or about March 5, 2010, coconspirator Dreszer ordered and/or received from various pharmaceutical wholesalers 849,600 dosage units of oxycodone.

69.     Coconspirator Patrick Graham was a physician licensed to practice medicine in the State of Florida. Coconspirator Graham obtained DEA numbers FG1413424 and AG2216580 which allowed coconspirator Graham to dispense controlled substances.

70.     ARCOS records established that from in or about July 21, 2009 to in or about July 30, 2010, coconspirator Graham ordered and/or received from various pharmaceutical wholesalers 193,300 dosage units of oxycodone.

71.     Coconspirator Robert Meek was a physician licensed to practice medicine in the State of Florida. Coconspirator Meek obtained DEA numbers FM1335296, FM1208897, and BM8985939 which allowed coconspirator Meek to dispense controlled substances.

72.     ARCOS records established that from in or about April 14, 2009 to in or about March 26, 2010, coconspirator Meek ordered and/or received from various pharmaceutical wholesalers 628,200 dosage units of oxycodone.

73.     Coconspirator Daniel Hauser was a physician licensed to practice medicine in the State of Florida. Coconspirator Hauser obtained DEA numbers AH1221756 and FH1269631 which allowed coconspirator Hauser to dispense controlled substances.

74.     Coconspirator Vernon Thomas Atreidis was a physician licensed to practice medicine in the State of Florida. Coconspirator Atreidis obtained DEA number FA1556628 which allowed coconspirator Atreidis to dispense controlled substances.

75.     ARCOS records established that from in or about July 29, 2009 to in or about March 16, 2010, coconspirator Atreidis ordered and/or received from various pharmaceutical wholesalers 481,400 dosage units of Oxycodone.

76.     Coconspirator Augusto Lizarazo was a physician licensed to practice medicine in the State of Florida. Coconspirator Lizarazo obtained DEA number AL6108573 which allowed coconspirator Lizarazo to dispense controlled substances.

77.     ARCOS records established that from in or about January 28, 2010 to in or about April 22, 2010, coconspirator Lizarazo ordered and/or received from various pharmaceutical wholesalers 37,000 dosage units of oxycodone.

78.     Coconspirator Christine Chico a/k/a Chico-Blume, was a physician licensed to practice medicine in the State of Florida. Coconspirator Chico obtained DEA number FC0175679 which allowed coconspirator Chico to dispense controlled substances.

79.     ARCOS records established that from in or about August 5, 2008 to in or about December 23, 2009, coconspirator Chico ordered and/or received from various pharmaceutical wholesalers 368,520 dosage units of oxycodone.

80.    During the operation of South Florida and American Pain, the physicians employed therein ordered at least 6,155,020 dosage units of oxycodone.

81.    From January 2009 to December 2009, Dr. Boshers, Dr. Aruta, Dr. Cadet and Dr. R. Dreszer were ranked nationally in the top 9 purchasers of oxycodone in the United States.

82.    During the operation of Executive Pain the physicians employed therein ordered at least 1,438,200 dosage units of oxycodone.

83.    During the operation of East Coast Pain, the physicians employed therein, ordered at least 991,230 dosage units of oxycodone.

## DISTRIBUTION AND DISPENSING STATISTICS

## AMERICAN PAIN CLINIC

84.    From in or about July 7, 2008 through in or about March 2, 2010, approximately 66,871 prescriptions were dispensed from American Pain.  Of the prescriptions filled at American Pain, approximately 96 percent were filled for either oxycodone or alprazolam.

85.    The prescriptions filled at American Pain reflect that approximately 80 percent were for individuals who listed an address outside of Florida.

86.    Of the 66,871 prescriptions filled at American Pain, approximately 43 percent were filled for patients who listed an address in Kentucky.  Patients from Tennessee accounted for approximately 18.4 percent and those from Ohio accounted for approximately 11.5 percent.

87.    Kentucky, Tennessee and Ohio are states with active operational prescription drug monitoring programs (PDMP) which enable physicians, pharmacists, local, state and federal administrative and law enforcement authorities to identify and track drug abusers who obtain multiple prescriptions within a thirty-day period.  A PDMP is a state-administered data collection

23

system used to gather prescription information.  Such databases assist in preventing drug abusers from obtaining prescriptions from multiple physicians.  The PDMP's are used by states to address prescription drug abuse, diversion and addiction.  The PDMP's facilitate and encourage the identification, intervention and treatment of persons addicted to prescription drugs, and enable states to establish public health initiatives through the identification of use and abuse trends.  At the time of the instant indictment, thirty-five states have operational PDMP's.

88.     During the time period charged in the instant Indictment, Florida had no active operational prescription drug monitoring program (PDMP).

## MEDICAL ARTS

89.     Between in or about December 2008 and in or about March 2010, Medical Arts sold approximately 1,000,000 dosage units of oxycodone, primarily 30 mg tablets, to physicians employed at defendant clinics American Pain and Executive Pain.

90.     On or about June 11, 2009, defendant Steven Goodman, Medical Arts president/owner, received a Letter of Admonition from the DEA citing eleven record-keeping violations.

91.     On or about August 18, 2009, defendant Goodman attended a briefing at the offices of the DEA.  Defendant Goodman was advised of the responsibility to exercise due diligence and to avoid filling suspicious orders that may be diverted into other than legitimate medical, scientific and industrial channels.  Defendant Goodman was advised that federal law required Medical Arts to design and operate a system to discover suspicious orders of controlled substances, including orders of unusual size, orders deviating substantially from a normal pattern and orders of unusual frequency.

24

## UNDERCOVER ACTIVITY

92.     A Hollywood Police Detective acted in an undercover capacity (hereinafter UCA 1) as a patient seeking pain medication.  On July 29, 2009, UCA 1 consulted with coconspirator physician Beau Boshers at American Pain, 5801 North Federal Highway, Boca Raton, Florida. UCA 1 consensually recorded the conversation between himself and defendant physician Boshers.

93.     On July 29, 2009, UCA 1 consulted with coconspirator physician Patrick Graham at Executive Pain, 4047 Okeechobee Road, West Palm Beach, Florida.  UCA 1 consensually recorded the conversation between himself and coconspirator Graham.

94.     A Hollywood Police Department Detective acted in the undercover capacity (hereinafter UCA 2 ) as a patient seeking pain medication.  On July 31, 2009 UCA 2 consulted with coconspirator Beau Boshers at American Pain, 5801 North Federal Highway, Boca Raton, Florida. UCA 2 consensually recorded the conversation between himself and coconspirator Boshers.

95.     On August 28, 2009, UCA 2 consulted with coconspirator physician Beau Boshers at American Pain, 5801 North Federal Highway, Boca Raton, Florida. UCA 2 consensually recorded the conversation between himself and coconspirator Boshers.

96.     On September 25, 2009, UCA 2 consulted with coconspirator Beau Boshers at American Pain, 5801 North Federal Highway, Boca Raton, Florida. UCA 2 consensually recorded the conversation between himself and coconspirator Boshers.

97.     On October 23, 2009, UCA 2 consulted with coconspirator Beau Boshers at American Pain, 5801 North Federal Highway, Boca Raton, Florida.  UCA 2 consensually recorded the conversation between himself and coconspirator Boshers.

99. On November 24, 2009, UCA 2 consulted with coconspirator Beau Boshers at American Pain, 5801 North Federal Highway, Boca Raton, Florida. UCA 2 consensually recorded the conversation between himself and coconspirator Boshers.

99. On December 31, 2009, UCA 2 consulted with coconspirator Beau Boshers at American Pain, 5801 North Federal Highway, Boca Raton, Florida. UCA 2 consensually recorded the conversation between himself and coconspirator Boshers.

100. On January 28, 2010, UCA 2 consulted with coconspirator Beau Boshers at American Pain, 5801 North Federal Highway, Boca Raton, Florida. UCA 2 consensually recorded the conversation between himself and coconspirator Boshers.

101. On February 25, 2010, UCA 2 consulted with coconspirator Beau Boshers at American Pain, 1200 N. Dixie Highway, Lake Worth, Florida. UCA 2 consensually recorded the conversation between himself and coconspirator Boshers.

102. From in or about November 7, 2009 through in or about March 31, 2010, the United States initiated Court authorized wire interceptions regarding a cellular telephone facility utilized by defendant Christopher Paul George. These Court authorized interceptions disclosed conversations among and between members of the Enterprise regarding criminal activity during the pendency of the conspiracy charged in this Indictment.

103. On March 3, 2010, search and seizure warrants were executed by Federal and State law enforcement personnel at the premises of American Pain, Executive Pain, East Coast Pain, South Beach Rejuvenation, Boca Drugs, and the residences of defendants Christopher Paul George, Ethan Baumhoff and Denice Haggerty.

104.    On February 4, 2003, Defendant Christopher Paul George was convicted in the Circuit Court of the Fifteenth Judicial Circuit of Florida, case number 02CF 9275 A02, on one count of Possession with Intent to Deliver New or Legend Drugs, in violation of Section 499.03(s)(3) Florida Statutes, and two counts of Possession of Steroids, in violation of Section 893.13 Florida Statutes, each of which constitutes a third degree felony punishable by up to five years' imprisonment. He was sentenced to 8 months' imprisonment on those charges.

105.    On December 14, 2009, defendants Christopher Paul George, Derik Nolan and Christopher Hutson were arrested in Jacksonville, Florida for extortion and released on $100,000 bond and were subject to Court ordered electronic monitoring. Defendants Christopher Paul George, Derik Nolan and Christopher Hutson were required to wear an electronic monitoring ankle bracelet during a portion of the time period encompassed by the instant Indictment.

106.    Coconspirator physician Beau Boshers was prescribed approximately 3840 oxycodone and 120 xanax pills by defendant physician Cynthia Cadet, coconspirator Roni Dreszer and others, from in or about November 2008 to in or about February 2010.

## TELEMARKETING FRAUD

107.    American Marketing Group (AMG) - approximately 3,300 invoices were generated by AMG regarding customer contact information containing details on the timeshare properties sought to be sold by the customers and the marketing fees charged by AMG. The 3,300 invoices accounted for $4.7 million in fees charged by AMG.

## COUNT 1

1.    The allegations contained in paragraphs 1 through 107 are hereby realleged and incorporated as if fully set forth herein.

THE ENTERPRISE

2.      Beginning at least in or about 2006 and continuing through at least in or about April

2010, the exact dates being unknown, in Broward and Palm Beach Counties in the Southern District

of Florida and elsewhere, defendants Christopher Paul George, Jeffrey George, Derik Nolan,

Christopher Hutson, Theodore Obermeyer, Ethan Baumhoff, Andrew Harrington, Daryl Michael

Stewart, Steven Goodman, Michael Renda, Matthew Siss, Pedro Martinez, Jason Leve, Jack Martin,

Marc Anthony Naya, Zachary Horsley, Gino Marquez, Cynthia Cadet; entities South Beach

Rejuvenation, South Florida Pain, Hallandale Pain, American Pain, Executive Pain, East Coast Pain,

Medical Arts, Inc., American Marketing Group, International Marketing and Finance Group, Inc.,

Hutson MRI, Apurtenance Biotechologies, d/b/a Boca Drugs Pharmacy, Quick Pharm Inc., L.A.

Health Inc.; and others known and unknown to the Grand Jury, constituted an enterprise within the

meaning of Title 18, United States Code, Section 1961(4), that is, individuals and entities associated

in fact.  The Enterprise constituted an ongoing organization, the members and associates of which

functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise.

THE CONSPIRACY

3.      During at least in or about 2006 and continuing thereafter through at least in or about

April 2010, the exact dates being unknown, in Broward and Palm Beach counties, in the Southern

District of Florida and elsewhere, the defendants:

> Christopher Paul George,
> Jeffrey George,
> Derik Nolan,
> Christopher Hutson,
> Theodore Obermeyer,
> Ethan Baumhoff,
> Andrew Harrington,
> Daryl Michael Stewart,

28

Steven Goodman,
Michael Renda,
Matthew Siss,
Pedro Martinez,
Jason Leve,
Jack Martin,
Marc Anthony Naya,
Zachary Horsley,
Gino Marquez,
Cynthia Cadet, M.D.,

being persons employed by and associated with the Enterprise, which Enterprise engaged in, and the

activities of which affected, interstate and foreign commerce, did knowingly, willfully and

unlawfully combine, conspire, confederate, and agree, together and with each other, and with persons

known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1962(c), that

is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise,

through a pattern of racketeering activity, as that term is defined in Title 18, United States Code,

Sections 1961(1) and (5), as set forth herein below at paragraph 3.

THE PATTERN OF RACKETEERING ACTIVITY

4.      The pattern of racketeering activity, as defined in Title 18, United States Code,

Sections 1961(1) and 1961(5), through which the defendants and their coconspirators agreed to

conduct and participate in the conduct of the affairs of the Enterprise consisted of multiple acts

indictable under:

A.      Title 18, United States Code, Section 1341 (Mail Fraud);

B.      Title 18, United States Code, Section 1343 (Wire Fraud);

C.      Title 18, United States Code, Section 1951 (Extortion and Conspiracy To
         Extort);

29

D.    Title 18, United States Code, Section 1956 (Money Laundering and Conspiracy To Launder);

E.    Title 18, United States Code, Section 1957 (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity);

and multiple acts and threats involving:

F.    Distributing, Dispensing and Possessing with Intent to Distribute and Dispense a Controlled Substance, to wit; oxycodone. (Title 21, United States Code, Section 841(a)(1));

G.    Acquiring and Possessing Controlled Substances By Misrepresentations, Fraud, Forgery, Deceit and Subterfuge )Title 21, United States Code, Section 843(a)(3));

H.    Use of a Communication Facility In the Commission of a Violation of Title 21 (Title 21, United States Code, Section 843(b));

I.    Conspiracy To Possess With Intent To Distribute and Dispense Controlled Substances, to wit: oxycodone (Title 21, United States Code, Section 846);

J.    Maintaining Drug-Involved Premises (Title 21, United States Code, Section 856);

K.    Kidnapping, Attempted Kidnapping and Conspiracy to Commit Kidnapping, in violation of Florida Statutes 787.01 and 777.04, which are punishable by imprisonment for more than one year.

It was part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the Enterprise.

## PURPOSES OF THE ENTERPRISE

5.      The purposes of the Enterprise included the following:

      A.      Providing the Enterprise and its leaders, members and associates with an expanding base of clients and customers for narcotics distribution;

      B.      Generating, preserving and protecting the Enterprise's profits and client base through acts of, among other things, kidnapping and money laundering;

      C.      Promoting and enhancing the Enterprise and its leaders', members' and associates' activities;

      D.      Enriching the leaders, members and associates of the Enterprise; and

      E.      Concealing and otherwise protecting the criminal activities of the Enterprise and its participants from detection and prosecution.

## ROLES AND RESPONSIBILITIES OF THE COCONSPIRATORS

A.      Defendant Christopher Paul George: would organize, supervise and manage the criminal enterprise. Defendant Christopher Paul George was aware that a large number of individuals would travel from various states, including Tennessee, Ohio and Kentucky, to Florida in order to illegally obtain controlled substances. Defendant Christopher Paul George was aware that Florida State laws were among the most lenient and ineffective in the United States regarding the monitoring of prescriptions by individuals who illegally obtained multiple prescriptions for controlled substances. Defendant Christopher Paul George was aware that Tennessee, Ohio and

Kentucky had active prescription drug monitoring programs and that drug abusers, addicts and narcotics traffickers would travel to Florida in order to illegally obtain controlled substances. Defendant Christopher Paul George was aware that individuals demanded prescriptions of large quantities of oxycodone 30 mgs. Defendant Christopher Paul George was aware that drug addicts would illegally inject, snort, crush and smoke oxycodone. Defendant Christopher Paul George was further aware that drug traffickers would illegally sponsor other coconspirators, that is, pay for their office visits, diagnostic tests, and filling of prescriptions in order to illegally divert and sell such controlled substances. Defendant Christopher Paul George was also aware that Florida law allowed non-medical personnel to own and operate pain clinics. Defendant Christopher Paul George would learn about the pain management business from his brother defendant Jeffrey George and a corrupt physician. Defendant Christopher Paul George would finance and establish pain management clinics in order to generate criminal proceeds through the illegal distribution and dispensing of controlled substances by means of prescriptions issued by defendant physician Cadet and coconspirator physicians without a legitimate medical purpose and outside the usual course of professional practice. Defendant Christopher Paul George would solicit physicians through advertisements placed on the internet, including Craig's List and newspapers. Defendant Christopher Paul George and coconspirators would personally interview the physicians in order to determine such physicians' willingness to prescribe large quantities of controlled substances to individuals presenting with complaints of alleged pain. Defendant Christopher Paul George would conspire to insulate the enterprise members from criminal prosecution by creating the appearance of legitimate medical practice. Defendant Christopher Paul George and coconspirators would create medical forms to be completed by the individuals seeking controlled substances. Defendant Christopher Paul George

32

would direct that only cash or credit cards would be accepted at the defendant clinics. Defendant Christopher Paul George would offer to pay the clinic physicians per individual examined in order to induce the physicians to examine the greatest number of individuals. Defendant Christopher Paul George understood that since a complaint of pain is subjective, it would be easy to attempt to justify the illegal prescription of large quantities of controlled substances through the use of diagnostic tests. Defendant Christopher Paul George would require such individuals to present with a current magnetic resonance imaging (MRI) report prior to being examined by a clinic physician. Defendant Christopher Paul George would also require such individuals to provide a urine sample prior to the examination. Defendant Christopher Paul George understood that such activities were not conducted for a legitimate medical purpose, but rather to prevent and/or obstruct law enforcement scrutiny and to insulate the coconspirators from prosecution. Defendant Christopher Paul George understood that most adults had some spinal abnormality (bulging disc or herniated disc) which would be reflected on an MRI and that an MRI report could be used as a justification for a complaint of pain and the issuance of a prescription for controlled substances. Defendant Christopher Paul George and coconspirators understood that the majority of the individuals seeking controlled substances at the clinics would travel from outside the State of Florida. Defendant Christopher Paul George understood that the out of state residents traveled in excess of one thousand miles to obtain controlled substances, without a legitimate medical necessity. Defendant Christopher Paul George would establish pharmacies in order to illegally distribute and dispense controlled substances to the individuals receiving prescriptions from the clinic physicians. Defendant Christopher Paul George would arrange for the dispensing of controlled substances directly from the clinics in order to generate large criminal proceeds.   Defendant Christopher Paul George would finance the

establishment of an MRI facility by a coconspirator and refer individuals from the clinics to such facility. Defendant Christopher Paul George would also refer individuals to a mobile MRI facility located behind an adult entertainment business. Such MRI facility would be open seven days per week. Defendant Christopher Paul George would hire friends and relatives to staff the pain clinics and pharmacies in order to ensure loyalty to the enterprise. Defendant Christopher Paul George would incorporate businesses, including pain clinics and pharmacies, using nominees in order to conceal his true ownership interest and status as a convicted felon. Defendant Christopher Paul George would instruct coconspirators to place the cash generated from the pain clinics into large garbage bags, on a daily basis, for transport to financial institutions. Defendant Christopher Paul George would state that his pain clinics generated in excess of forty million dollars. Defendant Christopher Paul George, through coconspirators, would solicit individuals and groups to frequent the clinics in order to illegally obtain prescriptions for controlled substances. Defendant Christopher Paul George would review files and monitor the quantities of controlled substances prescribed by the defendant physician Cadet and coconspirator physicians in order to facilitate the operation of the criminal enterprise. Defendant Christopher Paul George would instruct the clinic physicians to prescribe large quantities of controlled substances in order to satisfy the requests of individuals seeking controlled substances. Defendant Christopher Paul George would conspire with pharmaceutical suppliers to obstruct DEA investigators regarding the suppliers' due diligence obligations, in order to insure the continued supply of oxycodone pills. Defendant Christopher Paul George was aware that employees of American Pain and Executive Pain were receiving prescriptions for large quantities of oxycodone from the physicians employed at the clinics. Defendant Christopher Paul George would provide an attorney to the clinic physicians in order to defend

34

Florida State Department of Health complaints filed against the physicians. Defendant Christopher Paul George would take all steps necessary to ensure that individuals traveling from outside the State of Florida receive prescriptions for large amounts of controlled substances. Defendant Christopher Paul George would cause the transfer of controlled substances among and between the physicians' inventories maintained in the clinics without the documentation required by the DEA. Defendant Christopher Paul George would use violence and threats of violence to intimidate, coerce and extort other pain clinic owners. Defendant Christopher Paul George would instruct coconspirators to commit acts of violence towards the property of competing clinic owners. Defendant Christopher Paul George would direct coconspirators to make material misrepresentations to the DEA regarding the management and operation of the pharmacies. Defendant Christopher Paul George and coconspirators would agree to make material misrepresentations to pharmaceutical suppliers in order to continue to obtain large quantities of controlled substances. Defendant Christopher Paul George and coconspirators would travel outside the Southern District of Florida to confront competing clinic owners. Defendants Christopher Paul George and Jeffrey George would analyze the laws and regulations in several states in order to determine the most lenient laws regarding the establishment and operation of pain management clinics. Defendants Christopher Paul George and Jeffrey George would finance the establishment and operation of a pain clinic in Georgia.

Defendant Christopher Paul George would finance the establishment of a fraudulent timeshare resale business wherein material misrepresentations would be made to customers in order to illegally solicit fees for the alleged marketing of such time shares. Coconspirators would employ individuals experienced in telemarketing fraud to induce victims to pay fees for non-existent services. Such salespersons would falsely inform victims and potential victims that the time shares

would be advertised, marketed, promoted and/or sold. Defendant Christopher Paul George and coconspirators would generate millions of dollars through the fraudulent timeshare resale activity.

Defendant Christopher Paul George would participate in acts of violence, including the kidnaping, unlawful restraint and aggravated assault with a firearm of an individual suspected of stealing proceeds generated through criminal conduct. Defendant Christopher Paul George would be present when his brother defendant Jeffrey George would discharge a firearm near the head of a bound victim. Defendant Christopher Paul George would order coconspirators to submit to polygraph examinations regarding the theft of criminal proceeds. Defendant Christopher Paul George and coconspirators would travel to Jacksonville, Florida to confront a rival pain clinic owner. Defendant Christopher Paul George understood that as a convicted felon, it was illegal for him to possess firearms. Defendant Christopher Paul George would solicit coconspirators to illegally purchase firearms on his behalf. Defendant Christopher Paul George would instruct coconspirators including defendant Dianna Pavnick George, to lie to law enforcement authorities regarding his ownership and possession of firearms. Defendant Christopher Paul George and coconspirators would use proceeds generated from criminal activities to purchase real estate, luxury automobiles, marine vessels, jewelry and firearms.

B. Defendant Jeffrey George: would organize, supervise and manage the criminal enterprise. Defendant Jeffrey George would establish an illegal anabolic steroid internet sales business. Such business would illegally market and sell anabolic steroids by means of advertisements on the internet and fitness magazines. Defendant Jeffrey George would solicit physicians to illegally prescribe anabolic steroids. Defendant Jeffrey George would use several pharmacies to manufacture and prepare the illegal anabolic steroids. Defendant Jeffrey George,

36

through telephone sales consultants, would require customers illegally seeking anabolic steroids to submit the results of a physical examination conducted near the customer's residence and a blood test, and to complete a questionnaire on the internet.  Such activities were engaged in to give the appearance of legitimate medical practice.  Defendant Jeffrey George would employ coconspirators to act as sales consultants.  Such sales consultants had no medical training or experience and would illegally use steroids themselves.  The coconspirator sales consultants would have telephone conversations with customers in order to convince such customers to order large quantities of steroids.  The sales consultants would earn commissions based upon the quantity of steroids purchased by the customers.  Defendant Jeffrey George would instruct the coconspirator sales consultants to write prescriptions for anabolic steroids which would then be presented to coconspirator physician Daniel Hauser.  Defendant Jeffrey George and coconspirator physician Hauser would agree that anabolic steroids would be prescribed to individuals who had not had an in-person physical examination as required by Federal law.  Defendant Jeffrey George and coconspirators would agree that steroids would be illegally prescribed to individuals to enhance their athletic abilities and not for a legitimate and accepted medical purpose.  Defendant Jeffrey George would agree that coconspirator physician Hauser could review the prescriptions at coconspirator physician Hauser's residence and not have to appear at the office.  Defendant Jeffrey George and other coconspirators, on occasion, would forge the name of coconspirator physician Hauser in order to expedite the acquisition and sale of anabolic steroids.

Defendant Jeffrey George would become aware that large amounts of criminal proceeds could be generated through the establishment and operation of illegal pain management clinics. Defendant Jeffrey George would be informed of the operation of such pain clinics through a corrupt

clinic owner and corrupt physician.  Defendant Jeffrey George would finance the establishment of

pain management clinics in order to illegally generate criminal proceeds on behalf of the enterprise.

Defendant Jeffrey George would conspire with defendant Christopher Paul George and other

coconspirators, including physicians, to illegally facilitate and cause the distribution and dispensing

of controlled substances to individuals without a legitimate medical purpose.  Defendant Jeffrey

George was aware that Tennessee, Ohio and Kentucky had active prescription drug monitoring

programs and that drug abusers, addicts and narcotics traffickers would travel to Florida to illegally

obtain controlled substances.   Defendant Jeffrey George would solicit physicians through

advertisements on Craig's List, among other sources.  Defendant Jeffrey George, in the interview

of prospective physicians, would assess the physicians willingness to prescribe large quantities of

controlled substances.  Defendant Jeffrey George and coconspirators would draft medical forms and

require that individuals seeking controlled substances to submit an MRI report and urinalyses in

order to create the appearance of legitimate medical practice.  Defendant Jeffrey George would

finance the establishment of an MRI facility by a coconspirator and refer individuals from the

defendant clinics to such facility.  Defendant Jeffrey George, as a means of generating income,

would advice the coconspirator sales consultants employed at the illegal steroid business, to obtain

prescriptions for controlled substances from the physicians at the pain clinics.  Defendant Jeffrey

George and the physicians understood that such sales consultants had no legitimate medical purpose

for obtaining controlled substances.  Defendant Jeffrey George understood that the sales associates

would illegally sell the controlled substances to third parties.  Defendant Jeffrey George and the

physicians would attempt to restrict the number of out of state residents who received prescriptions

for controlled substances in order to reduce the threat of government scrutiny on the activity of the

illegal pain clinics. Defendant Jeffrey George and coconspirators would use violence and threats of violence to intimidate, coerce and extort other business owners. Defendant Jeffrey George and coconspirators would illegally divert and cause the diversion of large quantities of controlled substances from inventories maintained at the defendant clinics to narcotics traffickers. Defendant Jeffrey George, through coconspirators, would facilitate the illegal sale of controlled substances diverted from the defendant clinics. Defendant Jeffrey George would instruct coconspirators and a narcotics trafficker, to submit to polygraph examinations in order to confirm that such coconspirators and narcotics trafficker were not law enforcement officers or informants. Defendant Jeffrey George would facilitate the transfer of controlled substances among and between the physicians' inventories maintained at the pain clinics without the documentation required by the DEA. Defendant Jeffrey George would instruct coconspirators, including defendant Obermeyer, to direct the physicians to prescribe large quantities of controlled substances without a legitimate medical purpose, in order to satisfy the requests of individuals seeking such drugs. Defendants Jeffrey George and Christopher Paul George would finance the establishment and operation of a pain clinic in Georgia.

Defendant Jeffrey George would participate in acts of violence, including a kidnaping, unlawful restraint and aggravated assault with a firearm regarding an individual suspected of stealing proceeds generated through criminal conduct. Defendant Jeffrey George, in the presence of defendant Christopher Paul George and other coconspirators would discharge a firearm near the head of a bound victim. Defendant Jeffrey George and coconspirators would unlawfully enter a residence in order to recover evidence of the armed physical assault and would dispose of firearms and other items used in such assaults.

39

Defendant Jeffrey George would finance the establishment of a fraudulent timeshare resale business wherein material misrepresentations would be made to customers in order to illegally solicit fees for the alleged marketing of such timeshares. Defendant Jeffrey George and coconspirators would generate millions of dollars through the fraudulent activity.

       C.    <u>Defendant physician Cynthia Cadet and coconspirator physicians Michael Aruta, Roni Dreszer, Patrick Graham, Beau Boshers, Robert Meek, Vernon Atreidis, Augusto Lizarazo and Christine Chico-Blume:</u> through their employment at the illegal pain clinics would prescribe large quantities of controlled substances to individuals, without a legitimate medical purpose and outside the course of accepted medical practice. The physicians, during their initial employment interviews with either defendants Christopher Paul George, Jeffrey George, Ethan Baumhoff and/or Theodore Obermeyer understood and observed that such defendants had no prior legitimate experience owning, managing and supervising medical offices, but were in fact primarily interested in the amount and type of controlled substances the physicians were willing to prescribe. In sum and substance, during such employment interviews, the physicians were asked whether they would agree to prescribe large quantities of oxycodone, xanax and other controlled substances. Once hired, the physicians would "shadow" other corrupt physicians employed at the clinics in order to become familiar with the examination and prescribing practices. The physicians would fail to implement a treatment plan which would particularize and vary the treatment given to individuals based upon their condition, functionality and goals and instead prescribe a standard "cocktail" of controlled substances in violation of accepted medical practice in order to generate as much income as possible. The physicians would practice medicine outside the scope of their education, training, experience and expertise without the review of pertinent medical literature. The physicians conspired with

coconspirators to have urine tests and MRI's conducted prior to examination of individuals in order to create the appearance that the doctors were engaging in legitimate medical practice, which would insulate the clinics' physicians from scrutiny by law enforcement and other agencies. The physicians understood that such diagnostic tests were insufficient to justify the prescription of large quantities of controlled substances. The majority of the physicians would agree to be paid per individual examined in order to maximize their compensation. Some of the physicians would agree to receive an hourly compensation. The physicians would agree to obtain controlled substances from multiple pharmaceutical wholesalers, by use of their DEA numbers, in order to maintain adequate inventories for dispensing from the clinics. The physicians were aware that the inventories of controlled substances ordered and maintained under their DEA numbers were mishandled and/or stolen by clinic employees. The physicians failed to determine the accuracy of any inventories and/or inspections of their supply of controlled substances as required by federal law. The physicians were aware that supplies of controlled substances were transferred between physicians' inventories without the required DEA forms. The physicians would agree to be paid in cash, without supporting documentation, in order to maintain inventories of controlled substances at the defendant clinics. The physicians would agree to make material misrepresentations to pharmaceutical wholesalers regarding the true percentage of individuals from outside the State of Florida who had been prescribed controlled substances and the true percentage of prescriptions which were for controlled substances, in order to ensure the continued shipment by pharmaceutical wholesalers of large quantities of controlled substances to the clinics. The physicians were aware and understood that individuals would be referred to MRI facilities without prior examination by a physician. The physicians would conduct brief physical examinations of individuals seeking controlled substances

41

in order to examine as many individuals per day as possible and to make it appear that they were practicing legitimate medicine. The physicians would observe the waiting rooms and parking areas of the clinics and be aware of the disruptive behavior of the individuals seeking controlled substances. The physicians employed at American Pain and Executive Pain were aware that the majority of the individuals seeking controlled substances were not residents of Florida and had traveled in excess of one thousand miles to obtain controlled substances. Physicians employed at East Coast Pain, would corruptly prescribe large quantities of controlled substances to defendants Renda, Siss, Hutson, Leve, Naya, Horsley, Martin and others, knowing such defendants were employees of defendant Jeffrey George, were employed at South Beach Rejuvenation and that such prescriptions were not for a legitimate medical purpose.

The physicians employed at American Pain would observe the cash proceeds generated from the clinic activities, maintained in garbage bags at the clinic. The physicians employed at Executive Pain were aware that many of the individuals seeking controlled substances had been previously refused service and discharged from American Pain because of intravenous track marks and scars and other reasons and had been referred by coconspirators, including defendant Derik Nolan, to Executive Pain. The physicians understood that urine samples maintained for analysis were often tainted or falsified to provide inaccurate results and were analyzed by clinic personnel who were not qualified to perform such a function. The physicians would agree to refrain from additional, sophisticated urinalysis tests which would more accurately reflect prior drug usage. The physicians would use medical forms provided by coconspirators, including defendants Christopher and Jeffrey George, to make it appear that they were engaged in the legitimate practice of medicine. The physicians would refrain from conducting inventories of the controlled substances ordered and

42

maintained at defendant clinics under their DEA numbers. The physicians would refrain from communicating with prior treating physicians and/or specialists in order to expedite the examinations. The physicians would not require the production of prior treatment records of individuals seeking controlled substances prior to the issuance of prescriptions for controlled substances. The physicians employed at East Coast Pain would, at times, receive prior treatment records, but would not read, inspect or utilize such records to treat individuals. The physicians would obtain such prior treatment records as a means of obstructing governmental scrutiny and to create the appearance of legitimate medical practice. The physicians would agree to use a stamp to prepare prescriptions for controlled substances. Such stamp would have pre-printed quantities and strengths of controlled substances. The physicians would refrain from individualized and particularized treatment plans in order to expedite examinations and the illegal dispensing of controlled substances. The physicians employed at Executive Pain would occasionally reduce the quantity of oxycodone pills prescribed to individuals as a means of obstructing law enforcement and administrative scrutiny. The physicians would not require the production of original MRI, x-ray, catscan films and/or other diagnostic tools and instead rely on MRI radiologist reports in order to expedite the examination of individuals. The physicians would, at times, rely on preliminary radiologist reports in their prescribing of large quantities of controlled substances. The physicians would take no steps to determine if the complaint correlated with the MRI report. The physicians would fail to undertake any action to examine, diagnose or treat the underlying cause of the alleged pain. The physicians understood that the majority of individuals seeking controlled substances would allege complaints of neck or back pain. The physicians understood that the majority of such individuals had traveled in excess of one thousand miles from Tennessee, Kentucky, Ohio and

43

elsewhere and were capable of paying large sums of cash for examination, MRI's, and the purchase of controlled substances. The physicians would refrain from carefully reviewing the alleged medical files pertaining to such individuals in order to ascertain inconsistencies in the information provided by such individuals. The physicians would refrain from prescribing alternative treatment modalities including, anti-inflammatories, TENS units, physical therapy, muscle relaxants, low doses of controlled substances and/or interventional pain management procedures. The physicians would prescribe a "cocktail' of controlled substances which would include quantities of 30 mg oxycodone pills and quantities of xanax. The physicians understood that the individuals obtaining controlled substances sought the oxycodone 30 mg pills because such pills could be diverted, illegally sold and/or unlawfully consumed. The physicians would refrain from appreciably reducing the quantity and strength of oxycodone pills prescribed to individuals. The physicians would agree to refrain from attempting to ween individuals off of high dosages of controlled substances and/or refer such individuals to licensed detoxification facilities and mental health addiction experts. The physicians would refrain from significantly adjusting the drug therapy to the individual medical needs of the individuals as required by Florida law. The physicians would require individuals to be examined every 28 days in order to generate large proceeds for the Enterprise. During the initial operation of American Pain, the physicians would refrain from reviewing and initialing prescriptions as required by Florida law. The physicians employed at East Coast Pain would refrain from inspecting the bottles of controlled substances sold to the individuals seeking such controlled substances. The East Coast Pain physicians would initial prescriptions at the end of every day, rather than at the time of dispensing, contrary to Florida State law. The physicians would prescribe controlled substances to employees of the defendant clinics without the showing of a medical necessity and with the

.

44

knowledge that such employees were capable of functioning in their daily activities. The physicians would prescribe minimal quantities of medication other than controlled substances such as blood pressure and antibiotics in order to make it appear that they were engaged in a legitimate practice of medicine and to ensure the continued supply of controlled substances from pharmaceutical suppliers. The physicians understood that defendants Christopher Paul George and Jeffrey George would review the treatment records in order to monitor the amount of controlled substances prescribed. The physicians would receive instruction and commands from coconspirators including defendants Christopher Paul George and Jeffrey George regarding the amount of controlled substances to be prescribed to individuals. The physicians would discuss and did discuss with defendants Christopher Paul George and Jeffrey George the amount of controlled substances prescribed to individuals. The physicians would allow defendant Christopher Paul George and other coconspirators to be present in the examination room, at times, while they conducted examinations. The physicians understood that the managers and clinic employees of American Pain, Executive Pain and East Coast Pain were friends, family members and/or associates of defendants Christopher and Jeffrey George and had no prior experience operating medical clinics. The physicians would agree to be transferred among and between the defendant clinics by Defendant Christopher Paul George and other coconspirators. The physicians understood that the coconspirators who dispensed controlled substances in the subject clinics would be friends and/or associates of defendants Christopher Paul George and Jeffrey George and not have any medical or pharmaceutical training or experience. The physicians were aware that the individuals preparing and dispensing controlled substances were often committing egregious errors in the preparation of prescription bottles.

Defendant physician Cadet and coconspirator physician Meek would be employed by co-defendant Christopher Hutson in an illegal internet steroid business and would illegally prescribe anabolic steroids to individuals without conducting in-person examinations as required by federal law and without the showing of a medical necessity or having a doctor-patient relationship.

D.    Defendant Ethan Baumhoff: would manage American Pain clinic on behalf of defendant Christopher Paul George. Defendant Baumhoff would agree to place his name on incorporation documents in order to conceal defendant Christopher Paul Georges' true ownership and status as a convicted felon. Defendant Baumhoff would communicate instructions received from Defendant Christopher Paul George to coconspirators including clinic staff and physicians. Defendant Baumhoff would supervise and perform administration duties at American Pain. Defendant Baumhoff, pursuant to instructions from defendant Christopher Paul George, would have responsibility to ensure the continuous supply of controlled substances from the pharmaceutical suppliers. Defendant Baumhoff would collect and aggregate cash generated through criminal conduct and deposit such cash into various financial institutions. Defendant Baumhoff would maintain large quantities of cash proceeds generated from the pain clinics at his residence, on behalf of defendant Christopher Paul George. Defendant Baumhoff would agree to receive salary and compensation by check and cash in order to conceal such proceeds from the Internal Revenue Service. Defendant Baumhoff would maintain records required by the DEA in order to give the appearance of legitimate medical practice. Defendant Baumhoff would order large quantities of controlled substances from the pharmaceutical wholesalers on behalf of defendant Christopher Paul George. Defendant Baumhoff would agree to facilitate the physicians' submission of materially false statements to the pharmaceutical wholesalers to ensure the continued supply of controlled

46

substances.  Defendant Baumhoff would transfer controlled substances among and between physicians' inventories without the required documentation.  Defendant Baumhoff would order small quantities of non-controlled substances from pharmaceutical suppliers in order to make the distribution of large quantities of controlled substances appear legitimate and to obstruct law enforcement scrutiny.  Defendant Baumhoff would maintain files regarding complaints filed by the Florida State Department of Health against the physicians.  Defendant Baumhoff would coordinate responses to such complaints with an attorney retained by defendant Christopher Paul George to represent the physicians.  Defendant Baumhoff would inform defendant Christopher Paul George regarding the unprofessional conduct of the clinic staff, including their intoxication.  Defendant Baumhoff would illegally purchase firearms on behalf of defendant Christopher Paul George, with the knowledge that defendant Christopher Paul George was a convicted felon.

        E.     <u>Defendant Theodore Obermeyer</u>:  would manage East Coast Pain on behalf of defendant Jeffrey George.  Defendant Obermeyer would communicate instructions received from defendant Jeffrey George to coconspirators including clinic staff and the physicians.  Defendant Obermeyer, on the direction of defendant Jeffrey George, would instruct the physicians to prescribe large quantities of controlled substances without a medical necessity.  Defendant Obermeyer, pursuant to instructions from defendant Jeffrey George, would have responsibility to ensure a continuous supply of controlled substances from the pharmaceutical suppliers.  Defendant Obermeyer would take all steps necessary to ensure that the individuals seeking controlled substances were satisfied with the quantities of drugs prescribed by the clinic physicians, regardless of medical necessity .  Defendant Obermeyer and defendant Jeffrey George would review files and monitor the quantities of controlled substances prescribed by the clinic physicians.  Defendant

Obermeyer would inquire of individuals regarding their satisfaction with the quantities of controlled substances prescribed. Defendant Obermeyer would supervise the operation of the pain clinics, including the staff, urinalyses, MRI's, record keeping and inventories of pills in order to ensure the appearance of a legitimate medical office. Defendant Obermeyer would divert and facilitate the diversion of large quantities of controlled substances maintained in the defendant clinic inventories. Defendant Obermeyer would illegally sell narcotics diverted from the defendant clinics' inventories to third parties. Defendant Obermeyer would order large quantities of controlled substances from pharmaceutical wholesalers on behalf of defendant Jeffrey George. Defendant Obermeyer would transfer controlled substances, among and between the inventories maintained at the defendant clinics, without the required documentation. Defendant Obermeyer would facilitate the opening of a pain clinic in Georgia on behalf of defendants Christopher Paul George and Jeffrey George.

      F.     <u>Defendant Derik Nolan</u>: would assist in the management, operation and supervision of American Pain on behalf of defendant Christopher Paul George. Defendant Nolan would supervise the security personnel of American Pain and undertake to control the activities of the individuals seeking controlled substances. Defendant Nolan would physically confront out of state residents in an attempt to control their disruptive behavior. Defendant Nolan would instruct and admonish individuals seeking controlled substances regarding their behavior while in the clinic. Defendant Nolan would solicit and accept monetary gratuities to expedite the examination of individuals seeking controlled substances. Defendant Nolan would discuss with coconspirators the fact that individuals, often accompanied by their family and friends, would travel in excess of one thousand miles to obtain prescriptions for controlled substances from the defendant physicians. Defendant Nolan and defendant Christopher Paul George would discuss the deaths of individuals

by overdose and other means, who had obtained controlled substances from the defendants' clinics. Defendant Nolan would refer individuals discharged from American Pain due to marks from intravenous drug usage and other causes to Executive Pain. Defendant Nolan would illegally extort the office visit payment from those individuals discharged from American Pain. Defendant Nolan would demand the payment of kickbacks from clinic employees in order that such employees may work in a capacity to receive illegal gratuities from individuals seeking controlled substances. Defendant Nolan would solicit individuals and groups to pose as individuals seeking prescriptions for pain management. Defendant Nolan would escort individuals he solicited through the clinic in order to expedite their examinations by the physicians. Defendant Nolan, upon direction of defendant Christopher Paul George, would on occasion assist in the management and operation of Executive Pain. Defendant Nolan and coconspirators would travel outside the Southern District of Florida to confront rival pain clinic owners. Defendant Nolan would agree to commit acts of violence, including vandalism, towards competitor clinics and law enforcement personnel. Defendant Nolan would participate with coconspirators in extortion by threats of violence of rival pain clinic operators. Defendant Nolan would participate with defendants Christopher Paul George, Jeffrey George and Gino Marquez in the kidnaping, unlawful restraint and aggravated assault with a firearm of an individual suspected of stealing criminal proceeds, that is, clinic receipts. Defendant Nolan, after the execution of Federal search and seizure warrants on March 3, 2010, would attempt to sell the telephone numbers of American Pain and Executive Pain to a competing clinic owner, in furtherance of the criminal enterprise.

G.     Defendant Andrew Harrington: would be employed at South Florida and American Pain and perform various administrative duties. Defendant Harrington would operate and manage

a pharmacy, Boca Drugs, on behalf of defendant Christopher Paul George. Defendant Harrington would place his name on incorporation documents in order to conceal defendant Christopher Paul George's true ownership status. Defendant Harrington, pursuant to instructions from defendant Christopher Paul George, would have responsibility to ensure the continuous supply of controlled substances from pharmaceutical suppliers. Defendant Harrington would unlawfully dispense and distribute  controlled substances through Boca Drugs, by facilitating the filling of prescriptions issued by the clinic physicians to individuals examined at the defendants' clinics. Defendant Harrington understood that individuals seeking prescriptions for controlled substances were addicts and/or traffickers and had no legitimate medical purpose to obtain controlled substances. Defendant Harrington would make materially false statements to the DEA regarding the ownership, operation, and management of the pharmacy. Defendant Harrington would make false statements in order to solicit pharmacists for employment in the pharmacy. Defendant Harrington would also perform administrative duties at South Florida Pain and American Pain.

H.     Defendant Christopher Hutson:  would solicit customers on behalf of defendant Jeffrey George to illegally purchase large quantities of anabolic steroids by means of telephone sales. Defendant Hutson would attempt to convince the customers to purchase the largest quantities of anabolic steroids in order to generate the largest commissions for himself and other coconspirators. Defendant Hutson would illegally acquire large quantities of anabolic steroids for sale in defendant Christopher Paul George's pharmacies and elsewhere. Defendant Hutson would also unlawfully obtain prescriptions for controlled substances from the physicians at the defendant pain clinics and illegally sell such narcotics to third parties. Defendant Hutson would operate an illegal anabolic steroid internet sales business. Such business would illegally market and sell anabolic steroids by

50

means of advertisements on the internet and fitness magazines.  Defendant Hutson would employ

defendant physician Cadet and coconspirator physician Meek to illegally prescribe such steroids

without conducting in-person examinations of the customers, as required by federal law.  Defendant

Christopher Hutson would establish an MRI facility with financing obtained from defendant

Christopher Paul George.  Defendants Hutson and Christopher Paul George would plan to refer

individuals from American Pain to defendant Hutson's facility for MRI's.  Defendant Hutson would

illegally pay defendant Christopher Paul George a fee for each individual referred.  Defendant

Hutson would hire a radiologist to review the MRI's and to issue a report.  Defendant Hutson would

also conspire with defendant Jeffrey George to establish an MRI facility.  Defendant Hutson would

receive financing from defendants Christopher and Jeffrey George to establish and operate a large

scale fraudulent timeshare resale business, International Marketing Group, (IMG).  Defendant

Hutson would facilitate the material misrepresentations made to victims by employees of the

fraudulent timeshare resale business. Defendant Christopher Hutson would solicit and employ

individuals experienced in telemarketing fraud to telephonically contact potential victims in the

fraudulent timeshare resale business.  Defendant Christopher Hutson would purchase lists of

potential victims from corrupt brokers. Defendant Christopher Hutson would share the large profits

generated through the illegal timeshare resale business with defendants Christopher Paul George,

Jeffrey George and other coconspirators. Defendant Hutson would hire over one hundred individuals

to make material misrepresentations to customers regarding the alleged advertising and sale of the

customers timeshare.  Defendant Hutson would supervise the illegal activities of IMG, and such

business would earn over two million dollars.  Defendant Hutson would travel with defendants

Christopher Paul George, Derik Nolan and another coconspirator to confront a competing clinic

owner. Defendant Hutson, along with defendant Jeffrey George, would engage in acts of vandalism regarding other business owners and competing pain clinics.

I.      Defendant Steven Goodman: As the president/owner of Medical Arts, Inc. a pharmaceutical distributor, would corruptly sell large quantities of Schedule II controlled substances, that is, oxycodone 30 mg, to physicians employed by defendant clinics American Pain and Executive Pain.  Defendant Goodman was aware and/or should have been aware that such clinics were unlawfully distributing and dispensing controlled substances without a legitimate medical necessity and outside the usual and customary scope of medical practice.  Defendant Goodman would fail to file suspicious order reports as required by Federal law despite receiving and distributing orders of suspicious size, orders deviating substantially from a normal pattern, and orders of unusual frequency.  Defendant Goodman failed to design and operate a system to identify suspicious orders and report those suspicious orders to DEA when discovered.  Defendant Goodman would ignore warnings and notice provided to him by DEA personnel on or about August 18, 2009 regarding his responsibility under federal law to exercise due diligence and avoid filling suspicious orders for controlled substances.  Defendant Goodman would also ignore warnings explaining the common characteristics of corrupt pain management physicians and issues associated with such practices. Defendant Goodman would inform DEA personnel that he did not consider oxycodone to be a significant drug of abuse.  DEA personnel would inform defendant Goodman of recent actions taken by the DEA to suspend or revoke controlled substances registrations of distributors who continue to divert controlled substances.  Defendant Goodman would intentionally ignore information provided to him by a physician hired by Medical Arts, Inc. to inspect defendant clinics, American Pain and Executive Pain. Such physician would inform defendant Goodman that American Pain was

52

filthy, dispensed enormous amounts of Schedule II drugs, appeared to be a "pill mill" and the activities of which violated state and federal law. The physician further informed Defendant Goodman that the procedure used to dispense controlled substances at American Pain was "life threatening." Defendant Goodman would ignore a Letter of Admonition, issued by DEA and dated on or about June 11, 2009, which set forth eleven violations of federal regulations committed by Medical Arts, Inc. Defendant Goodman would inform defendants Christopher George and Ethan Baumhoff regarding the information provided by the physician hired by Medical Arts, Inc., that is critical of American Pain activities.

> J.      Defendant Daryl Michael Stewart:  would agree to perform various administrative functions on behalf of defendant Christopher Paul George at American Pain. Defendant Stewart would dispense controlled substances at American Pain and collect payment from individuals obtaining such drugs. Defendant Stewart, while an employee at American Pain, would be examined by the physicians and obtain prescriptions for large quantities of controlled substances. Defendant Stewart would illegally sell such controlled substances to third parties. Defendant Stewart would agree to place his name on incorporation documents regarding Quick Pharm Pharmacy in order to conceal defendant Christopher Paul George's true ownership and status as a convicted felon. Defendant Stewart would discuss with defendant Christopher Paul George and other coconspirators the dispensing and distribution of controlled substances and anabolic steroids through Quick Pharm Pharmacy. Defendant Stewart, pursuant to instructions from defendant Christopher Paul George, would make material misrepresentations to the DEA regarding the operation of Quick Pharm Pharmacy.

K.     Defendants Michael Renda, Matthew Siss, Jason Leve, Marc Anthony Naya, Zachary Horsley and Jack Martin were telephone sales consultants employed at South Beach Rejuvenation. The defendants would solicit customers on behalf of defendant Jeffrey George to illegally purchase large quantities of anabolic steroids by means of telephone sales. The defendants would themselves illegally possess and consume large quantities of anabolic steroids. The defendants would attempt to convince customers to purchase the largest quantities of anabolic steroids in order to generate the largest commissions for themselves and coconspirators. The defendants would advise the customers regarding the types of steroids they should purchase in order to enhance their athletic capabilities. The defendants would illegally solicit the sale of anabolic steroids to customers for purposes contrary to legitimate medical purposes. The defendants would draft and prepare prescriptions for anabolic steroids to be presented to coconspirator physician Hauser. The defendants would unlawfully, on occasion, forge the signature of coconspirator physician Hauser, in order to expedite the acquisition and sale of anabolic steroids. The defendants would themselves unlawfully obtain prescriptions for controlled substances, in particular, oxycodone, from the physicians employed at East Coast, Hallandale, and other pain clinics and illegally sell such narcotics to third parties. The defendants would inform coconspirator physician Chico-Blume that they were employed by defendant Jeffrey George, in order to expedite their examinations and prescriptions.

L.     Defendant Pedro Martinez: would perform various administrative duties at American Pain, including the maintenance of files of individuals seeking controlled substances and the counting of pills and preparation of bottles containing controlled substances. Defendant Martinez would solicit, recruit, and sponsor narcotics traffickers and addicts to pose as individuals seeking prescriptions and compensate them for their office visits, examinations and prescriptions. Defendant

Martinez would obtain the controlled substances prescribed to these individuals and thereafter sell such controlled substances to other narcotics traffickers.  During the pendency of the conspiracy, defendant Martinez would sponsor several persons per month to pose as individuals seeking prescriptions for controlled substances.

      M.     Defendant Gino Marquez: would solicit customers on behalf of defendant Jeffrey George to illegally purchase large quantities of anabolic steroids by means of telephone sales. Defendant Marquez would attempt to convince the customers to purchase the largest quantities of anabolic steroids in order to generate the largest commission for himself and other coconspirators. Defendant Marquez would receive financing from defendant Jeffrey George in order to establish and operate a large scale fraudulent timeshare resale business, American Marketing Group.  Such misrepresentations would include information regarding the alleged advertising, marketing, and sale of customer time shares.  Defendant Marquez would solicit and employ individuals experienced in telemarketing fraud as well as recovering drug addicts to telephonically contact potential victims for the fraudulent timeshare resale business.  Defendant Marquez would facilitate the material misrepresentations made to victims by employees of the fraudulent timeshare resale business. Defendant Marquez would purchase lists of potential victims from corrupt brokers.  Defendant Marquez would share the large profits generated through the illegal timeshare resale business with defendant Jeffrey George and other coconspirators.  Defendant Marquez would participate with defendants Christopher Paul George, Jeffrey George and Derik Nolan in the kidnaping, unlawful restraint and aggravated assault with a firearm of an individual suspected of stealing criminal proceeds.

N.      Coconspirator Daniel Hauser: would facilitate the illegal distribution of anabolic steroids through South Beach Rejuvenation.  Coconspirator Hauser would review and sign large quantities of prescriptions drafted and prepared by telephone sales consultants who had no medical training and experience.  Coconspirator Hauser understood that the sales consultants, some of whom were steroid abusers, attempted to convince customers to order the largest quantities of steroids, in order to receive the largest commissions from the sales.  Coconspirator Hauser would authorize and approve the illegal dispensing of anabolic steroids by means of prescriptions to customers without conducting in-person medical evaluations of such customers, in violation of federal criminal law. Coconspirator Hauser was aware that the customers purchasing anabolic steroids did so with the intent to illegally enhance their athletic capabilities and not for a legitimate and accepted medical purpose.  Coconspirator Hauser would on occasion conduct those illegal activities from his residence.  Coconspirator Hauser, on occasion, would be employed at pain clinics owned and operated by defendant Jeffrey George.  Coconspirator Hauser would issue prescriptions for controlled substances, to wit, oxycodone, to individuals seeking such drugs without a legitimate medical purpose and outside the usual course of professional medical practice.

## MANNER AND MEANS OF THE ENTERPRISE

A.      Illegal Distribution and Dispensing of Controlled Substances

1.      In or about 2006, defendant Jeffrey George would establish and operate an illegal internet anabolic steroid distribution business, South Florida Rejuvenation.

2.      In or about 2007, defendants Christopher Paul George and Jeffrey George would obtain advice regarding the establishment and operation of pain clinics from a corrupt physician and clinic owner.  Said corrupt physician would be referred to as "the Candy Man" by members of law

enforcement as a reference to the amount of controlled substances prescriptions illegally issued by the physician.

3.      Defendants Christopher Paul George and Jeffrey George would discuss the establishment of pain clinics in order to generate large proceeds on behalf of the Enterprise.

4.      In or about 2008, defendants Christopher Paul George and Jeffrey George would finance the establishment of South Florida Pain.

5.      Defendants Jeffrey George and Christopher Paul George initially would use the DEA number of the corrupt physician to order large quantities of controlled substances from pharmaceutical wholesalers.

6.      Thereafter, defendant Christopher Paul George would establish and operate American Pain, Executive Pain, Quick Pharm and Boca Drugs. Defendant Jeffrey George would establish and operate East Coast Pain and Hallandale Pain. Defendants Christopher Paul George and Jeffrey George together would establish and operate Pain Express located in Kennesaw, Georgia.

7.      Defendant Christopher Paul George would direct co-defendants to act as nominee owners of American Pain, Executive Pain, Quick Pharm and Boca Drugs in order to conceal defendant Christopher Paul George's true ownership of such facilities and his status as a convicted felon.

8.      Defendants Christopher Paul George and Jeffrey George and coconspirators would solicit physicians through the use of advertisements placed on Craig's List and in newspapers.

9.      Defendants Christopher Paul George and Jeffrey George would independently conduct employment interviews with prospective physicians. Defendants Christopher Paul George

and Jeffrey George would primarily inquire regarding the physician's willingness to prescribe large quantities of controlled substances.

10.    Defendants Christopher Paul George and Jeffrey George and coconspirators would create medical forms to be used by the physicians in order to give the appearance of legitimate medical practice.

11.    Defendants Christopher Paul George and Jeffrey George and coconspirators would agree to accept only cash or credit cards as payment for examination by the physicians and the issuance of prescriptions, in order to obstruct potential law enforcement and administrative scrutiny.

12.    Defendants Christopher Paul George and Jeffrey George and coconspirators would require individuals seeking controlled substances to present a magnetic resonance imaging (MRI) report less than two years old in order to insulate the coconspirators and to make the clinics and physicians appear legitimate.

13.    Coconspirators employed at the clinics would refer individuals to an MRI facility for a fifty dollar fee.

14.    Coconspirators employed at the clinics would provide individuals with either pre-signed prescriptions for MRI's or cards directing the individuals to an MRI facility without having such individuals first confer with the physicians.

15.    Coconspirators employed at the clinics would inquire of the individuals whether such individuals requested primarily neck or back MRI's.

16.    Coconspirators employed at the clinics would refer individuals to, among other facilities, a mobile MRI facility located in the parking lot behind an adult entertainment club.  Such

mobile MRI facility would remain open after twelve a.m. in order to accommodate individuals seeking controlled substances.

17.     Coconspirators would require that individuals provide a urine sample in order that a urinalysis be conducted prior to exam by a clinic physician. The urinalysis would be conducted in order to make the clinic and the physicians' activities appear to be proper and to ensure that the prescription of controlled substances appeared to be legitimate. The urine sample would be provided by individuals without supervision or monitoring.

18.     Coconspirators would illegally solicit individuals from outside the State of Florida through recruiters who would refer large numbers of individuals from Tennessee, Kentucky, Ohio and elsewhere.

19.     Coconspirators would hire non-medical personnel including friends and family members to staff the clinics.

20.     Defendant physician Cadet and coconspirator physicians would conspire to prescribe large amounts of controlled substances to individuals without requiring the showing of a legitimate medical purpose and outside the course of professional practice.

21.     Coconspirators would agree to compensate the physicians per individual examined in order to induce the physicians to inappropriately examine as many individuals as possible. Several of the physicians would be paid on an hourly basis.

22.     The physicians would perform a minimal and cursory physical examination of the individuals in order to insulate the coconspirators and to make their activities appear legitimate.

23.     The physicians would agree to examine each patient for the minimal amount of time possible in order to examine the largest number of patients each day and to generate the largest amount of criminal proceeds for the enterprise.

24.     The physicians, in order to examine as many individuals as possible on a daily basis, would refrain from communicating with specialists, prior treating physicians or alternative medical providers.

25.     Coconspirators would direct individuals to the dispensing facilities located within the clinics or the pharmacies owned and controlled by defendants Christopher Paul George and Jeffrey George, in order to generate criminal proceeds and to avoid government scrutiny.

26.     The physicians would use prepared stamps to create prescriptions for controlled substances.  Such stamps would list the same amount of controlled substances for each patient.

27.     Defendants Christopher Paul George, Jeffrey George and coconspirators would instruct and encourage the physicians to examine as many patients as possible on a daily basis in order to illegally generate the largest proceeds. Defendant Christopher Paul George would agree that some physicians could receive a salary in excess of one million dollars per year, depending upon the amount of patients examined.

28.     Defendant Christopher Paul George and coconspirators would agree to pay employees both by check and in cash in order to obstruct potential scrutiny by the Internal Revenue Service and other governmental agencies.

29.     Defendant Christopher Paul George and coconspirators would discuss creating prescription pads for new physicians by copying and pasting old prescription pads used by other physicians.

30.     Coconspirators would discuss the fact that individuals seeking controlled substances wanted to be treated by the physicians who maintained inventories of controlled substances at the clinics, so that such individuals could quickly obtain controlled substances.

31.     Coconspirators would discuss the fact that the physicians wanted to examine as many individuals as possible in order to make as much money as possible.

32.     Coconspirators would hand out cards and fliers on the street and at hotels frequented by individuals from outside the state of Florida in order to advertise the clinics and to solicit individuals from outside the State of Florida.

33.     Defendant Christopher Paul George and other coconspirators would agree to waive the fees for physician exams for individuals who were either close friends or who had been solicited by competing pain clinics.

34.     Defendant Christopher Paul George would make cash payments of approximately $1,000 per month to the physicians employed at American Pain and Executive Pain who maintained inventories of controlled substances at the facility.

35.     The physicians would execute power of attorney forms in order that coconspirators might order and obtain controlled substances from pharmaceutical wholesalers by means of the physicians' DEA registration numbers.

36.     Defendants Christopher Paul George and Jeffrey George would examine and review files in their respective clinics, in order to determine if the defendant physician and coconspirator physicianss were prescribing large quantities of controlled substances.

37.     Defendants Christopher Paul George, Andrew Harrington, Daryl Stewart and coconspirators would establish and operate pharmacies under nominee names in order to illegally fill the prescriptions issued by the clinic physicians.

38.     Coconspirators would order quantities of non-controlled substances from pharmaceutical suppliers to be dispensed from the subject clinics, Boca Drugs and Quick Pharm, in order to obstruct law enforcement scrutiny and make such entities appear to be legitimate.

39.     Coconspirators would discuss the potential name change of American Pain and Executive Pain in order to conceal the true purpose of the business, that is, the illegal dispensing and distribution of controlled substances. Such coconspirators planned to use the terms "Parkridge Medical Center," "family oriented clinic" and "general practice" to further the scheme.

40.     On or about November 13, 2009, in a telephone conversation, defendant Christopher Paul George and a coconspirator would discuss a pending application to establish a pain clinic. The coconspirator would instruct defendant Christopher Paul George to submit false statements to a municipal agency in order to conceal the true nature of the business. The coconspirator would state 'You know bureaucrats are baffled by bullshit, Chris. Bullshit baffles brains." The coconspirator further stated,"You know what I'm saying? So if we, so you know what I'm saying. Get it away from this whole pain thing and just get into medical. If I can switch the...we can leave the pain and become the medical. We're gonna sail through this deal."

41.     Defendants Christopher Paul George, Derik Nolan and coconspirators would discuss the fact that individuals who had traveled from out of state would arrive at the defendant clinics with members of their family, friends and/or associates.

62

42.     Defendants Christopher Paul George, Derik Nolan and coconspirators would discuss the fact that individuals would travel interstate, in excess of a thousand miles, in order to receive prescriptions at the clinics controlled by the coconspirators.

43.     Individuals traveling from outside the State of Florida would arrive at the clinics with large quantities of cash in order to pay for physician examinations, MRI's and for the purchase of prescription medications.

44.     Coconspirators would refer individuals among the various clinics controlled by the coconspirators.

45.     Coconspirators would discuss the hiring of an individual to stand in the street with a sign in order to solicit individuals to the clinics.

46.     Coconspirators were aware that individuals seeking controlled substances would bring other persons urine in containers and/or condoms in order to provide such urine for urinalysis. Such activity was conducted to conceal the illegal drug use of the individuals seeking controlled substances and to provide fraudulent results of the urinalysis tests.

47.     Coconspirators would hire plumbing services to clear blockages of bathroom facilities at the defendant clinics caused by individuals attempting to dispose of containers and condoms in the clinic toilets. Such conduct was intended to illegally alter the results of the urinalysis.

48.     Coconspirators would discuss the deaths of individuals who had obtained controlled substances from the physicians at pain clinics owned and/or controlled by defendants.

49.     On or about November 15, 2009 in a telephone conversation, defendants Christopher Paul George and a coconspirator would discuss a Palm Beach Post newspaper article regarding an overdose death related to defendant Jeffrey George's pain clinic. Defendant Christopher Paul

George and a coconspirator would agree that politicians can never stop a doctor from prescribing medication. Defendant Christopher Paul George would state, "yeah, there's no way they can ever stop that...But you know bitch about it and cry about it." A coconspirator would state, "I get pain medication Chris. I mean I don't get the kind of medication you know that you guys dispense." The coconspirator would state, "And people been overdosing for years."

50.     Coconspirators would discuss the difficulties clinic employees encountered in attempting to physically control individuals who had traveled from out of state and were causing disruptions in the clinic waiting rooms.

51.     Coconspirators employed at the defendant clinics would observe individuals having drug induced seizures and/or overdoses in the clinic waiting rooms.

52.     Individuals whose urinalysis disclosed marijuana use would be permitted to be examined by a clinic physician. The urine samples taken at American Pain would be maintained in a tray on the floor of the clinic. Individuals whose urinalysis results showed cocaine usage, would be instructed to leave the clinic and return for treatment within one to two weeks.

53.     Coconspirators, without any training or experience in the dispensing of controlled substances, would act in the capacity of a pharmacy technician and frequently dispense such controlled substances at the coconspirators clinics.

54.     Defendant Christopher Paul George would hire a coconspirator who was a professional bikini model to dispense controlled substances.

55.     Coconspirators who would dispense controlled substances at the clinics would take controlled substances from one physician's inventory in order to cover a shortage in another

physician's inventory, without executing the documentation as required by DEA regulations and federal law.

56.     Coconspirators would  accept cash gratuities from individuals in order to expedite such individuals meeting with the physicians.  Such coconspirators would obtain thousands of dollars per week in illegal gratuities.

57.     Defendant Derik Nolan would require American Pain clinic employees to pay "kickbacks" to defendant Nolan in exchange for the opportunity to work the windows at the clinic and receive unlawful payments from individuals seeking controlled substances.

58.     Defendants Christopher Paul George, Derik Nolan and coconspirators would solicit groups of individuals known to be narcotics traffickers to be examined by the physicians in order to generate additional criminal proceeds.  One such group was known as the "Loxahachee group."

59.     Individuals from outside the State of Florida would illegally obtain controlled substances from the dispensing facilities at the clinics or from pharmacies owned and/or controlled by the coconspirators and illegally sell such controlled substances for large profits both inside and outside the State of Florida.

60.     Various coconspirator employees of the clinics owned and/or operated by the coconspirators would be examined by the clinic physicians and prescribed large amounts of controlled substances.  Such coconspirators would illegally sell and distribute the controlled substances.

61.     Defendants Christopher Paul George and Jeffrey George would direct coconspirators to vandalize the commercial facilities of competing pain clinics and other businesses.

62.     Defendant Christopher Paul George would direct coconspirators to vandalize vehicles the coconspirators believed were used by either undercover law enforcement or the media.

63.     On or about November 9, 2009 in a telephone conversation, defendant Christopher Paul George would have a conversation with defendant Derik Nolan regarding a suspected media vehicle with a concealed camera in the parking lot of American Pain. Defendant Nolan would state, "Should I put a mask on and go cover it up or something? "Should I change my clothes and put a mask on and go slash the tires?" Defendant Christopher Paul George would state, "The best thing to do is have a sling shot far away and shoot out some of the windows."

64.     Coconspirators would obstruct law enforcement surveillance of the defendant clinics by interfering with law enforcement vehicles.

65.     Defendants Christopher Paul George, Andrew Harrington and coconspirators would discuss an inspection of the defendants' pharmacies conducted by the DEA.  Such coconspirators would discuss the misrepresentations they would make to the DEA personnel in order to conceal the quantity of controlled substances dispensed and the out of state residence of the individuals receiving the controlled substances.

66.     Defendant Christopher Paul George would instruct coconspirators to make material misrepresentations to pharmaceutical wholesalers in order to conceal the true amount of controlled substances dispensed at Quick Pharm and Boca Drugs.

67.     Defendant Christopher Paul George would instruct coconspirators to make material misrepresentations to pharmaceutical wholesalers in order to conceal the true number of out of state individuals who obtained controlled substances from Quick Pharm and Boca Drugs.

68. Defendant Christopher Paul George would discuss with defendant Derik Nolan the death of individuals who had traveled from Tennessee, had received controlled substances from the defendant clinics and had been killed while attempting to cross a railroad crossing.

69. On or about November 20, 2009, in a telephone conversation, defendant Derik Nolan would state, "In the Palm Beach Post today and the Sun Sentinel, they tried to f–king weave through a railroad crossing and got hit by a f–king train yesterday...Two of them are dead. One of them is in critical condition." Defendant Christopher Paul George would state, "Did it say they were pain clinic people?" Defendant Nolan would state, "No, it doesn't say, but it will tomorrow...It will tomorrow that there was Roxies scattered throughout the car." Defendant Christopher Paul George would state, "You got to be an idiot to get hit by a train."

70. On or about November 20, 2009, in a telephone conversation, defendant Christopher Paul George would falsely inform a real estate agent that American Pain would offer rehabilitation, detox and internal medicine services in order to corruptly convince such agent to lease premises for the clinic. Defendant George would falsely state, "I mean we have a mix of doctors that do just about everything."

71. Defendant Christopher Paul George would make material misrepresentations to a leasing agent regarding the true purpose of the clinic activities in order to conceal the distribution of controlled substances and to convince the leasing agent to negotiate the acquisition of larger premises.

72. On or about November 23, 2009, in a telephone conversation, defendant Christopher Paul George would falsely inform a leasing agent, "Oh we do rehabilitation. We do detox. We do pain management. We do internal medicine. I have all different types of doctors...We do laser hair

removal...I have plastic surgeons here.  I have an anesthesiologist, I have internal medicine, a surgeon and an emergency room doctor."

73.     Defendant Christopher Paul George would instruct defendant Andrew Harrington to illegally intercept conversations between himself and DEA inspection personnel by means of a cellular telephone in order that defendant Christopher Paul George could advise defendant Andrew Harrington regarding misrepresentations to be made to the DEA.

74.     Defendant Christopher Paul George would instruct defendant Andrew Harrington and coconspirators to make material misrepresentations to DEA inspection personnel regarding the reason Boca Drugs dispensed large quantities of controlled substances.

75.     On or about November 30, 2009, in a telephone conversation, defendant Andrew Harrington would inform defendant Christopher Paul George that DEA personnel were asking questions regarding the ownership of Boca Drugs. Defendant Harrington would state, "No, then they are going to know that we are together and then it's all over after that."

76.     Defendant Christopher Paul George would instruct coconspirators not to allow individuals seeking controlled substances to fill prescriptions at Boca Drugs during a DEA inspection in order to prevent law enforcement personnel from interviewing such individuals.

77.     Defendant Andrew Harrington would inform defendant Christopher Paul George that defendant Christopher Paul George had left prescription labels in Boca Drugs in violation of federal patient privacy laws. Defendant George would advise defendant Harrington to falsely inform the DEA that such labels pertained to fake patients.

78.     On or about November 30, 2009, in a telephone conversation, defendant Andrew Harrington would state, "Dude, you just got me shut down...dude.  You know what you f-king left

68

in my place, dude...you left f–king labels of your patients in my pharmacy...they are all over the place. They are going to call State of Florida right now and get me shut down."

79.     On or about November 30, 2009, in a telephone conversation, defendant Andrew Harrington would inform defendant Christopher Paul George, "well, right when she came in she goes, you lied to me and told me that you weren't taking out of state patients. First thing she said and I was like, oh man." Defendant Christopher Paul George would state, "How...how did they know that you were taking out of state patients?"

80.     Defendant Christopher Paul George would instruct defendant Andrew Harrington and coconspirators to make material misrepresentations to DEA inspection personnel regarding the acceptance of health insurance.

81.     Coconspirators would discuss their concerns regarding whether other coconspirators would talk to police authorities in the event the clinics were raided.

82.     On or about December 3, 2009, in a telephone conversation, defendants Christopher Paul George and Derik Nolan would discuss defendant Nolan's suspicions about defendant Ethan Baumhoff. Defendant Nolan would state, "When the sh-t, goes down, g-d forbid, something happens, where we all get arrested, you know and the cops come in and just to question or something like that, that little faggot is going to squeal like a f-king pig with a knife in it's neck...he's gonnna squeal...he knows too much..."

83.     On or about December 3, 2009, in a telephone conversation, defendant Derik Nolan would advise defendant Christopher Paul George that defendant Nolan informed a competing pain clinic owner, "You guys want to f-k around, you're gonna f-king, you're gonna feel it and you are really going to need pain management."

84.     On or about December 4, 2009, in a telephone conversation, defendant Christopher Paul George would inform a coconspirator that defendant Christopher Paul George would go to a competing pain clinic and inform the owners, "I'm gonna beat everyone of your f-king asses."

85.     On or about December 1, 2009, in a telephone conversation, a coconspirator would send text messages to defendant Christopher Paul George regarding Executive Pain, "This place is jammed packed with people, cops outside...people starting fights in the lobby."

86.     On or about December 31, 2009, in a telephone conversation, defendant Derik Nolan would inform defendant Christopher Paul George that Executive Pain is too small to accommodate the amount of individuals seeking controlled substances. Defendant Nolan would state, "I'm sure for every, every one person that's waiting to see a doctor, there's like three people with their entourage here, you know what I mean."

87.     Coconspirators would discuss providing fraudulent magnetic resonance imaging (MRI) reports to competing pain clinics in order to cause such clinic owners to be arrested.

88.     Coconspirators would send text messages to each other regarding fights and assaults committed by the individuals waiting for exams within the defendants' clinics.

89.     On or about December 3, 2009, in a telephone conversation, defendant Derik Nolan and coconspirators would refer to the defendant clinics as a "dope hole."

90.     On or about January 4, 2010, coconspirator Dianna Pavnick George would send a text message to defendant Christopher Paul George wherein she would allege that he (defendant Christopher Paul George) was using her as a "money mule."

91.     On or about January 4, 2010, coconspirator Dianna Pavnick George would send a text message to defendant Christopher Paul George wherein she would allege, "I'm scared to go away

70

for a long time, but I keep going for you." Defendant Christopher Paul George would inquire "going where?" A coconspirator would respond, "prison."

92.    On or about January 3, 2010, in a telephone conversation, defendant Christopher Paul George would have a conversation with a coconspirator regarding defendant Hutson. Such coconspirator would ask defendant Christopher Paul George if defendant Hutson was "still doing a time share thing?" The conspirator would state "But that scams gonna end. I mean, people are onto that one, that makes the news almost as much as pain clinics." Defendant Christopher Paul George would respond "(UI) it's not killing any body though, that's the difference."

93.    Defendant Christopher Paul George would discuss with coconspirators the suspension of coconspirator physician Patrick Graham's medical license for a period of thirty days and the imposition of a requirement of fifty hours of community service based upon a finding by the Florida Board of Medicine of poor quality medical records keeping.

94.    Defendant Christopher Paul George would discuss with coconspirator physician Patrick Graham the satisfaction of the fifty hour community service requirement by means of a fraud.

95.    On or about January 5, 2010, in a telephone conversation, defendant Christopher Paul George and coconspirator physician Patrick Graham would discuss the medicine that coconspirator physician Graham corruptly provided to defendant George and defendant George's electronic monitoring ankle bracelet. Coconspirator physician Graham would state, "I think the idea is that I'll do this one time, but I don't like playing around with this stuff, this is not just something that you just ...not in a medical setting, that's for sure." Defendant George would respond, "I know, don't worry about me. You are the bad boy here." Coconspirator physician Graham would state, "I always worry about you. I'm the bad guy? I'm not wearing a little ankle bracelet, buddy."

71

96.     On or about January 4, 2010, in a telephone conversation, defendant Christopher Paul George would discuss with coconspirator physician Patrick Graham a judgment against coconspirator physician Graham.   Defendant George would state, "You're a bad boy." Coconspirator physician Graham would respond, "You'd be surprised how bad I was, too."

97.     Coconspirator physician Patrick Graham would inform defendant Christopher Paul George that coconspirator physician Graham requested full-time employment at American Pain because, "You make a lot more money doing this than you do doing plastic surgery."

98.     During the course of a physical examination, coconspirator physician Beau Boshers would introduce defendant Christopher Paul George to an undercover agent (UCA) as an "expert."

99.     Defendant Christopher Paul George would refer the undercover agent to Executive Pain so that such UCA could obtain a prescription for controlled substances.

100.    Physicians employed at the clinics would argue over access to "follow-up visits" because such exams could be completed more quickly than initial visits and therefore more individuals could be examined on a daily basis.

101.    Coconspirator physician Roni Dreszer would inform a coconspirator that defendant Christopher Paul George had offered to increase the per patient compensation from seventy-five dollars to one hundred dollars per patient if coconspirator physician Roni Dreszer prescribed higher quantities of controlled substances.

102.    Physicians, during the initial period of the conspiracy, would fail to inspect and initial the prescriptions issued to individuals seeking controlled substances, in violation of Florida law.

103.    Physicians, during the initial period of the conspiracy, would fail to inspect prescription bottles prior to the dispensing of such bottles, in violation of Florida laws.

104.     Physicians in East Coast Pain would routinely monitor the Palm Beach Sheriff's Office arrest web site in order to determine if they recognized the names of individuals who had recently been arrested.

105.     Defendant Jeffrey George would instruct defendant Theodore Obermeyer to illegally divert thousands of oxycodone pills to a coconspirator in order for that coconspirator to deliver such pills to a coconspirator narcotics trafficker.

106.     Defendant Theodore Obermeyer would falsify the inventories of the controlled substances maintained under the clinic physicians DEA numbers at East Coast Pain in order to conceal the illegal diversion of large quantities of controlled substances.

107.     Defendant Jeffrey George would instruct a coconspirator to deliver thousands of oxycodone pills to a storage facility where they would be transferred to a coconspirator narcotics trafficker.

108.     Defendant Christopher Paul George and defendant Jeffrey George would each contribute money to establish and operate an alleged pain management clinic, Pain Express, in Kennesaw, Georgia.

109.     Defendant Christopher Paul George would instruct defendant Ethan Baumhoff to order "marijuana pills" to be prescribed to a coconspirator by coconspirator physician Boshers.

110.     Coconspirator physician Beau Boshers would prescribe marinol, a marijuana derivative, to a coconspirator without a legitimate medical purpose.

111.     Defendant Christopher Paul George and coconspirators would hire a private investigator to electronically sweep the defendant clinic offices in order to determine if law enforcement authorities had placed a concealed listening device in the offices.

112.   Defendant Christopher Paul George and coconspirators would hire a private investigator to place a tracking device on a competitor's automobile.

113.   Defendants Christopher Paul George, Jeffrey George and coconspirators would hire a private investigator to conduct polygraph tests of individuals they believed had either stolen money or were law enforcement informants.

114.   Defendant Jeffrey George would instruct a polygrapher to administer a test to a coconspirator narcotics trafficker to determine if such narcotics trafficker was a government informant.

115.   Defendant Christopher Paul George would illegally retain approximately 90,000 pills of controlled substances abandoned by a physician previously employed in the defendant clinic, without the consent of the physician or the completion of the required documents.

116.   Individuals who presented at American Pain with obvious marks and scars from intravenous drug use, would be referred to Executive Pain by defendant Derik Nolan, to be prescribed controlled substances by the coconspirator physicians.

117.   Defendant physician Cadet and coconspirator physicians would observe the conduct of individuals in the clinic waiting rooms, including fights, assaults, seizures and intoxication.

118.   Coconspirators would at times forge a physician's signatures on prescriptions in order to dispense controlled substances from the clinic.

119.   Defendant Christopher Paul George would instruct coconspirators on the proper methods to create false and fraudulent prescriptions.

74

120.    Coconspirators would solicit and compensate individuals for their office visits and purchase of controlled substances in order that such individuals would illegally transfer the controlled substances to the coconspirators.

121.    Defendant Christopher Paul George would direct coconspirators to maintain cash generated through the illegal distribution and dispensing of controlled substances in trash bags in the clinics. Such trash bags filled with cash would then be deposited at various financial institutions.

122.    Defendant Jeffrey George and coconspirators would make materially false statements to financial institutions regarding the source of the proceeds sought to be deposited.

123.    A coconspirator would discuss with other coconspirators the plastic surgery procedures she would acquire through the use of criminal proceeds generated through the activity of the enterprise, including breast and buttocks enhancement.

124.    Defendant Christopher Paul George would use criminal proceeds to purchase breast implants for an employee who would dispense controlled substances in the clinic.

125.    On or about November 13, 2009, in a telephone conversation, defendant Christopher Paul George would discuss a clinic employee's breast implants with the mother of the clinic employee. The mother would complain about the amount of pain pills consumed by her daughter. The mother would state, "She's like a zombie..." Defendant Christopher Paul George would state, "Hey, you know what? She's like one of the patients now." The mother would state, "And why she take all those pills? She wants to be a drug addict? What happens if she likes that garbage?" Defendant Christopher Paul George would state, "I won't let her, don't worry."

126.    Defendants Jeffrey George, Theodore Obermeyer, Derik Nolan and coconspirators would illegally divert and unlawfully distribute large quantities of controlled substances from the inventories maintained in the clinics.

127.    Defendant Ethan Baumhoff, as manager of American Pain, would maintain an inventory of Florida Department of Health complaints filed against defendant physician Cadet and coconspirator physicians.  Such complaints would include excessive and inappropriate prescribing of controlled substances, pre-signing blank prescription forms, and complaints made by pharmacists in Tennessee alleging that individuals from Tennessee were being prescribed medications by defendant physician Cadet and coconspirator physicians. Defendant Christopher Paul George would retain an attorney to represent defendant physician Cadet and coconspirator physicians in administrative proceedings in order to continue the illegal operation of the enterprise.

128.    Defendant Christopher Paul George, defendant Andrew Harrington and coconspirators would discuss employing a licensed pharmacist at Quick Pharm and/or Boca Drugs who would not object to dispensing controlled substances to out of state patients.

129.    Defendant Christopher Paul George, defendant Andrew Harrington and coconspirators would seek to employ a licensed pharmacist who would not be suspicious of the large quantities of controlled substances dispensed from the coconspirators pharmacies.

130.    Coconspirators would discuss changing the names of the owners and managers of the clinics and pharmacies in order to conceal the true ownership and to frustrate law enforcement scrutiny.

131.    Defendant Christopher Paul George and coconspirators would discuss the laundering of proceeds derived from criminal activity through the formation of corporate entities in nominee names.

132.    Defendant Christopher Paul George would inform coconspirators that the "average" physician in his employ would make $35,000 per week.

133.    Defendant Christopher Paul George would discuss with representatives of wholesale pharmaceutical companies the leniency in the Florida State law which enabled individuals to obtain multiple prescriptions for controlled substances.

134.    Defendant Christopher Paul George would discuss with a coconspirator the concealment of cash proceeds maintained in the kitchen of defendant Christopher Paul George's residence.

135.    Defendant Andrew Harrington would inform defendant Christopher Paul George that Boca Drugs dispensed 10,600 thirty milligram oxycodone pills in one day.

136.    On or about January 26, 2010, defendants Christopher Paul George and Jeffrey George would send and receive text messages regarding a physician employed at the defendant clinics. Defendant Jeffrey George sent a text "The doctor is the best one out of all clinics. Every patient loves her." Defendant Christopher Paul George would respond, "writer big." Defendant Jeffrey George would send a text, "Min. 180 if new patient with no records."

137.    On or about March 3, 2010, in a telephone conversation, defendant Christopher Paul George and a coconspirator would discuss a plan whereby a coconspirator would pose as a narcotics trafficker and attempt to entrap the owners of a competing pain clinic. Defendant Christopher Paul George would instruct a coconspirator to state that she receives 240 oxycodone pills per prescription

and can "bring a lot of people down here." Defendant Christopher Paul George would instruct a coconspirator to state "you know, I pay for all their stuff and, you know, I split it with them. So, I need to get a good deal."

138.    Defendant Jeffrey George would, on at least three occasions, illegally divert and sell thousands of oxycodone pills.

139.    Defendant Theodore Obermeyer would advise defendant Jeffrey George that coconspirator physician Chico-Blume's boyfriend was in jail and her daughter was a drug addict.

140.    Defendant Jeffrey George, during an employment interview, would show coconspirator physician Chico-Blume files and quantities of controlled substances previously given to individuals and would inquire if coconspirator physician Chico-Blume was willing to prescribe between 180-240 oxycodone.  Coconspirator physician Chico-Blume would state that she was willing to prescribe such amounts.

141.    Defendant Jeffrey George would instruct defendant Theodore Obermeyer to direct and order coconspirator physicians employed at East Coast Pain to prescribe large quantities of controlled substances to individuals seeking such drugs.

142.    Defendant Jeffrey George and coconspirators would solicit employee telephone sales consultants of South Beach Rejuvenation to be examined at various pain management clinics owned and/or controlled by the coconspirators, including East Coast Pain.

143.    Coconspirator physicians employed at East Coast Pain would be informed that employees of Jeffrey George would be seeking prescriptions for large quantities of controlled substances.

144.    Coconspirator physicians employed at East Coast Pain would prescribe large quantities of controlled substances for employees of South Beach Rejuvenation, without a legitimate medical purpose.

145.    Coconspirator physicians employed at East Coast Pain would fail to inspect inventories of controlled substances maintained under their DEA numbers.

146.    Defendant Theodore Obermeyer would, on several occasions, instruct coconspirator physician Chico-Blume to prescribe the same quantity of controlled substances which the individuals seeking controlled substances were currently receiving.

147.    Defendant Steven Goodman would inform defendants Christopher Paul George and Ethan Baumhoff that American Pain had failed the inspection conducted by a physician hired by Medical Arts.

148.    Defendant Ethan Baumhoff after speaking to pharmaceutical wholesalers, would advise defendant physician Cadet and coconspirator physicians to prescribe non-controlled substances in order to avoid scrutiny by law enforcement sources.  Defendant Baumhoff would purchase quantities of medications other than controlled substances, such as blood pressure and anti-smoking medication in order to make American Pain appear to be a legitimate medical clinic.

149.    Defendant Steven Goodman would make false and fraudulent statements to DEA personnel regarding the quantity of oxycodone dosages sold to his clients, including American Pain and Executive Pain, his knowledge regarding his clients and his knowledge regarding the abuse of oxycodone by drug traffickers and addicts.

150.    Defendant Steven Goodman would inform defendant Baumhoff that defendant Goodman had been instructed to attend a meeting at DEA headquarters regarding the supply of large

quantities of oxycodone by Medical Arts to physicians employed at American Pain and Executive Pain.

151.    On or about April 8, 2010, defendant Steven Goodman would make false and fraudulent statements to DEA personnel regarding the quantity of oxycodone dosages sold to his clients, including American and Executive Pain.

152.    Defendant Baumhoff would advise coconspirator physician Aruta regarding the need to prescribe medications other than controlled substances. Coconspirator physician Aruta would reply "These hillbillies don't give a sh-t about their health, that's all they're here for."

153.    Defendant Christopher Paul George would instruct defendant Ethan Baumhoff to materially misrepresent to the pharmaceutical supplier the true and accurate quantity of controlled substances dispensed from American Pain.

154.    On or about January 8, 2010, in a telephone conversation, defendant Ethan Baumhoff would advise defendant Christopher Paul George , "But when we lie on here and say we only see 50-60 patients per doctor and 250 total for the f-king clinic and then they look at the dispensing records and we dispense f-king 500 prescriptions that day, they're gonna go how does that math, that math doesn't add up."

155.    Coconspirators would discuss the possibility that a pharmaceutical wholesaler would reduce the amount of controlled substances provided to the coconspirators if the true number of out of state individuals who received controlled substances was disclosed to the wholesaler.

156.    Coconspirators, including coconspirator physicians, would discuss making material misrepresentations to a pharmaceutical supplier regarding the percentage of medications prescribed

which were controlled substances and the percentage of individuals being provided controlled substances who resided outside the state of Florida.

157.    On or about January 18, 2010, in a telephone conversation, defendant Ethan Baumhoff would discuss with defendant Christopher Paul George the false statements made by defendant physician Cadet and coconspirator physicians on a form transmitted to a pharmaceutical supplier.  Defendant George would inquire, "Was it hard for the doctors to sign those, or did they just sign them right away?"  Defendant Baumhoff would reply, "Oh they signed them right away."  Defendant Christopher Paul George would ask, "Signed them right away.  Well what did you tell them they were?  Defendant Baumhoff would state, "I told them it was only a questionnaire for a wholesaler."  Defendant Christopher Paul George would ask, "Wholesaler, did they even read over it?"  Defendant Baumhoff would state, "No.  Aruta looked at it and he goes 'this, is this number really accurate?' and I said mmm, probably not, but I can't lie.  Too bad, because I gotta send the dispensing records and he goes 'so then this number should be' and then he goes 'never mind.'"

158.    Coconspirator physician Robert Meek would notarize the signatures of other coconspirator physicians regarding statements made under penalties of perjury on a form provided by a pharmaceutical wholesaler wherein the coconspirator physicians falsely agreed that no controlled substances would be prescribed to out of state patients.

159.    On or about January 17, 2010, in a telephone conversation, defendant Christopher Paul George would discuss with a coconspirator the completion of forms required by a pharmaceutical wholesaler.  Defendant George would instruct a coconspirator to delete and erase the name and address of individuals who were dispensed controlled substances in order to conceal the out of state residence of such individuals.  Defendant George would state, "Remember, we're lying

81

about how many are out of state.  Well, if you give them our real dispensing log it's gonna show that everybody's from out of state."

160.    On or about January 20, 2010, in a telephone conversation, defendant Christopher Paul George and a coconspirator would discuss the false statements made by defendant physician Cadet and coconspirator physicians on a form required by a pharmaceutical wholesaler.  The coconspirator would state, "...Dianna (George) got the rest of the doctors to sign all those forms..."

161.    Defendant Christopher Paul George, and coconspirators would discuss altering dispensing logs provided to pharmaceutical suppliers in order to conceal the true number of out of state individuals receiving controlled substances.

162.    Defendant Ethan Baumhoff would inform defendant Christopher Paul George that a pharmaceutical supplier would discontinue supplying oxycodone to American Pain if the supplier were aware of the true quantities of oxycodone prescribed by the physicians through the disclosure of the dispensing logs.

163.    Defendant Christopher Paul George would instruct a coconspirator not to release medical records of individuals seeking to transfer to another clinic.  Defendant Christopher Paul George stated, "Because we don't make it easy for people to leave"...Yeah, if they want to go somewhere else, we're gonna screw them over, every time...Once they're gone, make their lives miserable...Make it hard for them to go somewhere else."

164.    On or about January 21, 2010, in a telephone conversation, defendant Christopher Paul George would discuss an individual's overdose death with a coconspirator.  Defendant George would state, "Now, now I got this lawful death lawsuit for a patient that Jacob (Dreszer) killed...And

82

this f–king idiot came in one time and f–king died. First visit...He wouldn't, he couldn't handle pain management."

165.    On or about January 22, 2010, in a telephone conversation, defendant Christopher Paul George and defendant Ethan Baumhoff would discuss that American Pain employees who were drunk during the work day. Defendant Baumhoff would state, "...I got f–king, a bunch of alcoholics here already starting to f–king drink this morning." Defendant Baumhoff would inform defendant George, "And you know what, if you weren't here, I'd fire this whole f–king staff, Chris. They're all your friends and Derik's friends."

166.    Defendant Christopher Paul George and defendant Daryl Stewart would discuss incorporating Quick Pharm under a nominee name to conceal the true ownership.

167.    On or about January 18, 2010, in a telephone conversation, defendant Christopher Paul George would discuss with a coconspirator an arbitration concerning American Pain. Defendant Christopher Paul George would state, "...American Pain has no assets, we don't have like an office that we own, we don't have any real equipment, we don't have any money in the bank...what are you gonna take?  My patients are money..."

168.    Defendant Christopher Paul George would discuss with a coconspirator the amount of money made by the clinic physicians. Defendant Christopher Paul George would state, "The more, the more, the more they make, I make that plus the medication. Yeah, I want them to make a lot of money, the more they make, the more I make."

169.    Defendant Christopher Paul George would inform a coconspirator that 99.9% of the business of Boca Drugs involved the filling of prescriptions for controlled substances.

170.    A coconspirator would inform defendant Christopher Paul George that the coconspirator deposited $147,000 in the bank in one week.

171.    Defendants Christopher Paul George and Jeffrey George would send and receive text messages regarding the law as to dispensing of controlled substances and the opening of pain clinics in Texas and St. Louis, Missouri.

172.    A coconspirator would advise defendant Christopher Paul George that the "money" comes from out of state patients.

173.    On or about January 11, 2010, in a telephone conversation, defendant Christopher Paul George would inform a coconspirator that defendants Christopher Paul George and Jeffrey George were "basically partners in everything."

174.    Defendant Jeffrey George and defendant Christopher Paul George would discuss an individual from Tennessee who would solicit individuals seeking controlled substances on behalf of defendants Jeffrey George and Christopher Paul George.

175.    Defendants Christopher Paul George and Jeffrey George would send and receive text messages regarding referring patients and physicians among and between the clinics.

176.    Defendants Christopher Paul George and Jeffrey George would send and receive text messages regarding the sharing of medical forms for the pain clinics.

177.    Defendant Christopher Paul George would discuss with a coconspirator the hiring of a new pharmacist for Boca Drugs, who would be willing to fill prescriptions for controlled substances.

178.   On or about January 10, 2010, in a telephone conversation, a coconspirator would advise defendant Christopher Paul George that the employees at Executive Pain, "they're not professional."

179.   On or about January 10, 2010, in a telephone conversation, a coconspirator would inform defendant Christopher Paul George that an employee of Executive Pain was "on oxycodone."

180.   On or about January 10, 2010, in a telephone conversation, a coconspirator would inform defendant Christopher Paul George that an employee of Executive Pain was mistakenly filling prescriptions with the wrong dosage of controlled substances, "once a week."

181.   On or about January 10, 2010, in a telephone conversation, a coconspirator would inform defendant Christopher Paul George that an employee of Executive Pain, "he threw, he threw ten bottles of oxycodone away by mistake."

182.   On or about January 10, 2010, in a telephone conversation, a coconspirator would inform defendant Christopher Paul George that coconspirator physician Michael Aruta found ten bottles of oxycodone "that were left in the box to be thrown out."

183.   On January 8, 2010, in a telephone conversation, Defendant Christopher Paul George would inform coconspirator physician Augusto Lizarazo, who was applying for a position at defendant George's clinics, that it was not necessary for coconspirator physician Lizarazo to have any training or experience in pain management and that defendant Christopher Paul George's physicians receive $75.00 per patient and see from 40-100 patients per day. Defendant Christopher Paul George would inform coconspirator physician Lizarazo that a new patient exam takes 10-15 minutes and a follow-up exam takes no more than 10 minutes. Defendant Christopher Paul George would inform coconspirator physician Lizarazo that one office sees 400-500 people per day and the

other office sees 150 per day. Defendant Christopher Paul George would state, "Are you familiar with pain management?" Coconspirator physician Lizarazo would respond "...I don't have any, I don't have any experience in pain management at all, no..." Defendant Christopher Paul George would state, "Okay, well that's Okay...it's okay if you don't." Coconspirator physician Lizarazo would state, "Okay, I can, I can come and talk to you on and you can let me know what I am supposed to do and everything because believe me, I have been in private practice for so many years but really I'm not familiar with pain management at all. I never did that kind of job, you know."

184.    On or about January 8, 2010, in a telephone conversation, defendant Christopher Paul George, would inform coconspirator physician Lizarazo that defendant Christopher Paul George owns the "biggest office in the country" and that the average doctor earns between $2,000 - $6,000 per day. Coconspirator physician Lizarazo would respond "Oh,okay...well, I'm really interested in making a lot of money..."Defendant Christopher Paul George would inform coconspirator physician Lizarazo that, "it's a real simple job" and with one half-day training, "you will probably know as much as you need to know to do it."

185.    On or about January 8, 2010, in a telephone conversation, defendant Christopher Paul George would discuss with a coconspirator that coconspirator physician Lizarazo should have an inventory of controlled substances so he could dispense oxycodone from the clinic. The coconspirator would state, "Yeah, because if you don't, people aren't gonna want to see him." Defendant Christopher Paul George would state, "we get more medication, make more money."

186.    On or about January 15, 2010, in a telephone conversation, defendant Christopher Paul George would discuss with a coconspirator the hiring of coconspirator physician Lizarazo. The coconspirator would state that coconspirator physician Lizarazo was hard to understand. Defendant

Christopher Paul George would respond, "but you know what? People don't care as long as he's writing the scripts." The coconspirator would state, "you know? That's all that matters."

187.   Defendant Christopher Paul George would discuss coconspirator physician Lizarazo with a coconspirator. Defendant Christopher Paul George would inquire whether coconspirator physician Lizarazo was reducing the quantity of controlled substances being prescribed to individuals seeking controlled substances.

188.   On January 18, 2010 in a telephone conversation, defendant Christopher Paul George would inquire of a coconspirator the quantity of pills prescribed by coconspirator physician Lizarazo. Defendant Christopher Paul George would state "what he write for medication?" The coconspirator would respond, "Oh, 180 30's, um 2-2 milligrams xanax, I think that one he only wrote two scripts."

189.   On January 18, 2010 in a telephone conversation, a coconspirator would inform defendant Christopher Paul George that coconspirator physician Lizarazo "enjoyed" the job. The coconspirator would state, "He said, you know, its not hard work. And, um, when you're looking at, you know your make $2,850 dollars today...so that's not a hard days' work." The coconspirator would further state "...I was thinking, you know, Atreidis sees so many people and his making like... works four days a week that's like almost like $700,000 a year." Defendant Christopher Paul George would respond "Well, my doctors average about 1.5 to 1.8 million a year."

190.   A coconspirator would complain to defendant Christopher Paul George that the coconspirator could not fit any more cash into the money drawer maintained at Executive Pain.

191.   On or about January 7, 2010, in a telephone conversation, defendant Derik Nolan would inform defendant Christopher Paul George that defendant Nolan is defendant Jeffrey George's friend. Defendant Nolan would state, "...whenever he needs some dirt done or something like that,

I'm like the f-king underboss here. You know what I'm saying? I am the f-king, I'm the one who knows all his dirty little secrets, and the f-king one that gets called when sh-t needs to get done."

192.    On or about January 7, 2010, in a telephone conversation, defendant Christopher Paul George and a coconspirator would discuss the establishment of a pain clinic in Georgia. Defendant Christopher Paul George would state that he would be a partner with defendant Jeffrey George in the Georgia clinic. Defendant Christopher Paul George, in discussing the operation of the clinic would state, "Yeah, but you know it's still, it goes for a while until the doctor actually gets caught, maybe and then the doctor gets caught, just hire another doctor."

193.    Defendant Derik Nolan would inform defendant Christopher Paul George that defendant Nolan has personally, "brought in" over 500 people to American Pain and Executive Pain.

194.    Defendant Christopher Paul George and a coconspirator would speculate regarding whether there was a wire tap on defendant Christopher Paul George's telephone.

195.    A coconspirator would inform defendant Christopher Paul George that an individual who had obtained controlled substances from Executive Pain had been involved in a serious automobile accident.

196.    On or about November 20, 2009, in a telephone conversation, a coconspirator would inform defendant Christopher Paul George, "Some guy who was our patient f-king OD'd on the side of the road." Defendant Christopher Paul George would respond, "Oh yeah."

197.    On or about December 4, 2009, in a telephone conversation, defendant Christopher Paul George would inform a financial advisor that defendant Christopher Paul George had $5 million in cash, "just sitting there."

198.   On or about November 24, 2009, in a telephone conversation, defendant Christopher Paul George would inform a coconspirator that defendant Christopher Paul George had secured a lease on a new building for a pain clinic which was located near, "Mexicans and little houses" and therefore the neighbors would not complain.

199.   Defendant Christopher Paul George would instruct a coconspirator to not give any financial information to DEA representatives during an inspection of Boca Drugs.

200.   Coconspirator physician Boshers would advise a clinic employee to schedule an examination so that coconspirator physician Boshers could prescribe large amounts of controlled substances to such clinic employee and collect an examination fee.

201.   Defendant Christopher Paul George would discuss with a coconspirator a Broward County Grand Jury report which recommended that convicted felons be prohibited from owning pain clinics.

202.   Defendant Christopher Paul George would inform a real estate agent that his company brings in about $2 million per month.

203.   Defendant Christopher Paul George would inform a pharmaceutical wholesaler representative that defendant Christopher Paul George's company is based on out of state patients.

204.   Defendant Christopher Paul George would inform a pharmaceutical wholesaler representative that a consultant hired by defendant Christopher Paul George had advised the clinic physicians that it was illegal to prescribe controlled substances to out of state residents.

205.   Defendant Christopher Paul George would discuss with coconspirators and defendant Andrew Harrington the newspaper coverage of an individual who had died after receiving oxycodone

89

at defendant Jeffrey George's clinic.  Defendant Christopher Paul George would refer to the deceased individual as a "loser."

206.   On or about November 15, 2009, in a telephone conversation, a coconspirator informed defendant Christopher Paul George, "Until they change the laws there's nothing they can do about it," referring to the operation of pain management clinics.

207.   Defendant Christopher Paul George would advise a coconspirator to have a clinic employee sign MRI prescriptions, rather than a physician, in order to expedite the examination of individuals seeking controlled substances.  On or about November 17, 2009, in a telephone conversation, defendant Christopher Paul George would inquire of a coconspirator, "What do you do with the MRI scripts."  Defendant Christopher Paul George would state, "The f–king guy at the front signing it...we don't have the doctor signing it."  The coconspirator would state, "It says physician's signature.  It doesn't say personal friend's signature.  If doesn't say some guy's signature."  Defendant Christopher Paul George would state, "Well, no one's gonna ask for that. We're not...in my place (UI) question our stuff.  You know?  That's retarded."

208.   Defendant Christopher Paul George would instruct coconspirators to lie to pharmaceutical wholesale representatives regarding the amount of Schedule II controlled substances sold from Boca Drugs.

209.   Defendant Christopher Paul George would inform coconspirators that the physicians at American Pain would examine approximately 2,200 individuals per week.

210.   Defendant Christopher Paul George would telephonically communicate with several coconspirator physicians during the execution of federal searches and seizure warrants by law enforcement personnel.

211.    On or about March 3, 2010, in a telephone conversation, defendant Christopher Paul George would inform coconspirator Dianna Pavnick George regarding a search warrant executed at his residence. Defendant Christopher Paul George would state "Oh man, babe I don't know what to do...Babe...I don't know...maybe I should just kill myself."

212.    Defendant Christopher Paul George would inform defendant Jeffrey George that the FBI was at defendant Christopher Paul George's residence.

213.    On or about March 3, 2010, in a telephone conversation, coconspirator Dianna Pavnick George would inform defendant Christopher Paul George that defendant Christopher Paul George needed to come up with a plan to deal with the search warrants. The coconspirator would state, "you cannot leave me here on my f–king cell to deal with your dirt."

214.    On or about March 3, 2010, in a telephone conversation, defendant Christopher Paul George would inform coconspirator Dianna Pavnick George, "I'm f–ked, dude. They're gonna put me in jail for a long time, babe, a long f–king time." Coconspirator Dianna Pavnick George would state, "I'll take the fall for everything, OK?" Defendant Christopher Paul George would advise coconspirator Dianna Pavnick George that if the law enforcement officials arrested her he would "get you out."

215.    On or about March 3, 2010, in a telephone conversation, defendant Jeffrey George would inform defendant Christopher Paul George, 'The cops come after me, I'm f--ked."

216.    Defendant Christopher Paul George would instruct a coconspirator to lie to federal authorities regarding a luxury automobile and condominium defendant George had purchased for the coconspirator.

217.    Coconspirator physician Beau Boshers would make materially false statements to government officials regarding his execution of a power of attorney form in order to conceal the fact that he had authorized defendant Ethan Baumhoff to order controlled substances on his behalf by use of his DEA number.

218.    Coconspirator physician Beau Boshers would make materially false statements to law enforcement agents regarding the percentage of out of state individuals seeking controlled substances.

219.    Coconspirator physician Beau Boshers would make materially false statements to law enforcement agents regarding the names of medical specialists to whom coconspirator physician Beau Boshers had allegedly referred individuals for specialized medical tests.

220.    Coconspirator physician Beau Boshers would make materially false statements to law enforcement agents regarding his ability to observe the individuals in the clinic waiting room and other areas.

221.    Coconspirator physician Michael Aruta would make materially false statements to law enforcement agents regarding the percentage of out of state individuals seeking controlled substances at the clinic.

222.    Coconspirator physician Michael Aruta would make materially false statements to law enforcement agents regarding the co-mingling of controlled substances between inventories of the defendant physicians.

223.    Coconspirator physician Michael Aruta would make materially false statements to law enforcement agents regarding the quantity of controlled substances authorized in each prescription.

224.     Coconspirator physician Michael Aruta would make materially false statements to law enforcement agents regarding his execution of a power of attorney form in order to conceal the fact that he had authorized defendants Christopher Paul George and Ethan Baumhoff to order controlled substances on his behalf by use of his DEA number.

225.     On or about March 3, 2010, in a telephone conversation, defendant Derik Nolan would inform defendant Christopher Paul George that the federal law enforcement authorities, "...got all the doctors and suspended all their license." Defendant Nolan would state, "they took Roni (Dreszer) in and gave him a piece of paper saying his DEA license was suspended. His got a hearing in a month. They went to Cynthia's (Cadet) house, gave her a piece of paper said her license was suspended for a month. Ah, Jacob (Dreszer) also." Defendant Christopher Paul George would state, "Dude, it's over dude. Hear me?"

226.     On or about March 3, 2010, in a telephone conversation, defendant Christopher Paul George would inform defendant physician Cynthia Cadet that the FBI and DEA were at defendant Christopher Paul George's residence and that he was "not even going there."

227.     On or about March 3, 2010, in a telephone conversation, defendant Derik Nolan would inform defendant Christopher Paul George that defendant Nolan would go to the clinic during the execution of the search warrants. Defendant Christopher Paul George would state "they're gonna question you like a mother-f--ker, dude. About who deals with the money. Who owns the place. F--king all kind of shit, dude."

228.     On or about March 3, 2010, in a telephone conversation, defendant Christopher Paul George would advise defendant physician Cynthia Cadet that defendant George would "..try to call you back unless I'm f--king in jail." Defendant physician Cadet would respond, "Okay." Defendant

Christopher Paul George would state, "...see if you guys aren't in jail." Defendant physician Cadet responded, "Oh G-d, I know."

229. On or about March 3, 2010, in a telephone conversation, defendant Christopher Paul George would inform a coconspirator that during the execution of the search warrants defendant George was "hiding right now."

230. Defendant Derik Nolan would inform defendant Christopher Paul George that the federal authorities had interviewed staff employees regarding defendant George. Defendant Nolan would state that the employees falsely informed the law enforcement agents that they did not know defendant Christopher Paul George.

231. Coconspirator Denice Haggerty would agree to maintain approximately 4.3 million dollars in cash generated from criminal activities in safes concealed in the attic of her residence.

232. Coconspirator Denice Haggerty would falsely inform federal law enforcement officials that she was the owner of American Pain and the manager of Executive Pain. Coconspirator Denice Haggerty would falsely state that she had no knowledge as to the contents of the safes concealed in her attic.

233. Defendant Christopher Paul George would instruct a coconspirator not to talk to federal authorities during the execution of search warrants.

234. Defendant Christopher Paul George would inform coconspirator physician Beau Boshers to treat any individuals seeking controlled substances as if they were a "cop."

235. Defendant Christopher Paul George and Jeffrey George would discuss their suspicions regarding the identity of an informant in relation to the execution of search warrants.

236.    A coconspirator would ask defendant Christopher Paul George if it was safe to talk on a telephone.

237.    On or about March 3, 2010, in a telephone conversation, defendant Christopher Paul George would inform a representative of a pharmaceutical wholesaler that defendant George had "something to do with American Pain." Defendant Christopher Paul George would state, "And you know, you know about Executive Pain." Defendant Christopher Paul George would also state that he owned Boca Drugs and Quick Pharm. Defendant Christopher Paul George further advised the pharmaceutical representative that the federal authorities, "they're taking down every pain clinic and they're gonna go after the wholesalers afterwards." The pharmaceutical representative would reply, "Uh, so what you're giving us is a heads up, you're saying," defendant Christopher Paul George would state, "...there was no control in the whole industry and the medication is gone..."

238.    On or about March 3, 2010, in a telephone conversation, defendant Christopher Paul George would inform a pharmaceutical representative that defendant Christopher Paul George, "makes over ten million dollars a year, you know..." Defendant Christopher Paul George would state, "and you know American Pain saw five hundred patients a day, you know it brought in forty million dollars a year." Defendant Christopher Paul George would state, 'Executive did probably, about fifty grand a day so, I don't know what that works out to be, uh, almost ten million."

239.    On or about March 3, 2010, in a telephone conversation, defendant Ethan Baumhoff would inform defendant Christopher Paul George that "Dude, I told you this f–king day was going to come, remember when I asked you to put f–king some money away, in a trust account with an attorney for a defense fund?"

95

240.    On or about March 3, 2010, in a telephone conversation, defendant Christopher Paul George would advise coconspirator physician Boshers to "...you gotta get the money out of your account." Coconspirator physician Boshers would inquire, "Okay, what are they gonna indict you guys for?" Defendant Christopher Paul George would respond, "But most likely it'll be either conspiracy or racketeering, or something like that... you know, you know." Coconspirator physician Boshers would state, "Yeah, okay, it's just, just not, I don't ever wanna go through it but it looks like I'm in the middle of 'this crap,' I don't know."

241.    On or about March 6, 2010, in a telephone conversation, coconspirator physician Boshers would advise defendant Christopher Paul George that coconspirator physician Boshers "probably shouldn't talk on the phone."

242.    On or about March 8, 2010, in a telephone conversation, defendant Derik Nolan would inform defendant Christopher Paul George that "you can believe it if you want but you go down, I go down." Defendant Nolan further would state that he is "not cooperating with anybody."

243.    On or about March 12, 2010, in a telephone conversation, defendant Derik Nolan would inform defendant Christopher Paul George that defendant Nolan, "...I ain't f–king signing nothing, I ain't cooperating, I ain't talking. The only time is when, the only time they're gonna see me when they put me in handcuffs."

244.    On or about March 17, 2010, in a telephone conversation, defendant Derik Nolan would inform defendant Christopher Paul George that defendant Nolan was employed at another pain clinic after American Pain was shut down. Defendant Nolan would state that the individuals seeking controlled substance were all from American Pain and Executive Pain. Defendant George

96

inquired, "How are the doctors there?" Defendant Nolan would state, "Horrible...they won't write over 180."

245.    On or about March 22, 2010, in a telephone conversation, defendant Christopher Paul George would place telephone calls to physicians offices in Kentucky and falsely state that he was a patient seeking treatment. Defendant Christopher Paul George would falsely inform the Kentucky physicians that he had been prescribed 240 oxycodone and desired to obtain a prescription in Kentucky. Defendant Christopher Paul George would falsely inform a physician's receptionist, "I went to a clinic down in Florida and it closed down. If I bring my records up there, can I be treated there...pretty much the same medication I'm getting down here?" The receptionist would reply, "I doubt it...there's no guarantee, he likes to wean people off their medications."

246.    Defendant Derik Nolan would inform defendant Christopher Paul George that pain clinic owner "Jane" would pay defendant George fifty thousand dollars for the telephone number to Executive Pain.

247.    On or about March 25, 2010, in a telephone conversation, defendant physician Cynthia Cadet would send and receive text messages from defendant Christopher Paul George. Defendant physician Cadet would send a text, "Hang in there Chris. Let's hope this will all be resolved in time." Defendant George responded, "Well, it will take time for sure probably while I'm in jail and hopefully no one else with me."

248.    Defendant Christopher Paul George would place a telephone call to the Palm Beach County Medical Examiner's office and inquire about overdose deaths from prescription drugs.

249.    Defendant Christopher Paul George, subsequent to the execution of search and seizure warrants by the federal government, would instruct a coconspirator to withdraw all the funds maintained in a financial institution on behalf of Boca Drugs.

250.    Defendant Christopher Paul George would discuss with coconspirators the establishment of bank accounts in Belize, South America, in order to launder the proceeds obtained through the unlawful distribution of controlled substances.

251.    Defendant Christopher Paul George would discuss with a coconspirator the establishment of a Swiss bank account through a financial institution in Belize, South America.

252.    Defendant Jeffrey George and coconspirators would agree to launder criminal proceeds through the purchase of real estate.  Defendant Jeffrey George and coconspirators would agree to purchase a shopping plaza which contained an adult entertainment establishment.

253.    On or about January 19, 2010, defendant Jeffrey George would send a text message to defendant Christopher Paul George which would state, "Just closed on the strip club deal. So, happy, almost two years.  Well we're now proud owners of 3.5 acres and building."

254.    Defendant Christopher Paul George, on occasion, would conceal large amounts of cash, in the rear compartment of his vehicle and in his residence.

255.    Defendant Christopher Paul George, Jeffrey George and coconspirators would purchase luxury vehicles, marine vessels, jewelry, firearms and residences with criminal proceeds derived from the illegal distribution and dispensing of controlled substances.

B.    Illegal Anabolic Steroid Distribution

1.    Defendant Jeffrey George would finance establish, manage and operate an illegal internet anabolic steroid distribution business.

2.    Coconspirators would advertise on the internet and men's fitness and body building magazines to solicit customers throughout the United States to illegally purchase anabolic steroids.

3.    Coconspirator "telephone sales consultants," who had no medical background or training, would telephonically communicate with customers and instruct such customers to complete a medical questionnaire printed from the internet, obtain a physical examination from a physician or walk-in clinic near the customer's residence and to have a blood test. Such activities would be undertaken to insulate the coconspirators and defendant physicians and to make it appear that such dispensing of anabolic steroids was for a legitimate medical purpose.

4.    Coconspirator sales consultants would advise the customers regarding the types and quantities of anabolic steroids they should purchase. Such sales consultants would draft the prescriptions to be submitted for the physicians' signatures. The sales consultants would attempt to illegally sell the largest quantities of anabolic steroids in order to obtain the largest commissions.

5.    The coconspirator sales consultants themselves would illegally acquire steroids from the clinic physicians.

6.    Coconspirator physicians including physician Daniel Hauser would sign and authorize the prescriptions for large quantities of anabolic steroids prepared by the telephone sales consultants without conducting any "in-person medical evaluation" of the customers in violation of federal criminal law.

7.     Coconspirator physician Hauser would authorize and sign prescriptions for anabolic steroids without establishing any form of legitimate physician/patient relationship.

8.     Coconspirator physician Hauser would sign such prescriptions without the showing of a legitimate medical purpose and outside the course of professional medical practice.

9.     Coconspirator physician Hauser would agree to be paid approximately five thousand dollars per week by defendant Jeffrey George for illegally prescribing anabolic steroids.

10.    Coconspirator physician Hauser, on frequent occasions, would issue such prescriptions from his residence.

11.    Coconspirator physician Hauser would, on occasion, advise coconspirators that there was no legitimate medical purpose in providing anabolic steroids to healthy young males.

12.    Coconspirator sales consultants would, on occasion, illegally forge  coconspirator physician Hauser's signature on prescriptions in order to expedite the sale of anabolic steroids.

13.    Coconspirator physician Hauser and coconspirator sales consultants understood that the customers illegally sought anabolic steroids for unauthorized uses including body building and/or athletic performance enhancement purposes and not for legitimate medical purposes.

14.    Defendant Christopher Hutson with the assistance of defendant Christopher Paul George would finance, establish, manage and operate an illegal internet anabolic steroid distributions business, LA Health and Rejuvenation, without conducting an in person examination as required by federal law.

15.    Defendant Christopher Paul George would refer defendant physician Cynthia Cadet to defendant Christopher Hutson for employment in defendant Hutson's illegal steroid distribution business.

100

16.     Defendant Christopher Hutson would employ defendant physician Cynthia Cadet to illegally prescribe large quantities of anabolic steroids to customers of LA Health and Rejuvenation without conducting an in-person examination as required by federal law.

17.     Defendant Christopher Hutson would refer coconspirator physician Robert Meek to defendant Christopher Paul George for employment at defendant Christopher Paul George's pain clinics.

18.     Defendant Christopher Hutson would employ coconspirator physician Robert Meek to illegally prescribe large quantities of anabolic steroids to customers of LA health and Rejuvenation.

19.     Defendant physician Cynthia Cadet and coconspirator physician Robert Meek would authorize and issue prescriptions for large quantities of anabolic steroids without establishing a legitimate physician/patient relationship and without first conducting an "in-person medical evaluation" of the customers, in violation of Federal criminal law and without a legitimate medical purpose and outside the course of professional practice.

20.     Defendant Christopher Hutson would agree to pay defendant physician Cynthia Cadet and coconspirator physician Robert Meek one thousand dollars per week to issue prescriptions for anabolic steroids.

21.     Defendants Christopher Paul George, Christopher Hutson and coconspirators would discuss the illegal acquisition of large quantities of steroids to be distributed through pharmacies controlled by the coconspirators.

101

C.  Acts of Violence, Obstruction of Justice and Possession of Weapons

1.  Defendants Christopher Paul George, Derik Nolan, and Christopher Hutson would travel to Jacksonville, Florida, in order to observe and confront a competing clinic owner they believed had stolen lists of individuals receiving prescriptions from the defendants' clinics.

2.  Defendant Christopher Paul George would extort by threats of violence the owner of an MRI facility.

3.  Defendants Christopher Paul George, Jeffrey George, Derik Nolan and Gino Marquez would unlawfully kidnap, abduct and imprison an individual at the residence of defendant Jeffrey George and commit an aggravated assault with a firearm of such individual based upon a belief that such individual had stolen money from a conspirator's residence.

4.  Defendants Jeffrey George assisted by defendant Christopher Paul George, Derik Nolan and Gino Marquez would discharge a firearm near the head of a handcuffed individual in order to frighten, intimidate, and terrorize such individual.

5.  Defendants Jeffrey George and coconspirators would unlawfully enter a residence in order to determine if law enforcement authorities had previously searched such residence.

6.  Defendants Jeffrey George and coconspirators would unlawfully search such residence and attempt to recover a bullet previously discharged during the kidnaping.

7.  Defendants Christopher Paul George, Jeffrey George and coconspirators would attempt to illegally bribe the victim of the aggravated assault in order that such victim lie to law enforcement authorities.

8.      Defendant Jeffrey George would assault an individual he believed had stolen items from South Beach Rejuvenation.

9.      Defendants Christopher Paul George and Jeffrey George would instruct coconspirators to destroy and damage property owned by competing clinic owners and business owners.

10.     Coconspirators would threaten and intimidate competing clinic owners.

11.     Defendant Christopher Paul George, being a convicted felon, would illegally use nominees including defendant Ethan Baumhoff, to illegally purchase firearms on his behalf.

12.     Defendant Christopher Paul George would direct coconspirator Dianna Pavnick George to falsely claim ownership of firearms recovered during a search of defendant Christopher Paul George's residence in order to obstruct Federal law enforcement authorities.

13.     Defendant Christopher Paul George would discuss with coconspirator Dianna Pavnick George the execution of a search warrant at defendant Christopher Paul George's residence. Defendant Christopher Paul George would state, "Babe I'm f--ked. They have a search warrant. The cops are inside the house." Defendant Christopher Paul George would inform coconspirator Dianna Pavnick George, "There's two guns in the garage, but you're gonna have to say they are yours. I mean you just brought them there. And I wasn't there when you brought them there. And, do you have any drugs there?" Coconspirator Dianna Pavnick George would state, "Probably, like a little bit of pot, but nothing like crazy." Defendant Christopher Paul George would state, "There is a small bottle of 'seeps' too in that cabinet where my steroids were. Small thing of them." Coconspirator Dianna Pavnick George would respond, "I'll get rid of them." Defendant Christopher Paul George would state "Baby, you might have to take the blame for some of this stuff."

103

14.     Defendant Christopher Paul George would instruct defendant Andrew Harrington to falsely claim ownership of a handgun recovered by federal authorities from a bedroom in defendant Christopher Paul George residence.

D.      Fraudulent Time Share Resale Businesses

1.      Defendants Christopher Paul George, Jeffrey George, Christopher Hutson and Gino Marquez would finance, establish and operate illegal and fraudulent time-share resale businesses, American Marketing Group (AMG) and International Marketing Group.

2.      Coconspirators would discuss the use of merchant accounts in order to illegally process funds derived from customer credit cards in furtherance of the fraudulent time share resale businesses.

3.      Coconspirators would discuss the purchase of personal information relating to potential victims in the fraudulent time share resale businesses.

4.      Coconspirators would use criminal proceeds derived from the illegal distribution and dispensing of controlled substances in order to finance fraudulent timeshare businesses.

5.      Coconspirators would purchase lists of potential victims from corrupt brokers.

6.      Coconspirators would hire individuals experienced in large scale fraud activities to act as sales consultants in the fraudulent time-share business.

7.      Coconspirators would also hire individuals who had participated in drug and alcohol rehabilitation programs to act as sales consultants.

8.      Coconspirators would prepare scripts containing materially false and misleading statements to be used by the sales consultants to illegally convince potential victims to pay fees in order to allegedly market, advertise and sell the victims' time shares.

104

9.      Coconspirators would lie to potential victims in order to fraudulently convince such victims that efforts were actually being undertaken to sell the victims' timeshares.

10.     Coconspirators would discuss the large sums of money illegally solicited from the victims by means of false and fraudulent misrepresentations.

11.     Coconspirators would discuss placing a fraudulent time share resale business in the name of an unsuspecting individual in order to conceal their ownership interests from law enforcement authorities.

12.     Coconspirators would discuss the Florida State Attorney General's Office, Economic Crime Division's case against a fraudulent time share resale business owned by the coconspirators.

13.     Coconspirators would establish businesses in order to fraudulently obtain additional funds from victims who had previously been victimized by the defendants' time share resale frauds.

14.     Coconspirators would share the criminal proceeds, that is, in excess of five million dollars, generated through the illegal timeshare resale businesses.

15.     Defendant Jeffrey George and defendant Christopher Paul George would send and receive text messages regarding the unauthorized listing of a coconspirator's name as the owner of American Marketing Group.

16.     Defendant Christopher Paul George and a coconspirator would discuss a newspaper article and an Attorney General Office investigation of AMG.

All in violation of Title 18, United States Code, Section 1962(d).

## COUNT 2

(Money Laundering Conspiracy, 18 U.S.C. 1956(h))

1.      The allegations set forth in paragraphs 1 through 102 of Count 1 of the Indictment are realleged and incorporated herein by reference.

2.      Beginning in or about 2006 and continuing to in or about April 2010, the exact dates being unknown, in Broward and Palm Beach Counties, in the Southern District of Florida and elsewhere, the defendants,

Christopher Paul George,
Jeffrey George,
Derik Nolan,
Christopher Hutson,
Theodore Obermeyer,
Ethan Baumhoff,
Andrew Harrington,
Daryl Michael Stewart,
Steven Goodman,
Beau Boshers, M.D.,
Michael Aruta, M.D.,
Cynthia Cadet, M.D.,
Roni Dreszer, M.D.,
Patrick Graham, M.D.,
Daniel Hauser, M.D.,
Robert Meek, D.O.,
Vernon Atreidis, M.D.,
Augusto Lizarazo, M.D.,
Christina Chico-Blume, D.O.,

did knowingly conspire, combine, confederate, and agree with each other and with persons known and unknown to the Grand Jury to commit offenses against the United States, that is, to violate Title 18, United States Code, Section 1957.

106

<u>The Purpose and Object of the Conspiracy</u>

3.      It was the purpose and object of the conspiracy to:

a)      Knowingly engage and attempt to engage in monetary transactions affecting interstate and foreign commerce in criminally derived property that was of a value greater than $10,000, which was from specified unlawful activities, that is the felonious receiving, buying, selling or otherwise dealing in oxycodone, a Schedule II controlled substance, punishable under the laws of the United States in violation of Title 21, United States Code, Section 841(a)(1).

All in violation of Title 18, United States Code, Section 1956(h).

## COUNT 3

1.      The General Allegations of the Indictment set forth in paragraphs 17 through 106 are realleged and expressly incorporated herein as if set forth in full.

2.      Beginning in or about 2007 and continuing to in or about April, 2010, in the Southern District of Florida and elsewhere, the defendants,

Christopher Paul George,
Jeffrey George,
Derik Nolan,
Christopher Hutson,
Theodore Obermeyer,
Ethan Baumhoff,
Andrew Harrington,
Daryl Michael Stewart,
Steven Goodman,
Pedro Martinez,
Beau Boshers, M.D.,
Michael Aruta, M.D.,
Cynthia Cadet, M.D.,
Roni Dreszer, M.D.,
Patrick Graham, M.D.,
Robert Meek, D.O.,
Vernon Atreidis, M.D.,

107

Augusto Lizarazo, M.D.,
Christine Chico-Blume, D.O.,

knowingly and intentionally combined, conspired, confederated and agreed together and with each

other, and with other persons known and unknown to the Grand Jury, to unlawfully distribute and

dispense, and possess with intent to distribute and dispense, a controlled substance, that is, a quantity

of oxycodone, a Schedule II narcotic controlled substance, in violation of Title 21, United States

Code, Section 841(a)(1).

All in violation of Title 21, United States Code, Section 846.

## COUNT 4

1.     The General Allegations of the Indictment set forth in paragraphs 1 through 106 are

realleged and expressly incorporated herein as if set forth in full.

2.     From in or about 2007 and continuing to in or about April, 2010, in the Southern

District of Florida and elsewhere, the defendants,

Christopher Paul George,
Jeffrey George,
Derik Nolan,
Christopher Hutson,
Theodore Obermeyer,
Ethan Baumhoff,
Andrew Harrington,
Daryl Michael Stewart,
Steven Goodman,

knowingly and intentionally, maintained and aided and abetted the maintenance of places for the

purpose of unlawfully distributing oxycodone, a Schedule II narcotic controlled substance. Such

places were the following facilities:

108

A.     American Pain, LLC., aka South Florida Pain, LLC, was an alleged pain management clinic located at the following addresses: 500 W Oakland Park Boulevard, Fort Lauderdale, Florida, 2700 W. Cypress Creek Road, Building A, Suite 100, Fort Lauderdale, Florida, 1001 W. Cypress Creek Road, Suite 206, Fort Lauderdale, Florida, 5801 N. Federal Highway, Boca Raton, Florida, and 1200 North Dixie Highway, Lake Worth, Florida.

B.     Executive Pain, Inc., was an alleged pain management clinic located at 4047 Okeechobee Road, Suite 222 and/or 223, West Palm Beach, Florida.

C.     East Coast Pain, LLC,  was an alleged pain management clinic located at 4726 Okeechobee Boulevard, West Palm Beach, Florida.

D.     Hallandale Pain, LLC, was an alleged pain management clinic located at 621 W. Hallandale Beach Boulevard, Hallandale Beach, Florida.

E.     Medical Arts, Inc., was a pharmaceutical distributor with offices located at 2950 Central Avenue, St. Petersburg, Florida.

F.     Appurtenance Biotechnologies, d/b/a Boca Drugs, was an alleged pharmacy located at 7400 N. Federal Highway, Suite A-10, Boca Raton, Florida.

G.     QuickPharm, Inc., was an alleged pharmacy located at 114 S. Semoran Boulevard, Orlando, Florida.

All in violation of Title 21, United States Code, Section 856(a)(1) and Title 18, United States Code, Section 2.

## COUNT 5

### GENERAL ALLEGATIONS

1.      The General Allegations of the Indictment set forth in paragraphs 1 through 106 are realleged and expressly incorporated herein as if set forth in full.

2.      Defendant Joseph Castronuovo was a physician licensed to practice medicine in the State of Florida and maintained a Drug Enforcement Administration registration number which allowed defendant Castronuovo to order and dispense controlled substances.

3.      Defendant Irwin Beretsky was a physician licensed to practice medicine in the State of Florida and maintained a Drug Enforcement Administration registration number which allowed defendant Beretsky to order and dispense controlled substances.

4.      Defendant Jacobo Dreszer was a physician licensed to practice medicine in the State of Florida and maintained a Drug Enforcement Administration registration number which allowed defendant Dreszer to order and dispense controlled substances.

5.      Defendant Augusto Lizarazo was a physician licensed to practice medicine in the State of Florida and maintained a Drug Enforcement Administration registration number which allowed defendant ~~Dreszer~~ *Lizarazo M.D.* to order and dispense controlled substances.

6.      From in or about December 2009 through in or about February 2010, in Broward and Palm Beach Counties, in the Southern District of Florida and elsewhere, the defendants:

Christopher Paul George,
Ethan Baumhoff,
Steven Goodman,
Beau Boshers, M.D.,
Michael Aruta, M.D.,
Cynthia Cadet, M.D.,
Roni Dreszer, M.D.,

110

Patrick Graham, M.D.,
Robert Meek, D.O.,
Vernon Atreidis, M.D.,
Augusto Lizarazo, M.D.,
Dianna Pavnick George,
Denice Haggerty,
Joseph Castronuovo, M.D.,
Irwin Beretsky, M.D.,
Jacobo Dreszer, M.D.,

did knowingly and willfully combine, conspire, confederate, and agree with other persons known

and unknown to the Grand Jury to commit an offense against the United States of America, that is,

to devise and intend to devise a scheme and artifice to defraud and to obtain property by means of

false and fraudulent pretenses, representations, and promises, for the purpose of executing, and

attempting to execute, such scheme and artifice to defraud and for obtaining property by means of

false and fraudulent pretenses, representations, and promises, to (a) knowingly transmit and cause

to be transmitted by means of wire communication in interstate and foreign commerce, certain signs,

signals, and sounds, in violation of Title 18, United States Code, Section 1343 (Wire Fraud), and (b)

to place in any post office or authorized depository for mail matter, any matter or thing to be sent or

delivered by the Postal Service, and to cause to be deposited any matter or thing to be sent by private

or commercial interstate carrier, in violation of Title 18, United States Code, Section 1341 (Mail

Fraud).

## PURPOSE AND OBJECT OF THE CONSPIRACY

7.     The purpose and object of the conspiracy was to induce a pharmaceutical wholesaler

to continue to sell large quantities of controlled substances to American Pain clinic and Executive

Pain clinic through the use of false and fraudulent pretenses, representations and promises.

111

## MANNER AND MEANS OF THE CONSPIRACY

8.     It was a part of the conspiracy that individuals seeking controlled substances would allege complaints of pain and pay a fee to be examined by physicians employed by and/or associated with American Pain and Executive Pain clinics.

9.     It was further a part of the conspiracy that defendant physicians Beau Boshers, Michael Aruta, Cynthia Cadet, Roni Dreszer, Patrick Graham,  Robert Meek, Vernon Atreidis, Augusto Lizarazo, Joseph Castronuovo, Irwin Beretsky, and Jacobo Dreszer would prescribe large quantities of oxycodone pills to individuals without a legitimate medical necessity and outside the usual and customary standard of care.

10.     It was further a part of the conspiracy that defendants Dianna Pavnick George, Denice Haggerty and other coconspirators would sell and dispense oxycodone pills from facilities within American Pain and Executive Pain.

11.     It was further a part of the conspiracy that large quantities of oxycodone pills, a Schedule II controlled substance, would be ordered from pharmaceutical wholesalers by defendants Dianna Pavnick George and/or Denice Haggerty using the DEA registration numbers of defendant physicians Beau Boshers, Michael Aruta, Cynthia Cadet, Roni Dreszer, Patrick Graham,  Robert Meek, Vernon Atreidis, Augusto Lizarazo, Joseph Castronuovo, Irwin Beretsky, and Jacobo Dreszer.

12.     It was further a part of the conspiracy that the defendants would conspire to make materially false statements on a questionnaire required by a pharmaceutical wholesaler.  Such questionnaire required the defendant physicians to truthfully answer the following questions:

A.     "Of your entire patient base, what percentage do you dispense controlled substances to?"

112

B.      "Do you have out of state patients? If yes, what percentage of your customer base is from out of state?"

13.     It was further a part of the conspiracy that the defendants discussed the materially false statements to be made on the questionnaire.  Such false statements would include material misrepresentations regarding the percentage of patients who are dispensed controlled substances and the percentage of the customer base which was from outside the State of Florida.

14.     It was further a part of the conspiracy that for the purpose of executing or attempting to execute the above-described scheme and artifice to defraud and deprive, defendant Steven Goodman would place or cause to be placed in an authorized depository for mail, to be sent and delivered by the Postal Service, the following matter, DEA Form 222's.

### OVERT ACT

15.     In furtherance of the conspiracy and to achieve the purpose and object thereof, the defendants and their co-conspirators committed and caused to be committed in the Southern District of Florida and elsewhere, the following act, among others:

16.     On or about December 22, 2009, Ethan Baumhoff sent a telefax transmission from the offices of American Pain, LLC located in Palm Beach County, Florida to the offices of Harvard Drug Group, d/b/a Expert-Med, located in Lavonia, Michigan, which was comprised of certain documents titled "Expert-Med Questionnaire."

All in violation of Title 18, United States Code, Section 371.

### RICO CONSPIRACY FORFEITURE ALLEGATIONS

1.      The allegations contained in Count One (1) of this Indictment are hereby repeated, realleged, and incorporated by reference herein as though fully set forth at length for the purpose of

alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 1963. Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 1963 in the event of any defendant's conviction under Count One (1) of this Indictment.

   2. Pursuant to Title 18, United States Code, Section 1963, upon conviction of an offense in violation of Title 18, United States Code, Section 1962, the defendants, Christopher Paul George, Jeffrey George, Derik Nolan, Christopher Hutson, Theodore Obermeyer, Ethan Baumhoff, Andrew Harrington, Daryl Michael Stewart, Steven Goodman, Michael Renda, Matthew Siss, Pedro Martinez, Jason Leve, Jack Martin, Marc Anthony Naya, Zachary Horsley, Gino Marquez, and Cynthia Cadet, individually and/or through their nominee entities, South Beach Rejuvenation, South Florida Pain, Hallandale Pain, American Pain, Executive Pain, East Coast Pain, Medical Arts, Inc., American Marketing Group, International Marketing and Finance Group, Hutson MRI, Apurtenance Biotechologies, d/b/a Boca Drugs Pharmacy, Quick Pharm Inc., L.A. Health Inc., 3574 Lago de Talavera, LLC, 3493 Lago de Talavera, LLC, shall forfeit to the United States of America:

   a. any interest acquired or maintained in violation of section 1962;

   b. any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which the defendant[s] established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962; and

c.    any property constituting, or derived from, any proceeds obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of 1962.

The property to be forfeited includes, but is not limited to:

1.    At least $40,000,000 representing a money judgment for the amount of proceeds defendants obtained from the violation in Count 1, the RICO Conspiracy;

2.    A single family residence located at 3485 Lago de Talavera, Lake Worth, Fl. 33467, Parcel control number 00-42-44-19-09-000-0290, including the appurtenances thereto and the improvements thereon;

3.    A single family residence located at 3493 Lago de Talavera , Lake Worth, Fl. 33467, Parcel control number 00-42-44-19-09-000-0300, including the appurtenances thereto and the improvements thereon;

4.    A single family residence located at 3574 Lago de Talavera, Lake Worth, Fl. 33467, Parcel control number 00-42-44-19-09-000-0770, including the appurtenances thereto and the improvements thereon;

5.    2010 Range Rover-VIN # SALSK2D40AA231383;

6.    South Florida Pain, LLC account-SunTrust Bank account # 1000094241113 in the amount $281,903.23;

7.    Christopher Paul George account-SunTrust Bank account #1000094241170 In the amount of $919,615.58;

8.    3574 Lago de Talavera, LLC account-SunTrust Bank account # 1000101794419 in the amount $24,303.49;

9.    3493 Lago de Talavera, LLC account-SunTrust Bank account #1000101794427 in the amount $5,560.32;

10.   Christopher Paul George account-Citibank account #9115586621 in the amount of $36,025.12;

11.   U.S. Currency in the amount $4,553,400.00 seized from 1861 Primrose Lane;

12.   U.S. Currency in the amount $725,992.00 seized from 1200 N. Dixie Highway;

13.   U.S. Currency in the amount $75,457.00 seized from 3485 Lago de Talavera;

115

14.     U.S. Currency in the amount $197,821.00 seized from 4047 Okeechobee Blvd. # 223;

15.     One Patek Phillipe Woman's Watch;

16.     Executive Pain account-Bank of America account #898025603636 in the amount of $224,525.08;

17.     American Pain, LLC, Operating account-Bank of America account # 898027164319 in the amount $88,149.49;

18.     American Pain,LLC,  Payroll account-Bank of America account # 898027164322 in the amount of $638.26;

19.     Appurtenance Biotechnology, LLC, DBA Boca Drugs Operating account-Bank of America account #898027411619 in the amount $143,315.03;

20.     American Pain, LLC account-TD Bank Account # EIN32-02-65949 in the amount $351,331.15;

21.     United States currency seized from Jeffrey George in the amount of $8500.00;

22.     One Men's Rolex Submariner watch w/black face, gold and silver two toned band; and

23.     One Ladies Chopard Watch w/white face, surrounded by white stones, silver colored band.

3.      If any of the property described above, as a result of any act or omission

of the defendant[s]:

a.      cannot be located upon the exercise of due diligence;

b.      has been transferred or sold to, or deposited with, a third party;

c.      has been placed beyond the jurisdiction of the court;

d.      has been substantially diminished in value; or

e.      has been commingled with other property which cannot be divided without

        difficulty,

116

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 18, United States Code, Section 1963(m).

4.      The above-named defendants, and each of them, are jointly and severally liable for the forfeiture-money judgment alleged above.

All pursuant to Title 18, United States Code, Section 1963.

## MONEY LAUNDERING CONSPIRACY FORFEITURE ALLEGATIONS

1.      The allegations contained in Count 2 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Sections 982(a)(1), and/or Title18 U.S.C. § 981(a)(1)(C) and the procedures outlined in Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461.

2.      Pursuant to Title 18, United States Code, Section 982(a)(1), upon conviction of the Count 2 conspiracy, an offense in violation of Title 18, United States Code, Section 1956(h), the defendants, Christopher Paul George, Jeffrey George, Derik Nolan, Christopher Hutson, Theodore Obermeyer, Ethan Baumhoff, Andrew Harrington, Daryl Michael Stewart, Steven Goodman, Beau Boshers, Michael Aruta, Cynthia Cadet, Roni Dreszer, Patrick Graham, Daniel Hauser, Robert Meek, Vernon Atreidis, Augusto Lizarazo, and Christine Chico-Blume, entities, South Beach Rejuvenation, South Florida Pain, Hallandale Pain, American Pain, Executive Pain, East Coast Pain, Medical Arts, Inc., American Marketing Group, International Marketing and Finance Group, Hutson MRI, Apurtenance Biotechologies, d/b/a Boca Drugs Pharmacy, Quick Pharm Inc., L.A. Health Inc., 3574 Lago de Talavera, LLC, 3493 Lago de Talavera, LLC, shall forfeit to the United States of America any property, real or personal, involved in such offense, and/or pursuant to Title 18, United

117

States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense. The property to be forfeited includes, but is not limited to, the following:

1.  At least $40,000,000 representing a money judgment for the amount of proceeds defendants obtained from the violation in Count 1, the RICO Conspiracy;

2.  A single family residence located at 3485 Lago de Talavera, Lake Worth, Fl. 33467, Parcel control number 00-42-44-19-09-000-0290, including the appurtenances thereto and the improvements thereon;

3.  A single family residence located at 3493 Lago de Talavera , Lake Worth, Fl. 33467, Parcel control number 00-42-44-19-09-000-0300, including the appurtenances thereto and the improvements thereon;

4.  A single family residence located at 3574 Lago de Talavera, Lake Worth, Fl. 33467, Parcel control number 00-42-44-19-09-000-0770, including the appurtenances thereto and the improvements thereon;

5.  2010 Range Rover-VIN # SALSK2D40AA231383;

6.  South Florida Pain, LLC account-SunTrust Bank account # 1000094241113 in the amount $281,903.23;

7.  Christopher Paul George account-SunTrust Bank account #1000094241170 In the amount of $919,615.58;

8.  3574 Lago de Talavera, LLC account-SunTrust Bank account # 1000101794419 in the amount $24,303.49;

9.  3493 Lago de Talavera, LLC account-SunTrust Bank account #1000101794427 in the amount $5,560.32;

10. Christopher Paul George account-Citibank account #9115586621 in the amount of $36,025.12;

11. U.S. Currency in the amount $4,553,400.00 seized from1861 Primrose Lane;

12. U.S. Currency in the amount $725,992.00 seized from 1200 N. Dixie Highway;

13. U.S. Currency in the amount $75,457.00 seized from 3485 Lago de Talavera;

14.     U.S. Currency in the amount $197,821.00 seized from 4047 Okeechobee Blvd. # 223;

15.     One Patek Phillipe Woman's Watch;

16.     Executive Pain account-Bank of America account #898025603636 in the amount of $224,525.08;

17.     American Pain Operating account-Bank of America account #898027164319 in the amount $88,149.49;

18.     American Pain Payroll account-Bank of America account # 898027164322 in the amount of $638.26;

19.     Appurtenance Biotechnology, LLC, DBA Boca Drugs Operating account-Bank of America account #898027411619 in the amount $143,315.03;

20.     American Pain, LLC account-TD Bank Account # EIN32-02-65949 in the amount $351,331.15;

21.     United States currency seized from Jeffrey George in the amount of $8500.00;

22.     One Men's Rolex Submariner watch w/black face, gold and silver two toned band; and

23.     One Ladies Chopard Watch w/white face, surrounded by white stones, silver colored band.

3.     If any of the property described above, as a result of any act or omission of the

defendant[s]:

a.     cannot be located upon the exercise of due diligence;

b.     has been transferred or sold to, or deposited with, a third party;

c.     has been placed beyond the jurisdiction of the court;

d.     has been substantially diminished in value; or

e.     has been commingled with other property which cannot be divided without difficulty,

119

then the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

4.     The above-named defendants, and each of them, are jointly and severally liable for the forfeiture-money judgment alleged above.

All pursuant to Title 18, United States Code, Sections 982(a)(1),and 981(a)(1)(C), and the procedures of Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461.

## DRUG CONSPIRACY FORFEITURE ALLEGATIONS

1.     The allegations in this Indictment are re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States of America of property in which one or more of the defendants has an interest pursuant to the provisions of Title 21, United States Code, Section 853(a)(1) and/or (2).

2.     Upon conviction of Counts 3 and/or Count 4 of this Indictment, the defendants shall forfeit to the United States any property constituting or derived from any proceeds which the defendants Christopher Paul George, Jeffrey George, Derrick Nolan, Christopher Hutson, Theodore Obermeyer, Ethan Baumhoff, Andrew Harrington, Daryl Michael Stewart, Pedro Martinez, Beau Boshers, Michael Aruta, Cynthia Cadet, Roni Drezer, Patrick Graham, Robert Meek, Vernon Atreidis, and Christine Chico-Blume, entities, South Beach Rejuvenation, South Florida Pain, Hallandale Pain, American Pain, Executive Pain, East Coast Pain, Medical Arts, Inc., American Marketing Group, International Marketing and Finance Group, Hutson MRI, Apurtenance Biotechologies, d/b/a Boca Drugs Pharmacy, Quick Pharm Inc., L.A. Health Inc., 3574 Lago de

Talavera, LLC, 3493 Lago de Talavera, LLC, shall forfeit to the United States of America pursuant

to Title 21, United States Code, Section 853(a)(1) and/or (2) any property constituting, or derived

from any proceeds the defendant/s obtained, directly or indirectly, as the result of such violation; or

any of the defendant's property used, or intended to be used, in any manner or part, to commit, or

to facilitate the commission of such violation,  including but not limited to the following:

1.  At least $40,000,000 representing a money judgment for the amount of proceeds defendants obtained from the violation in Count 1, the RICO Conspiracy;

2.  A single family residence located at 3485 Lago de Talavera, Lake Worth, Fl. 33467, Parcel control number 00-42-44-19-09-000-0290, including the appurtenances thereto and the improvements thereon;

3.  A single family residence located at 3493 Lago de Talavera , Lake Worth, Fl. 33467, Parcel control number 00-42-44-19-09-000-0300, including the appurtenances thereto and the improvements thereon, and

4.  A single family residence located at 3574 Lago de Talavera, Lake Worth, Fl. 33467, Parcel control number 00-42-44-19-09-000-0770, including the appurtenances thereto and the improvements thereon;

5.  2010 Range Rover-VIN # SALSK2D40AA231383;

6.  South Florida Pain, LLC account-SunTrust Bank account # 1000094241113 in the amount $281,903.23;

7.  Christopher Paul George account-SunTrust Bank account #1000094241170 In the amount of $919,615.58;

8.  3574 Lago de Talavera, LLC account-SunTrust Bank account # 1000101794419 in the amount $24,303.49;

9.  3493 Lago de Talavera, LLC account-SunTrust Bank account #1000101794427 in the amount $5,560.32;

10. Christopher Paul George account-Citibank account #9115586621 in the amount of $36,025.12;

11. U.S. Currency in the amount $4,553,400.00 seized from 1861 Primrose Lane;

12.     U.S. Currency in the amount $725,992.00 seized from 1200 N. Dixie Highway;

13.     U.S. Currency in the amount $75,457.00 seized from 3485 Lago de Talavera;

14.     U.S. Currency in the amount $197,821.00 seized from 4047 Okeechobee Blvd. # 223;

15.     One Patek Phillipe Woman's Watch;

16.     Executive Pain account-Bank of America account #898025603636 in the amount of $224,525.08;

17.     American Pain Operating account-Bank of America account #898027164319 in the amount $88,149.49;

18.     American Pain Payroll account-Bank of America account # 898027164322 in the amount of $638.26;

19.     Appurtenance Biotechnology, LLC, DBA Boca Drugs Operating account-Bank of America account #898027411619 in the amount $143,315.03;

20.     American Pain, LLC account-TD Bank Account # EIN32-02-65949 in the amount $351,331.15;

21.     United States currency seized from Jeffrey George in the amount of $8500.00;

22.     One Men's Rolex Submariner watch w/black face, gold and silver two toned band; and

23.     One Ladies Chopard Watch w/white face, surrounded by white stones, silver colored band.

3.     If the property described above as being subject to forfeiture, as a result of any act or omission of the defendants,

(1)     cannot be located upon the exercise of due diligence;

(2)     has been transferred or sold to, or deposited with a third person;

(3)     has been placed beyond the jurisdiction of the Court;

(4)     has been substantially diminished in value; or

122

(5)     has been commingled with other property which cannot be subdivided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) to seek

forfeiture of any other property of the defendants up to the value of the above forfeitable property

and, in addition, to require the defendants to return any such property to the jurisdiction of the court

for seizure and forfeiture.

4.     The above-named defendants, and each of them, are jointly and severally liable for

the forfeiture-money judgment alleged above.

All pursuant to Title 21, United States Code, Section 853(a)(1) and/or (a)(2).


A TRUE BILL

FOREPERSON


_____
WIFREDO A. FERRER
UNITED STATES ATTORNEY

_____
PAUL F. SCHWARTZ
ASSISTANT UNITED STATES ATTORNEY

_____
LAWRENCE D. LaVECCHIO
ASSISTANT UNITED STATES ATTORNEY

_____
STRIDER DICKSON
ASSISTANT UNITED STATES ATTORNEY

123

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| UNITED STATES OF AMERICA | CASE NO. | 10-80149-CR-MARRA/HOPKINS(s) |
|---|---|---|

vs.

**CERTIFICATE OF TRIAL ATTORNEY\***

CHRISTOPHER PAUL GEORGE, *et al.*

_____
                    Defendants.
_____/

**Superseding Case Information:**

**Court Division**: (Select One)

| ____ | Miami | ____ | Key West |
|---|---|---|---|
| ____ | FTL | _X_ | WPB | ____ | FTP |

New Defendant(s)          Yes __X__   No ____
Number of New Defendants          __31__
Total number of counts          __5__

I do hereby certify that:

1.   I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.   I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.   Interpreter:     (Yes or No)     __No__
     List language and/or dialect     _____

4.   This case will take     _40_     days for the parties to try.

5.   Please check appropriate category and type of offense listed below:

     (Check only one)                              (Check only one)

| | | | | | |
|---|---|---|---|---|---|
| I | 0 to 5 days | _____ | Petty | _____ |
| II | 6 to 10 days | _____ | Minor | |
| III | 11 to 20 days | _____ | Misdem. | _____ |
| IV | 21 to 60 days | __X__ | Felony | __X__ |
| V | 61 days and over | | | |

6.   Has this case been previously filed in this District Court? (Yes or No)     _____
If yes:
Judge:   _Marra_____     Case No.   __10-80149-Cr-Marra_____
(Attach copy of dispositive order)
Has a complaint been filed in this matter?     (Yes or No)     __No___
If yes:
Magistrate Case No.     _____
Related Miscellaneous numbers:     _____
Defendant(s) in federal custody as of     _10/15/10 (Christopher Paul George)_____
Defendant(s) in state custody as of     _____
Rule 20 from the   _____     District of   _____

Is this a potential death penalty case? (Yes or No)     __No__

7.   Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003?     _____ Yes     _X_ No

8.   Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007?     _____ Yes     _X_ No

_____
LAWRENCE D. LaVECCHIO
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No. 0305405

\*Penalty Sheet(s) attached

REV 4/8/08

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**: **Jeffrey George**

**Count #: 1**

 **18 U.S.C. § 1962(d); RICO Conspiracy**

\* **Max.Penalty:**       20 years' imprisonment, $250,000 fine

**Count #: 2**

 **18 U.S.C. § 1956(h);  Conspiracy to Commit Money Laundering**

\***Max. Penalty:**      10 years' imprisonment, $250,000 fine or twice the amount of the criminally derived property involved in the transaction

**Count #: 3**

 **21 U.S.C. § 846; Conspiracy to Possess with Intent to Distribute a Controlled Substance (oxycodone)**

\***Max. Penalty:**      20 years' imprisonment, $1,000,000 fine

**Count #: 4**

 **21 U.S.C. § 856; Maintaining Drug Involved Premises**

\***Max. Penalty:**      20 years' imprisonment, $500,000 fine

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:  Derik Nolan**

**Count  #: 1**

  **18 U.S.C. § 1962(d); RICO Conspiracy**

* **Max.Penalty:**          20 years' imprisonment, $250,000 fine

**Count  #: 2**

  **18 U.S.C. § 1956(h);  Conspiracy to Commit Money Laundering**

*****Max. Penalty:**          10 years' imprisonment, $250,000 fine or twice the amount of the
                         criminally derived property involved in the transaction

**Count  #: 3**

  **21 U.S.C. § 846; Conspiracy to Possess with Intent to Distribute a Controlled**
                **Substance (oxycodone)**
*****Max. Penalty:**          20 years' imprisonment, $1,000,000 fine
**Count  #: 4**

  **21 U.S.C. § 856; Maintaining Drug Involved Premises**

*****Max. Penalty:**          20 years' imprisonment, $500,000 fine

**\*Refers only to possible term of incarceration, does not include possible fines, restitution,
special assessments, parole terms, or forfeitures that may be applicable.**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**: **Christopher Hutson**

**Count #: 1**

**18 U.S.C. § 1962(d); RICO Conspiracy**

\* **Max.Penalty**:     20 years' imprisonment, $250,000 fine

**Count #: 2**

**18 U.S.C. § 1956(h);  Conspiracy to Commit Money Laundering**

\***Max. Penalty:**     10 years' imprisonment, $250,000 fine or twice the amount of the
criminally derived property involved in the transaction

**Count #: 3**

**21 U.S.C. § 846; Conspiracy to Possess with Intent to Distribute a Controlled
Substance (oxycodone)**

\***Max. Penalty:**     20 years' imprisonment, $1,000,000 fine

**\*Refers only to possible term of incarceration, does not include possible fines, restitution,
special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**: Theodore Obermeyer

**Count #: 1**

 **18 U.S.C. § 1962(d); RICO Conspiracy**

\* **Max. Penalty**:        20 years' imprisonment, $250,000 fine

**Count #: 2**

 **18 U.S.C. § 1956(h);  Conspiracy to Commit Money Laundering**

\* **Max. Penalty:**        10 years' imprisonment, $250,000 fine or twice the amount of the
                        criminally derived property involved in the transaction

**Count #: 3**

 **21 U.S.C. § 846; Conspiracy to Possess with Intent to Distribute a Controlled
                        Substance (oxycodone)**

\* **Max. Penalty:**        20 years' imprisonment, $1,000,000 fine

**Count #: 4**

 **21 U.S.C. § 856; Maintaining Drug Involved Premises**

\* **Max. Penalty:**        20 years' imprisonment, $500,000 fine

**\*Refers only to possible term of incarceration, does not include possible fines, restitution,
special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**: **Ethan Baumhoff**

**Count #: 1**

**18 U.S.C. § 1962(d): RICO Conspiracy**

\* **Max.Penalty**: 20 years' imprisonment, $250,000 fine

**Count #: 2**

**18 U.S.C. § 1956(h);  Conspiracy to Commit Money Laundering**

\***Max. Penalty**: 10 years' imprisonment, $250,000 fine or twice the amount of the
criminally derived property involved in the transaction

**Count #: 3**

**21 U.S.C. § 846; Conspiracy to Possess with Intent to Distribute a Controlled
Substance (oxycodone)**

\***Max. Penalty**: 20 years' imprisonment, $1,000,000 fine

**Count #: 4**

**21 U.S.C. § 856; Maintaining Drug Involved Premises**

\***Max. Penalty**: 20 years' imprisonment, $500,000 fine

**Counts #:  5**

**18 U.S.C. § 371; Conspiracy to Commit Wire Fraud**

\* **Max.Penalty**: 5 years' imprisonment, $250,000 fine

**\*Refers only to possible term of incarceration, does not include possible fines, restitution,
special assessments, parole terms, or forfeitures that may be applicable.**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**:  **Andrew Harrington**

**Count  #: 1**

  **18 U.S.C. § 1962(d); RICO Conspiracy**

**\* Max.Penalty**:        20 years' imprisonment, $250,000 fine

**Count  #: 2**

  **18 U.S.C. § 1956(h);  Conspiracy to Commit Money Laundering**

**\*Max. Penalty**:        10 years' imprisonment, $250,000 fine or twice the amount of the
                               criminally derived property involved in the transaction

**Count  #: 3**

  **21 U.S.C. § 846; Conspiracy to Possess with Intent to Distribute a Controlled**
                  **Substance (oxycodone)**
**\*Max. Penalty**:        20 years' imprisonment, $1,000,000 fine
**Count  #: 4**

  **21 U.S.C. § 856; Maintaining Drug Involved Premises**

**\*Max. Penalty**:        20 years' imprisonment, $500,000 fine

**\*Refers only to possible term of incarceration, does not include possible fines, restitution,
special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name**:  **Daryl Michael Stewart**

**Count  #: 1**

   **18 U.S.C. § 1962(d); RICO Conspiracy**

**\* Max.Penalty**:          20 years' imprisonment, $250,000 fine

**Count  #: 2**

   **18 U.S.C. § 1956(h);  Conspiracy to Commit Money Laundering**

**\*Max. Penalty:**          10 years' imprisonment, $250,000 fine or twice the amount of the
                                      criminally derived property involved in the transaction

**Count  #: 3**

   **21 U.S.C. § 846; Conspiracy to Possess with Intent to Distribute a Controlled**
                        **Substance (oxycodone)**
**\*Max. Penalty:**          20 years' imprisonment, $1,000,000 fine
**Count  #: 4**

   **21 U.S.C. § 856; Maintaining Drug Involved Premises**

**\*Max. Penalty:**          20 years' imprisonment, $500,000 fine

**\*Refers only to possible term of incarceration, does not include possible fines, restitution,
special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**:  **Steven Goodman**

**Count  #: 1**

  **18 U.S.C. § 1962(d); RICO Conspiracy**

\* **Max.Penalty**:        20 years' imprisonment, $250,000 fine

**Count  #: 2**

  **18 U.S.C. § 1956(h);  Conspiracy to Commit Money Laundering**

\***Max. Penalty**:        10 years' imprisonment, $250,000 fine or twice the amount of the
                          criminally derived property involved in the transaction

**Count  #: 3**

  **21 U.S.C. § 846; Conspiracy to Possess with Intent to Distribute a Controlled**
                          **Substance (oxycodone)**
\***Max. Penalty**:        20 years' imprisonment, $1,000,000 fine

**\*Refers only to possible term of incarceration, does not include possible fines, restitution,
special assessments, parole terms, or forfeitures that may be applicable.**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**:  **Michael Renda**

**Count  #: 1**

  **18 U.S.C. § 1962(d); RICO Conspiracy**

**\* Max.Penalty**:          20 years' imprisonment, $250,000 fine

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**:  **Matthew Siss**

**Count  #: 1**

   **18 U.S.C. § 1962(d): RICO Conspiracy**

**\* Max.Penalty**:        20 years' imprisonment, $250,000 fine

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**:  **Pedro Martinez**


**Count  #: 1**

  **18 U.S.C. § 1962(d): RICO Conspiracy**

* Max.Penalty:        20 years' imprisonment, $250,000 fine

**Count  #: 3**

  **21 U.S.C. § 846; Conspiracy to Possess with Intent to Distribute a Controlled
                      Substance (oxycodone)**
*Max. Penalty:        20 years' imprisonment, $1,000,000 fine


**\*Refers only to possible term of incarceration, does not include possible fines, restitution,
special assessments, parole terms, or forfeitures that may be applicable.**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**:  Jason Leve

**Count  #: 1**

  18 U.S.C. § 1962(d); RICO Conspiracy

* **Max.Penalty**:        20 years' imprisonment, $250,000 fine

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**:  **Jack Martin**

**Count  #: 1**

  **18 U.S.C. § 1962(d): RICO Conspiracy**

**\* Max.Penalty**:          20 years' imprisonment, $250,000 fine

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name**:  **Marc Anthony Naya**

**Count  #: 1**

  **18 U.S.C. § 1962(d): RICO Conspiracy**

**\* Max.Penalty**:       20 years' imprisonment, $250,000 fine

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

<u>PENALTY SHEET</u>

**Defendant's Name**: **Zachary Horsley**

**Count #: 1**

 **18 U.S.C. § 1962(d); RICO Conspiracy**
_____

* **Max.Penalty**:        20 years' imprisonment, $250,000 fine
_____

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**: **Gino Marquez**

**Count #: 1**

**18 U.S.C. § 1962(d); RICO Conspiracy**

\* **Max.Penalty**:        20 years' imprisonment, $250,000 fine

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**: Beau Boshers, M.D.

**Count  #: 2**

 **18 U.S.C. § 1956(h);  Conspiracy to Commit Money Laundering**

*Max. Penalty:  10 years' imprisonment, $250,000 fine or twice the amount of the criminally derived property involved in the transaction

**Count  #: 3**

 **21 U.S.C. § 846; Conspiracy to Possess with Intent to Distribute a Controlled Substance (oxycodone)**

*Max. Penalty:  20 years' imprisonment, $1,000,000 fine

**Counts  #:  5**

 **18 U.S.C. § 371; Conspiracy to Commit Wire Fraud**

* Max.Penalty:  5 years' imprisonment, $250,000 fine

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**: **Michael Aruta, M.D.**

**Count  #: 2**

**18 U.S.C. § 1956(h);  Conspiracy to Commit Money Laundering**

**\*Max. Penalty:**     10 years' imprisonment, $250,000 fine or twice the amount of the
criminally derived property involved in the transaction

**Count  #: 3**

**21 U.S.C. § 846; Conspiracy to Possess with Intent to Distribute a Controlled
Substance (oxycodone)**

**\*Max. Penalty:**     20 years' imprisonment, $1,000,000 fine

**Counts  #:  5**

**18 U.S.C. § 371; Conspiracy to Commit Wire Fraud**

**\* Max.Penalty**:     5 years' imprisonment, $250,000 fine

**\*Refers only to possible term of incarceration, does not include possible fines, restitution,
special assessments, parole terms, or forfeitures that may be applicable.**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

PENALTY SHEET

**Defendant's Name:  Cynthia Cadet, M.D.**

**Count  #: 1**

  18 U.S.C. § 1962(d); RICO Conspiracy

* **Max.Penalty:**        20 years' imprisonment, $250,000 fine

**Count  #: 2**

  18 U.S.C. § 1956(h);  Conspiracy to Commit Money Laundering

***Max. Penalty:**        10 years' imprisonment, $250,000 fine or twice the amount of the
                          criminally derived property involved in the transaction

**Count  #: 3**

  21 U.S.C. § 846; Conspiracy to Possess with Intent to Distribute a Controlled
                  Substance (oxycodone)
***Max. Penalty:**        20 years' imprisonment, $1,000,000 fine

**Counts  #: 5**

  18 U.S.C. § 371; Conspiracy to Commit Wire Fraud
* **Max.Penalty:**        5 years' imprisonment, $250,000 fine

**\*Refers only to possible term of incarceration, does not include possible fines, restitution,
special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**:  **Roni Dreszer, M.D.**

**Count  #: 2**

  **18 U.S.C. § 1956(h);  Conspiracy to Commit Money Laundering**

**\*Max. Penalty:**     10 years' imprisonment, $250,000 fine or twice the amount of the
                        criminally derived property involved in the transaction

**Count  #: 3**

  **21 U.S.C. § 846; Conspiracy to Possess with Intent to Distribute a Controlled
                     Substance (oxycodone)**
**\*Max. Penalty:**     20 years' imprisonment, $1,000,000 fine

**Counts  #:  5**

  **18 U.S.C. § 371; Conspiracy to Commit Wire Fraud**
**\* Max.Penalty**:     5 years' imprisonment, $250,000 fine

**\*Refers only to possible term of incarceration, does not include possible fines, restitution,
special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**: **Patrick Graham, M.D.**

**Count #: 2**

**18 U.S.C. § 1956(h);  Conspiracy to Commit Money Laundering**

**\*Max. Penalty:**      10 years' imprisonment, $250,000 fine or twice the amount of the
criminally derived property involved in the transaction

**Count #: 3**

**21 U.S.C. § 846; Conspiracy to Possess with Intent to Distribute a Controlled
Substance (oxycodone)**

**\*Max. Penalty:**      20 years' imprisonment, $1,000,000 fine

**Counts #: 5**

**18 U.S.C. § 371; Conspiracy to Commit Wire Fraud**

**\* Max.Penalty:**      5 years' imprisonment, $250,000 fine

**\*Refers only to possible term of incarceration, does not include possible fines, restitution,
special assessments, parole terms, or forfeitures that may be applicable.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**:  Daniel Hauser, M.D.

**Count  #: 2**

 **18 U.S.C. § 1956(h);  Conspiracy to Commit Money Laundering**

**\*Max. Penalty:**          10 years' imprisonment, $250,000 fine or twice the amount of the
                             criminally derived property involved in the transaction

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**:  **Robert Meek, D.O.**

**Count  #: 2**

 **18 U.S.C. § 1956(h);  Conspiracy to Commit Money Laundering**

**\*Max. Penalty:**    10 years' imprisonment, $250,000 fine or twice the amount of the
criminally derived property involved in the transaction

**Count  #: 3**

 **21 U.S.C. § 846; Conspiracy to Possess with Intent to Distribute a Controlled
Substance (oxycodone)**
**\*Max. Penalty:**    20 years' imprisonment, $1,000,000 fine

**Counts  #:  5**

 **18 U.S.C. § 371; Conspiracy to Commit Wire Fraud**
**\* Max.Penalty:**    5 years' imprisonment, $250,000 fine

**\*Refers only to possible term of incarceration, does not include possible fines, restitution,
special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**:  Vernon Atreidis, M.D.

**Count #: 2**

 **18 U.S.C. § 1956(h);  Conspiracy to Commit Money Laundering**

**\*Max. Penalty:**  10 years' imprisonment, $250,000 fine or twice the amount of the criminally derived property involved in the transaction

**Count #: 3**

 **21 U.S.C. § 846; Conspiracy to Possess with Intent to Distribute a Controlled Substance (oxycodone)**

**\*Max. Penalty:**  20 years' imprisonment, $1,000,000 fine

**Counts #:  5**

 **18 U.S.C. § 371; Conspiracy to Commit Wire Fraud**

**\* Max.Penalty**:  5 years' imprisonment, $250,000 fine

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**:  Augusto Lizarazo, M.D.

**Count  #: 2**

  **18 U.S.C. § 1956(h);  Conspiracy to Commit Money Laundering**

**\*Max. Penalty:**          10 years' imprisonment, $250,000 fine or twice the amount of the
                                 criminally derived property involved in the transaction

**Count  #: 3**

  **21 U.S.C. § 846; Conspiracy to Possess with Intent to Distribute a Controlled**
                        **Substance (oxycodone)**
**\*Max. Penalty:**          20 years' imprisonment, $1,000,000 fine

**Counts  #:  5**

  **18 U.S.C. § 371; Conspiracy to Commit Wire Fraud**
**\* Max.Penalty:**          5 years' imprisonment, $250,000 fine

**\*Refers only to possible term of incarceration, does not include possible fines, restitution,
special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**: **Christine Chico-Blume, D.O.**

**Count #: 2**

**18 U.S.C. § 1956(h):  Conspiracy to Commit Money Laundering**

**\*Max. Penalty:**      10 years' imprisonment, $250,000 fine or twice the amount of the criminally derived property involved in the transaction

**Count #: 3**

**21 U.S.C. § 846; Conspiracy to Possess with Intent to Distribute a Controlled Substance (oxycodone)**

**\*Max. Penalty:**      20 years' imprisonment, $1,000,000 fine

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:  Dianna Pavnick George**

**Counts  #:  5**

  **18 U.S.C. § 371; Conspiracy to Commit Wire Fraud**
\* **Max.Penalty**:        5 years' imprisonment, $250,000 fine

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name**:  Denice Haggerty

**Counts  #:  5**

  **18 U.S.C. § 371; Conspiracy to Commit Wire Fraud**

\* **Max.Penalty**:        5 years' imprisonment, $250,000 fine

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:  Joseph Castronuovo, M.D.**

**Counts  #:  5**

 **18 U.S.C. § 371; Conspiracy to Commit Wire Fraud**
\* **Max.Penalty**:        5 years' imprisonment, $250,000 fine

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:  Irwin Beretsky, M.D.**

**Counts  #:  5**

  **18 U.S.C. § 371; Conspiracy to Commit Wire Fraud**
* **Max.Penalty**:        5 years' imprisonment, $250,000 fine

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**:  Jacobo Dreszer, M.D.

**Counts #:  5**

 **18 U.S.C. § 371; Conspiracy to Commit Wire Fraud**
\* **Max.Penalty**:        5 years' imprisonment, $250,000 fine

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

FORM DBD-34

JUN 85

No. _____

# UNITED STATES DISTRICT COURT

## Southern District of Florida

Central Criminal Division

## THE UNITED STATES OF AMERICA

vs.

| | | |
|---|---|---|
| Christopher Paul George | Pedro Martinez | Daniel Hauser, M.D. |
| Jeffrey George | Jason Leve | Robert Meek, D.O. |
| Derik Nolan | Jack Martin | Vernon Atreidis, M.D. |
| Christopher Hutson | Marc Anthony Naya | Augusto Lizarazo, M.D. |
| Theodore Obermeyer | Zachary Horsley | Christine Chico-Blume, D.O. |
| Ethan Baumhoff | Gino Marquez | Dianna Pavnick George |
| Andrew Harrington | Beau Boshers, M.D. | Denice Haggerty |
| Daryl Michael Stewart | Michael Aruta, M.D. | Joseph Castronuovo, M.D. |
| Steven Goodman | Cynthia Cadet, M.D. | Irwin Beretsky, M.D. |
| Michael Renda | Roni Dreszer, M.D. | Jacobo Dreszer, M.D. |
| Matthew Siss | Patrick Graham, M.D. | |

## INDICTMENT

18 U.S.C. 1962(d)
18 U.S.C. 1956(h)
21 U.S.C. 846
21 U.S.C. 856
18 U.S.C. 371
18 U.S.C. 2

A true bill.

_____
Foreperson

Filed in open court this _____ day,

of _____ A.D. 20 ____

_____
Clerk

Bail, $ _____