# APPENDIX

# Aruta Statements

**Internal Revenue Service**
**Criminal Investigation Division**

**Memorandum of Interview**

| | | | |
|---|---|---|---|
| **In Re:** | MICHAEL ARUTA | **Location:** | United States Attorney Office |
| **Investigation #:** | 1000237973 | | Ft.Lauderdale, Fl |
| **Date:** | July 7, 2011 | | |
| **Time:** | 11:05 a.m.-12:15 p.m. | | |
| **Participant(s):** | MICHAEL ARUTA, Defendant | | |
| | Bruce Zimmet, Attorney | | |
| | AUSA Paul Schwartz, AUSA | | |
| | FBI SA Jennifer Turner | | |
| | DEA SA Mike Burt, and | | |
| | IRS-CI SA Anabel Pacheco and David Keyes | | |

1. AUSA Schwartz provided a Proffer Letter, which ARUTA reviewed with his attorney. Both signed the proffer letter. ARUTA's intention is to plead guilty and cooperate with the government in their investigation. The agreement is that ARUTA will plea to one count of money laundering, 18 USC 1957 which carries a maximum sentence of 10 years. The government could then file a 5K motion for downward departure based on ARUTA's cooperation.

The following information was provided by ARUTA:

2. ARUTA deposited the salary paid to him into his bank account.

3. ARUTA is currently employed as an independent contractor for ISAGENIX, a non-medical company out of Phoenix, Arizona. The company is internet based, has been in existence for 9 years, and has profits in the billions of dollars. ARUTA sells nutrition products and gets paid a commission based on the movement of product; multi-level marketing networking.

4. ARUTA described Dr. CADET as a sweet person. She was never in a hurry not even when she saw her patients. On occasions, ARUTA would see CADET's patients on her days off. ARUTA noticed that CADET prescribed larger amounts than he would have felt comfortable prescribing based on the MRI report.

5. The requirement that patients needed to have an MRI report was the main way to insulate the doctors and the clinics.

6. AUSA Schwartz advised ARUTA that that the investigation so far has uncovered 53 deaths for oxycodone overdoses in the state of Florida, and that 6 of those are attributed to ARUTA.

7. ARUTA's specialty if family practice.

8. "cocktail" – is the term used to describe the set/combination of medication prescribed to the patients at American Pain, the clinic where ARUTA and other doctors worked. ARUTA's cocktail

included Oxy 30 mg., Oxy 15 mg., and xanax. ARUTA would prescribe most of his patients 150-180 30mg. oxy per month; some patients would get 210-240 30 mg. oxy per month. 240 pills per month was the maximum that most of the doctors would prescribe in order to keep themselves under the DEA radar. The effect of an oxy pill lasts 3 hours.

9.  ARUTA started to work at American Pain on January 28, 2009. Before working at American Pain, ARUTA worked at A-Pain clinic in Boca Raton for about a month. The owner is Ken Jaffe and he also has offices in Del Rey and Hollywood. ARUTA explained that A-Pain was a slow clinic, he only saw about in 8-12 patients a day. He was paid per patient. ARUTA wanted to be able to see more patients i.e. make more money, so he left A-Pain and went to work at American Pain.

10. ARUTA saw billboards announcements from American Pain, he called the number and spoke to Chris GEORGE, they had short conversation. Later, ARUTA met with GEORGE at American Pain in person for the interview. GEORGE asked ARUTA about his medical practice, his education, and what prescriptions he was writing at A-Pain. The meeting lasted about half an hour and ARUTA was hired.

11. ARUTA learned that GEORGE was a convicted felon at the Boca Raton location. GEORGE told ARUTA that he was arrested for stealing a police motorcycle.

12. ARUTA went to pharmacy school before medicine school.

13. ARUTA described the American Pain clinic as a well-oiled machine, organized. Not long after being at American Pain, ARUTA realized that it was a criminal enterprise, "pretty damn quick".

14. ARUTA earned about $1.1 million in 2009 and was on track to make more in 2010. The most ARUTA had earned at any other job was $140,000.

15. ARUTA said that the American Pain personnel did not want the doctors to know that their pill stocks were being commingled.

16. ARUTA stated that the doctors at American Pain talked about GEORGE's criminal record, they talked about the "junky" patients.

17. ARUTA had conversations with Dr. CADET about the whole bad operation of American Pain. CADET had knowledge of the media coverage, of the law enforcement scrutiny, of patients passing out and having seizures, etc.

18. ARUTA explained that if a patient is taking 3 or 4 2mg xanax a day, and suddenly stop taking the pills the chances of seizures increases. That is why ARUTA decided not to prescribe more that 2 2mg. xanax per day.

19. At American Pain each doctor had his/her own safe where to keep the pills.

20. ARUTA stated that he was in denial; he was trying to convince himself that he was providing proper medical care.

21. ARUTA purchased airplane tickets for July 19th to the 26th. He is taking his 14 year old son to Ohio to visit the son's grandparents. This is ARUTA's only child.

**Internal Revenue Service**
**Criminal Investigation Division**

**Memorandum of Interview**

| | | | |
|---|---|---|---|
| **In Re:** | MICHAEL ARUTA | **Location:** | United States Attorney Office |
| **Investigation #:** | 1000237973 | | Ft. Lauderdale, Fl |
| **Date:** | July 13, 2011 | | |
| **Time:** | 9:35 a.m. – 11:35 a.m. | | |
| **Participant(s):** | MICHAEL ARUTA, Defendant | | |
| | Bruce Zimmet, Attorney | | |
| | FBI SA Jennifer Turner | | |
| | DEA SA Mike Burt, and | | |
| | IRS-CI SA Anabel Pacheco and David Keyes | | |

The following information was provided by ARUTA:

1.  Full Name: Michael John ARUTA; DOB: 8/16/1963; SSN: 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.
2.  He resides at 6655 Via Regina, Boca Raton, FL 33433. This is a condominium owned by his fiancée, Marisol Negron-Lotito.
3.  Negron-Lotito works for a web hosting company and also with ARUTA in ISAGENIX.
4.  ARUTA was born in Painesville, Ohio. He attended Ohio Northern University for 4 years 1981-1985. Then, he went to Ohio State University where ARUTA obtained his Medical Degree in 1989.
5.  ARUTA went to work at Jackson Memorial Hospital where he did a 2 year residence/fellowship in Family Practice. He also worked at the Cleveland Clinic until 1995. From 1995-1999, ARUTA worked with NuSkin, marketing nutritional products; trying to develop his anti-aging skin care practice. In 1999, he was a solo practitioner doing Botox and skin care type work. After 1 year, in 2000, he partnered with Dr. Roger Murray out of Maitland, Florida doing anti-aging work. In May 2002, ARUTA moved to South Florida to open his own practice, with his fiancée, (cosmetics, dermatology, peelings, and other anti-aging skin care services) across from Holy Cross Hospital on Federal Highway. He got trained in Level I liposuction (local anesthesia), and by 2006 he was making about $800,000 due to the liposuction treatments. When he offered his patients an alternative less-expensive treatment instead of the liposuction, his business declined dramatically. In trying to grow his practice, he incurred a $200,000 debt and was forced to close his family practice in 2008. ARUTA then dedicated himself to the Isogenix, nutritional business.
6.  **A-PAIN Clinic:** A doctor friend of ARUTA referred him to the pain management field. ARUTA went to work at A-PAIN, a pain management clinic owned by Ken JAFFE in Boca Raton, Florida. Jaffe conducted the interview; just asked a couple of medical questions. ARUTA advised JAFFE

that he did not have any pain management experience. The office looked like a medical practice, it had exam rooms, but the rooms had no sinks. There were some nurses at the clinic, like a physician extended-type. JAFFE told ARUTA that the patients needed an MRI report and that they needed to have a reason for being there. JAFFE said that he wanted the patients at their practice, but not the ones that could cause trouble for them. JAFFE showed ARUTA how to look for track marks and for patients that were not abusing drugs. JAFEE told ARUTA that after he finds a "legit" patient (one without track marks) then, ARUTA needed to see if he liked the patient. For that ARUTA needed to do a history of the patient; JAFFE told ARUTA that "slurred" speech did not preclude him from prescribing to a patient because that is what the drugs do to the patient. ARUTA asked the patients about alternative methods of treatment just to have it documented in the file not because he did not want to prescribe. ARUTA never verified with other doctors if the patient was or not being treated by them. He would see about 5 to 15 patients per day. He was paid $50 per patient. There was a guy by the name of GUS LNU; his job was to find patients for the clinic. He was a "runner". GUS slurred his speech a lot. ARUTA was certain that GUS was getting drugs at the clinic. Per JAFFE, the maximum prescription of the oxy 30mg was 8 pills per day. The average cocktail was 30mg, 15mg and xanax and it was for 28 days.  ARUTA did not have an inventory at the A-Pain clinic.

7. **AMERICAN PAIN**: ARUTA saw a billboard for AMERICAN PAIN, in late January 2009 he called the number and Erika UNDERWOOD answered the phone. He spoke to Chris GEORGE on the phone. GEORGE discussed the "cocktail" with ARUTA over the phone.  ARUTA left A-Pain because he wanted to make more money.

8. ARUTA described the waiting area of AMERICAN PAIN like that of Jackson Memorial, he stated that "it felt like home". He compared it to Jackson because there were lots of patients. ARUTA described the type of patients that he observed as: "Ozark" people, the normal people "like us", and the "suit and tie" people. He met with GEORGE in an office that had a lot of security cameras and close caption TVs.  ARUTA's impression was that GEORGE had the "pulse" of his operation. During the face-to-face interview, GEORGE was paying more attention to the security monitors than to ARUTA.

9. AMERICAN PAIN paid $75 per patient and $1,000 weekly in cash for the DEA dispensing license.

10. ARUTA was hired the same day that he went for the interview.  He was given a room and a couple of patients, both established and new ones. His work that day was reviewed by some administrator (either GEORGE or Ethan Baumhoff) not by a doctor. ARUTA spent about an hour or so "shadowing" Dr. Jacob Dreszer.

11. The least comfortable factor was the other doctors because of the "greed factor" that existed at AMERICAN PAIN. The fights over the patient files. If the doctors did not have patient files in their boxes they would be questioned why.  Once, ARUTA confronted Dr. J Dreszer because he was stealing patient files from Dr. Boshers' box.  Dr. J Dreszer had a tantrum.  ARUTA said that he had to confront him because Dr. J Dreszer did not want any other doctor seeing his patients, but here he was stealing patients from another doctor. Since this incident, ARUTA was not friends with Dr. J Dreszer anymore.

U.S. Treasury Criminal Investigation Division

12. ARUTA agreed that the numbers (i.e. the prescriptions) were excessive. He believes that not everyone had to be max out (as to the oxy prescriptions), but if the doctor did not max them out the patient would go somewhere else and, then, the doctor will also go somewhere else.

13. ARUTA also believes in specialization, which he had seen at Jackson. With specialization comes narrow focus. The patient starts with aspirin, Tylenol with codeine, hydrocodone, and, then, the only option is oxycodone. This is not how things were at America Pain; the patients went straight to oxycodone.

14. ARUTA noticed that the staff of American Pain would drink on the job. He remembered a Friday in which there were so many employees drunk that they had to be sent home.

15. On 3 occasions, ARUTA saw/became aware of a patient having seizures in the waiting area. 911 would be called. Dr. CADET did help with the seizure patients; ARUTA saw her a couple of times assisting, not sure if as first responder or providing support. ARUTA explained that when a seizure happened, the doctors would drop whatever they were doing and go to help the patient in need. The doctors talked about the seizure patients amongst themselves.

16. According to ARUTA, because of the physical layout of the area, there is no way that any doctor can say that they were not aware of patients having seizures or that they never saw the "zoo" like atmosphere of the waiting area. The doctors could see the waiting area when they pick up their patient files.

17. ARUTA remembered seeing an employee from Executive Pain as a patient. He could not remember the employee's name.

18. ARUTA was not aware that Dr. BOSHERS was a patient of American Pain. ARUTA never wrote any prescription for Dr. BOSHERS. BOSHERS did not give any indications of taking oxycodone pills. BOSHERS never complained of a bad back, it never came up in conversations with ARUTA. "That comes as a total surprise" "shock", ARUTA said.

19. ARUTA asked if it was true that 6 deaths in the state of Florida were attributed to him as he had learned in the 7/7/2011 meeting with us. SA Turner verified and confirmed the numbers.

20. The interview concluded at approximately 11:35 a.m.

Anabel Pacheco
Special Agent

I prepared this memorandum on July 15, 2011, after refreshing my memory from notes made during and immediately after the interview with MICHAEL ARUTA.

# Baumhoff Statements

U.S. Department of Justice
Drug Enforcement Administration

## REPORT OF INVESTIGATION

Page 1 of 9

| 1. Program Code | | 2. Cross File | Related Files | 3. File No. | 4. G-DEP Identifier |
|---|---|---|---|---|---|

By: Alfred Cortes, SA
At:
ENFORCEMENT GROUP 3

6. File Title

| 7. ☐ Closed ☐ Requested Action Completed ☐ Action Requested By: | | | 8. Date Prepared 03-15-2010 |

9. Other Officers: DEA SA Victor Gobbi, FBI SA Jennifer Turner, AUSA Robin Waugh, Defense Attorney J. David Bogenschutz.

10. Report Re: Proffer of Ethan A. BAUMHOFF III at the United States Attorney's Office in Fort Lauderdale, FL on 03/15/10.

### SYNOPSIS

On 03/15/2010, Federal Bureau of Investigation (FBI) Special Agent (SA) Jennifer Turner, Drug Enforcement Administration SAs Alfred Cortes and Victor Gobbi interviewed Ethan Allen BAUMHOFF III, at the United States Attorney's Office in Fort Lauderdale, FL.  Also present during the interview was BAUMHOFF's attorney J. David Bogenscutz, and Assistant United States Attorney (AUSA) Robin Waugh. BAUMHOFF was questioned about his knowledge and involvement in daily operations regarding AMERICAN PAIN, LLC., owned by Christopher P. GEORGE.  The following is a synopsis of the interview of BAUMHOFF.

### DETAILS

1.   Reference is made to all previous DEA-6 form Reports of Investigation (ROI) written under the above captioned file title and number, regarding the illegal prescribing, distribution and trafficking of controlled pharmaceutical substances from various clinics in this Organized Crime Drug Enforcement Task Force (OCDETF) investigation.

2.   On 03/15/2010 at approximately 11:37 a.m., Ethan A. BAUMHOFF III was interviewed at the United States Attorney's Office in Fort Lauderdale, Florida with all the individuals listed above in the #9 Other Officer's section present.

| 11. Distribution: Division | 12. Signature (Agent) Alfred Cortes, SA | 13. Date 03-15-2010 |
|---|---|---|
| District | 14. Approved (Name and Title) Robert M Schaefer, GS | 15. Date 03-19-2010 |
| Other | | |

DEA Form - 6

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

CAST

00056

U.S. Department of Justice
Drug Enforcement Administration

## REPORT OF INVESTIGATION

*(Continuation)*

| | | |
|---|---|---|
| 1. File No. ████████ | | 2. G-DEP Identifier ████████ |
| 3. File Title ████████████████ ████ | | |

Page 5 of 9

5. Program Code ████████

6. Date Prepared
03-15-2010

---

18.  While Dr. SOLLIE was still employed at SOUTH FLORIDA PAIN, BAUMHOFF stated that SOLLIE told BAUMHOFF to stay away from GEORGE.  SOLLIE told BAUMHOFF that GEORGE wanted SOLLIE to write more prescriptions and in higher quantities.

19.  SA Turner questioned BAUMHOFF about the manner in which GEORGE operated the clinic.  BAUMHOFF stated that GEORGE would routinely review the patient files to determine how many patients each doctor was seeing per day and also to determine the quantity of pills being prescribed.  BAUMHOFF stated GEORGE would question the doctors regarding why some patients were prescribed more pills than others.  BAUMHOFF stated that Dr. Patrick GRAHAM who was employed at Executive PAIN was never hired as a full time physician because GRAHAM would not write prescriptions for high quantities.

20.  BAUMHOFF stated that if clients were discharged as patients by an AMERICAN PAIN doctor, GEORGE would have the client seen by a different AMERICAN PAIN doctor or send the client to EXECUTIVE PAIN.  BAUMHOFF said that on numerous occasions he saw NOLAN remove paperwork from a patient's file which indicated a patient was discharged and then have the patient reexamined by a different doctor.

21.  BAUMHOFF stated that if a patient was discharged and sent to EXECUTIVE PAIN, NOLAN, in lieu of refunding the money the patient had already paid, would issue the patient an AMERICAN PAIN business card which was stamped with "Free Visit." BAUMHOFF stated that in this manner, GEORGE could make certain the money did not go elsewhere.

22.  BAUMHOFF stated that GEORGE would have new patients assigned to new doctors until the new doctor had established a follow-up patient base.

23.  BAUMHOFF stated that an employee named Steve MILLS was employed at AMERICAN PAIN to handle returning (follow-up) patients.  BAUMHOFF stated he believed that MILLS would accept cash bribes for providing expedited service for patients to be seen by the doctor more quickly.

---

DEA Form - 6a
DEA SENSITIVE
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription   06/21/2010

ETHAN BAUMHOFF (BAUMHOFF) was interviewed at the United States Attorney's Office subsequent to signing a Kastigar Letter. Also present during the interview was Internal Revenue Service Special Agent Richard Serrano and BAUMHOFF's attorney, David Bogenschutz.

BAUMHOFF is currently working at � ███████████████████

In 2006 or 2007, CHRIS GEORGE (GEORGE) bought Gamma Hydroxy Butyrate (GHB) in the form of wheel cleaner via the Internet from somewhere outside of the United States.  GEORGE bought the GHB using his credit card and sent it via Federal Express to DERIK NOLAN's (NOLAN) house in North Port, Florida. BAUMHOFF drove GEORGE to NOLAN's house to pick up the GHB, but BAUMHOFF never saw it.  GEORGE told BAUMHOFF the GHB is used to make "scoops", a date rape drug.

BAUMHOFF once asked DR. ARUTA (ARUTA) at AMERICAN PAIN (AP) how he can only spend two minutes with patients and then they leave with a prescription.  ARUTA responded, "Come on, you know why these hillbillies are here."

DR. BOSHERS (BOSHERS) often complained of back problems and was a patient at AP.  BAUMHOFF kept BOSHERS' patient file in a drawer in his office.

AP employees CHRIS HANEY and FIRST NAME UNKNOWN (FNU) ABBAS were patients at AP.  BAUMHOFF heard DR. RONNIE DRESZER had a cocaine problem.  BAUMHOFF would find RONNIE DRESZER sleeping in his patient exam room or in NOLAN's office.  DR. JACOB DRESZER may have a patient file at AP that contains a prescription for antibiotics.  DRs. CADET and ARUTA were not patients at AP.

Physicians at AP were paid $75.00 per patient they saw plus an additional $1,000 per week cash for being a dispensing practitioner.  DR. BOSHERS received $2,000 per week cash for being a dispensing practitioner.  The doctors were not reimbursed based on the quantities of medications distributed in-house.

---

Investigation on   06/15/2010   at  Fort Lauderdale, Florida

File # ███████████████████                              Date dictated

by   SA Jennifer J. Turner

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

01157

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of _____ETHAN BAUMHOFF_____ , On 06/15/2010 , Page   2

     After DR. SOLLIE left AP, SOLLIE said GEORGE pressued him to do things during his employment that were illegal.  GEORGE and SOLLIE were subsequently involved in a lawsuit.  After this, GEORGE came up with a form for employees to sign which stated they were not pressured to do anything illegal.  Employees signed the form when NOLAN passed out paychecks and/or cash weekly.  BAUMHOFF paid the physicians.

     NOLAN and GEORGE would funnel new patients to the physicians who wrote larger quantities of Oxycontin such as CADET and BOSHERS.  On one occasion, when the clinic was very busy, GEORGE told BAUMHOFF to help out.  BAUMHOFF moved patient files to the doctor's in-boxes and NOlAN took the files out because BAUMHOFF wasn't placing the files with the proper physician; meaning routing the patients to the physicians who wrote higher prescriptions.  DRs ARUTA and JACOB DRESZER were conservative script writers.

     GEORGE's philosophy was the higher the prescriptions (meaning the more quantities of Oxycontin a patient received), the more likely the patient is to return.  If physicians wrote higher scripts, they would get more money because they would see more patients.

     GEORGE would check patient files to see what the doctors were writing.  If GEORGE did not like the scripts a doctor was writing, he would talk to them or eventually force them out of the clinic.  GEORGE forced DRs ROLFE, SOLLIE, and DONALD BLETZ out of SOUTH FLORIDA PAIN/AMERICAN PAIN.  BAUMHOFF heard GEORGE have these conversations with DRs GRAHAM, ARUTA, and BERETSKY.  BERETSKY tried to ween patients off of their medication at AP, so GEORGE sent him to work at EXECUTIVE PAIN.

     The physicians never looked at their pill inventory.  The last time BAUMHOFF did an inventory, he noticed the pills were short.  BAUMHOFF took all of the Drug Enforcement Administration (DEA) 222 forms and added up the number of pills ordered.  He then looked at the pharmacy print-out to obtain the total number of pills dispensed.  He realized BOSHERS was short approximately 25,000 pills.  BAUMHOFF had DANA LAST NAME UNKNOWN (LNU) and ERIKA UNDERWOOD double-check his work and they found the same discrepency.

     While DR. BERETSKY was at EXECUTIVE PAIN, GEORGE was going to fire him.  GEORGE knew BERETSKY would not take his pills with him when he left, so GEORGE decided he was going to take

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    09/14/2010

       On September 1, 2010, ETHAN BAUMHOFF (BAUMHOFF) was
interviewed at the United States Attorney's Office with the
following individuals present:  AUSAs Paul Schwartz and Strider
Dickson, Drug Enforcement Administration SA Michael H. Burt,
Internal Revenue Service SA Richard Serrano, and Federal Bureau of
Investigation SA Jennifer J. Turner.

       CHRIS GEORGE (GEORGE) would yell at BAUMHOFF if AMERICAN
PAIN (AP) ran out of drugs.  GEORGE would tell BAUMHOFF, "You're
costing me $5,000 a day!"

       Drug distributors including PARAGON, MEDICAL ARTS, and
HARVARD all had similar forms for the physicians to sign regarding
number of out-of-state patients, number of controlled substances
dispensed, etc.  Generally when BAUMHOFF needed the doctors at AP
to sign something, the doctors did not read the document before
signing.  Typically, all of the HARVARD pharmaceutical forms were
faxed, then also sent to HARVARD via U.S. mail.

       AP was put in BAUMHOFF's name in December 2008.

       GEORGE had the physicians sign Power of Attorney forms
prior to BAUMHOFF ordering drugs for the physicians.  BAUMHOFF does
not know who was responsible for ordering pills and maintaining the
inventory prior to him doing so.  He believes it could have been
DERIK NOLAN (NOLAN), JENNIFER DECARRO (DECARRO), or DANA ANGELINO
(ANGELINO).

       A woman named EVE (EVE) LAST NAME UNKNOWN (LNU) owned the
building at the Oakland Park Boulevard location.  GEORGE financed a
house for EVE in Sarasota, Florida, then the building where the
clinic was located caught on fire.  BAUMHOFF asked GEORGE if he had
anything to do with the fire.  GEORGE told BAUMHOFF the fire
started in the electric panel.

       BAUMHOFF was asked about where the paperwork for SFP may
have been located when the government served a search warrant at AP
in March 2010.  BAUMHOFF looked at the FBI drawing of the clinic
and thought the paperwork could have been located in Areas I, H, or
J2.  He recalled they were in five inch white and black binders in
large brown moving boxes.

| | | | |
|---|---|---|---|
| Investigation on | 09/01/2010 | at | Fort Lauderdale, Florida |

File #

Date dictated

by   SA Jennifer J. Turner

01038

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of     ETHAN BAUMHOFF                              , On  09/01/2010  , Page     3

of each day.  When a doctor did not sign the log or say he would
sign it later, BAUMHOFF would say, "fine, it's your license".

BAUMHOFF tried to inventory the pills once AP moved to
the Boca location.  BAUMHOFF closed down the pharmacy and he and
ANGELINO started the inventory.  GEORGE eventually came in and told
them to re-open the pharmacy and do the inventory after hours.
DECARRO was also present.

Eventually BAUMHOFF and UNDERWOOD inventoried the pills.
The adding tape from their count is in a UPS box in GEORGE's
office.  The inventory revealed RONI DRESZER was approximately
3,500 pills off, JACOBO DRESZER was approximately 350 pills off,
and DR. CADET was dead on.  BOSHERS was missing 25,000 pills;
meaning the clinic dispensed 25,000 more pills than received in
BOSHERS name via the DEA 222 forms.  BAUMHOFF never talked to
BOSHERS about his findings.

DECARRO was a licensed pharmacy technician and worked at
the first and second Cypress Creek locations.  She was dating
NOLAN, but has supposedly broken up with him.  DECARRO trained
ANGELINO on how to fill scripts, but ANGELINO was not licensed.
ANGELINO then later trained UNDERWOOD.  MIKE MILLS and STEPHANIE
LNU also filled prescriptions in the pharmacy.

GEORGE paid a pharmacist to open BOCA DRUGS.  BAUMHOFF
could not recall her name, but she used her license to set up BOCA
DRUGS and worked at AP in Boca for a couple of weeks.

Once the prescriptions were filled, they were taken to
the doctors to review prior to being given to the patients.  This
practice was put in place at the second Cypress Creek location.

On at least five occasions, BAUMHOFF saw NOLAN in his
office with pill bottles after prescriptions were filled.  BAUMHOFF
told GEORGE about this every time he saw the pill bottles in
NOLAN's office.

ARUTA would discharge patients if he saw they had track
marks.  NOLAN would then send those patients to EXECUTIVE PAIN.
GEORGE timed ARUTA spending two minutes with a patient.  GEORGE
told ARUTA he had to spend more time with his patients.

Giving patient urine tests was in place before BAUMHOFF
started working at SFP.  Whoever was working in the back would

01040

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription   09/14/2010

On September 1, 2010, ETHAN BAUMHOFF (BAUMHOFF) was interviewed at the United States Attorney's Office with the following individuals present: AUSAs Paul Schwartz and Strider Dickson, Drug Enforcement Administration SA Michael H. Burt, Internal Revenue Service SA Richard Serrano, and Federal Bureau of Investigation SA Jennifer J. Turner.

CHRIS GEORGE (GEORGE) would yell at BAUMHOFF if AMERICAN PAIN (AP) ran out of drugs.  GEORGE would tell BAUMHOFF, "You're costing me $5,000 a day!"

Drug distributors including PARAGON, MEDICAL ARTS, and HARVARD all had similar forms for the physicians to sign regarding number of out-of-state patients, number of controlled substances dispensed, etc.  Generally when BAUMHOFF needed the doctors at AP to sign something, the doctors did not read the document before signing.  Typically, all of the HARVARD pharmaceutical forms were faxed, then also sent to HARVARD via U.S. mail.

AP was put in BAUMHOFF's name in December 2008.

GEORGE had the physicians sign Power of Attorney forms prior to BAUMHOFF ordering drugs for the physicians.  BAUMHOFF does not know who was responsible for ordering pills and maintaining the inventory prior to him doing so.  He believes it could have been DERIK NOLAN (NOLAN), JENNIFER DECARRO (DECARRO), or DANA ANGELINO (ANGELINO).

A woman named EVE (EVE) LAST NAME UNKNOWN (LNU) owned the building at the Oakland Park Boulevard location.  GEORGE financed a house for EVE in Sarasota, Florida, then the building where the clinic was located caught on fire.  BAUMHOFF asked GEORGE if he had anything to do with the fire.  GEORGE told BAUMHOFF the fire started in the electric panel.

BAUMHOFF was asked about where the paperwork for SFP may have been located when the government served a search warrant at AP in March 2010.  BAUMHOFF looked at the FBI drawing of the clinic and thought the paperwork could have been located in Areas I, H, or J2.  He recalled they were in five inch white and black binders in large brown moving boxes.

| | | |
|---|---|---|
| Investigation on | 09/01/2010 | at Fort Lauderdale, Florida |

File # ███████████████████   Date dictated

by   SA Jennifer J. Turner

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of ____ETHAN BAUMHOFF_____ , On 09/01/2010 , Page ___2___

       Initially, SFP gave patients prescriptions to get MRIs. The Department of Health (DOH) conducted an inspection and SFP got a "finding" from DOH for doing this. While at the second Cypress Creek location, MRI companies gave SFP pamphlets which were given to the patients. Whoever was working the new patient window that day would sign his name to the bottom of the pamphlet prior to giving it to the patient.

       After the DOH and/or DEA including Allison King conducted an inspection in November or December 2008, NOLAN wrote a question/answer sheet for employees in case DOH or DEA ever came back. DR. ENOCK JOSEPH surrendered his license during this inspection.

       Allison King returned to SFP after the first of 2009 to seize the pills of a physician who was no longer employed at AP. BAUMHOFF could not recall if it was DR. SOLLIE or DR. BLETZ.

       GEORGE ordered 90,000 pills from NUCARE while SOUTH FLORIDA PAIN (SFP) was at their location on Cypress Creek Road. SFP moved prior to the pills being delivered, so UPS brought the pills from NUCARE to their new location. DEA 222 forms were never signed to transfer pills from DR. SOLLIE or DR. BLETZ to the other SFP/AP physicians. BAUMHOFF knew pills were taken from one doctor's inventory to fill prescriptions for another doctor. ERICA UNDERWOOD (UNDERWOOD) told BAUMHOFF that GEORGE told UNDERWOOD to do this.

       When Allison King (King) from the DEA went to SFP to retrieve DR. SOLLIE or BLETZ's pills, GEORGE and NOLAN put the pills in NOLAN's office to hide them from King. After King left, GEORGE put the pills back into "service" meaning into the pharmacy's inventory.

       GEORGE altered the logs in the computer software. GEORGE had DECARRO and ANGELINO delete patient's prescriptions. The actual prescriptions the physicians signed were taken out of the patient's file and maintained in GEORGE's office.

       The physicians never inventories their pills. BAUMHOFF spoke with each doctor about doing an inventory of their pills, but they were not interested. Sometime before the government shut AP down, DR. BEAU BOSHERS walked into the safe to look at his inventory. The physicians signed their dispensing logs at the end

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    01/09/2012

     ETHAN BAUMHOFF (BAUMHOFF), having previously been interviewed by drafting Agent, provided the following information:

     CHRIS GEORGE (GEORGE) wanted an "Opinion Letter" from an attorney regarding AMERICAN PAIN's (AP) operations.  BAUMHOFF gave GEORGE a copy of the standard operating procedures written by BROAD & CASSEL for AP.

     JENNIFER DECARRO was a licensed pharmacy technician who worked at AP's first location on Cypress Creek Road and at the Boca Raton location for a short period of time.

     SHAFALI DATA (phonetic) was a pharmacist who worked at AP in Boca Raton for a couple of weeks.  GEORGE needed her license to open BOCA DRUGS.

     If the in-house pharmacy at AP was out of pills, GEORGE would yell at BAUMHOFF about how BAUMHOFF was costing GEORGE $5,000 per day.  BAUMHOFF witnessed GEORGE count pills in the pharmacy.

     AP employees getting Oxycodone included DARYL MICHAEL STEWART (STEWART), DEREK NOLAN (NOLAN), STEVE MILLS, CHRIS HANEY, ABBAS HASSAN, and possibly SAM HASSAN.  BAUMHOFF learned through STEWART that AP employees were selling their pills to NOLAN.  BAUMHOFF saw patient's pill bottles in NOLAN's right-hand desk drawer.

     When AP moved pills to a new location, the pills were transported locked in the safes utilizing a moving company.  No opening or closing inventories were conducted, but BAUMHOFF put paper in the safe to make it appear as if the opening and closing inventories were conducted.

     One of the wholesalers suggested to BAUMHOFF that AP prescribe something other than Oxycodone to its patients.  BAUMHOFF told DRs BOSHERS, CADET, JACOBO DRESZER, RONNIE DRESSER, and ARUTA the wholesalers said AP was a pill mill and the doctors needed to prescribe something other than Oxycodone.  The doctors then made suggestions of various drugs to order.  They were ordered, but never prescribed.  On one occasion, BAUMHOFF told the physicians

---

Investigation on    11/22/2010    at  Fort Lauderdale, Florida

File #  ▮▮▮▮▮▮▮▮▮▮▮                                    Date dictated

by    SA Jennifer J. Turner

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

# Bennett Statement

FD-302 (Rev. 10-6-95)

FD-

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription   03/04/2010

On March 3, 2010, agents interviewed J████ H███
B█████████, date of birth (DOB) ████████, Social Security
Account Number (SSAN) ██████████, Florida Drivers License
number ███████ cell phone number ██████████████, at
his temporary residence of ██████████████████████,
████████████████████ BEN██TT agreed to speak with agents
regarding his association with American Pain, LLC.

B████████ began his employment for American Pain in
February or March 2009. B████████ mother is the fiancé of Dr.
Beau Boshers, who works at American Pain.  B████ was employed
by American Pain due to the relationship between Dr. BOSHERS and
BENNETT's mother.

B████████ is a file clerk at American Pain.  B████████
responsibilities include handling patient files, verifying past
MRI's, and putting together new patient files.  B█████ makes
approximately $120 a day at the clinic.  IF B████ is working
full time, he receives payment by check.  If B████ is working
part time, he is paid cash.  DERIK NOLAN is B████████ immediate
supervisor and is the individual who hands B██████ a check or
cash for payment.  NOLAN also handles all issues involving law
enforcement.

CHRIS GEORGE may be the owner of American Pain.  Due to
recent health care regulation changes, a reorganization of
American Pain may have taken place but B████████ is unsure whether
this happened.  No other clinics are associated with American
Pain.  GEORGE may own another clinic (NFI).

The chain of command at American Pain starts with
GEORGE.  ETHAN LAST NAME UNKNOWN (LNU) and NOLAN answer to
GEORGE.  ETHAN is the office manager and NOLAN handles the
patients and medical side of the business.  There are
approximately 20 other people who work at American Pain.

ETHAN is responsible for handling all funds that go
through the business and transporting cash to the bank.  ETHAN
makes bank deposits once a week, which is comprised of mostly
cash.  All payments by customers are made by cash or

Investigation on   03/04/2010   at  West Palm Beach, Florida

File # █████████-████████                          Date dictated

Erik B. Sullenberger:ebs
by    Kevin Mullins

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;

FD-302a (Rev. 10-6-95)

FD-

▬▬▬▬▬▬▬

Continuation of FD-302 of ___JULIUS HENDRIX BENNETT III___ , On 03/04/2010 , Page ___2___

debit/credit card.  No health insurance, medicare, or medicaid is accepted by American Pain.

The doctors who presently work at American Pain are: MICHAEL ARUTA, BEAU BOSHERS, CYNTHIA CADET, RONNIE DRESZER, JACOB DRESZER, RANDAL or MICHAEL WOLFF.  BENNETT believes one or two doctors quit in the past but could not remember their names.

Other American Pain employees and their responsibilities include :

| | |
|---|---|
| ABBAS HASAN | New patients |
| OSAMA HASAN | Missed appointments / used to be security guard |
| TEIK LNU | On-time patients |
| CHRIS ELDER | File clerk |
| VICTORIA LNU | File clerk |
| NORMAN LNU | File clerk / used to be security |
| STEPHANIE LNU | File clerk |
| URSULA LNU | File clerk / copies prescription paperwork and puts it into patient file |
| DARYL LNU | Handles prescription administration / interacts with patients in waiting room regarding prescriptions |
| JAHANIE LNU | Security guard |
| FNU LNU | Security guard |
| FNU LNU | Security guard |
| RAQUEL LNU | NOLAN's assistant / discharge files |
| MIKE MILLS | Pharmacy tech |
| ERICA UNDERWOOD | Pharmacy tech / handles dispensary |

BENNETT is unaware of any law enforcement issues with American Pain.  BENNETT was not instructed by American Pain on what to say or do if questioned by police regarding the clinic. American Pain's policy regarding law enforcement is to cooperate fully.

American Pain's media policy was to not provide interviews.  American Pain had a negative media report a year earlier.

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___JULIUS HENDRIX BENNETT III_____ , On 03/04/2010 , Page ___3___

     American Pain has recording monitors / surveillance both inside and outside the clinic. Both ETHAN and NOLAN have monitors in their offices.

     American Pain has approximately 300 patients a day. Approximately 50 percent of those patients are from out of state. A patient's initial fee is $200, and follow up visits are $150. The typical prescriptions are oxycondone, zanex, and perkiset. BENNETT did not know the cost for the prescriptions. Out of state patients are given prescriptions once a month.

     To establish a new patient, American Pain requires any valid government identification card, past MRI of CT scan within two years, and the patient's past medical records.

     If a patient is referred to have a MRI, the patient may be referred to Del Ray Diagnostics.

     An American Pain patient may be discharged for drug abuse or disobeying doctor's orders. Approximately four or five patients are discharged per day for IV abuse.

     Instructions to patients from DARYL and the doctors are given to fill their prescriptions in-state because out-of-state pharmacies would sometimes not honor Florida clinic prescriptions. If patients chose not to fill their prescriptions at American Pain, patients were told not to fill at Wal Greene's Pharmacies because there had been issues in the past (NFI). BENNETT is unaware what instructions are given to patients in the event that patients are stopped by law enforcement while possessing their medications.

     American Pain patients are told not to loiter around the clinic parking lot. BENNETT does not know why they are told this. BENNETT does not get compensated for referring new patients.

# Biossat Statement

U.S. Department of Justice
Drug Enforcement Administration

## REPORT OF INVESTIGATION

Page 1 of 23

| 1. Program Code | 2. Cross File    Related Files | 3. File No. G8-09-0006 | 4. G-DEP Identifier WCN3D |
|---|---|---|---|
| 5. By: Robert P. Wise, TFO<br>  At: WEST PALM BEACH R. O. | ☒ ▮▮▮▮▮<br>☐<br>☐ | 6. File Title GEORGE, JEFFREY | |
| 7. ☐ Closed  ☐ Requested Action Completed<br>  ☐ Action Requested By: | ☐<br>☐ | 8. Date Prepared 03-29-2010 | |

9. Other Officers: DEA Special Agent (SA) Victor Gobbi, IRS SA Sergio Ramil, IRS SA Richard Serrano and DEA TFO Robert Wise

10. Report Re:  Interview of William BIOSSAT 3-24-2009

SYNOPSIS

    On March 24, 2010, at approximately 11:15 a.m., DEA SA Victor Gobbi, DEA TFO Robert Wise, IRS SA Sergio Ramil, IRS SA Richard Serano and AUSA Robin Waugh conducted a proffer session with William Z. BIOSSAT at the Federal Building in Fort Lauderdale.

DETAILS

1. AUSA Waugh requested BIOSSAT to provide information on four (4) main topics dealing with Jeffrey and Christopher GEORGE. The topics were drug diversion, a traffic stop in which BIOSSAT had a fictitious MRI, money-laundering and violence.

2. AUSA Waugh asked BIOSSAT to explain the traffic stop and the MRI. BIOSSAT stated that on December of 2008 BIOSSAT and his wife Heather Biossat moved in with Jeff GEORGE at a house Jeff GEORGE was leasing. The address of this location was 10505 Vignon Court, in Wellington, Florida. BIOSSAT stated he was recently out of the Marine Corps "hanging out," without a job.

3. BIOSSAT asked Jeff GEORGE for a job. Jeff GEORGE instructed BIOSSAT to come to "the clinic." BIOSSAT knew this to mean EAST COAST PAIN, owned by Jeff GEORGE. BIOSSAT stated to Jeff GEORGE "I don't have back problems", to which Jeff GEORGE replied "no problem."

| 11. Distribution:<br>  Division ▮▮▮▮▮<br><br>  District ▮▮▮<br><br>  Other ▮▮▮▮▮ | 12. Signature (Agent)<br>  Robert P. Wise | 13. Date<br>03-29-<br>2010 |
|---|---|---|
| | 14. Approved (Name and Title)<br>  Joseph M. Dubois, GS | 15. Date<br>04-05-<br>2010 |

DEA Form    - 6
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| **REPORT OF INVESTIGATION** *(Continuation)* | 1. File No. G8-09-0006 | 2. G-DEP Identifier WCN3D |
|---|---|---|
| | 3. File Title GEORGE, JEFFREY | |

| 4. Page   11   of   23 | |
|---|---|
| 5. Program Code | 6. Date Prepared 03-29-2010 |

Jeff GEORGE spotted the individual involved in the earlier accident. Jeff GEORGE pulled beside this person and began yelling for BIOSSAT to get the guns out of the trunk.  BIOSSAT stated he (BIOSSAT) exited Jeff GEORGE'S car, began yelling at the person and threw a water bottle to scare him off.

## MONEY TO FLEE TO COLOMBIA AND TO KILL EDDY

53.    BIOSSAT advised the investigators about another topic discussed at the Bonefish Grill meeting.  BIOSSAT and NOLAN were offered twenty thousand dollars each to make EDDY disappear.  Later that same week BIOSSAT and OBERMEYER were offered fifty thousand dollars to flee to Colombia.  BIOSSAT was asked to go with OBERMEYER to keep an "eye" on OBERMEYER.

54.    Attendees discussed which associates may be "flipping" (cooperating with law enforcement) and who constituted the greatest threats against Jeff and Chris GEORGE.  The individuals Jeff and Chris GEORGE were most concerned with were Ethan BAUMHOFF, EDDY and MARQUEZ.  Jeff GEORGE and BIOSSAT later discussed in greater depth Jeff GEORGE'S "huge concern" about OBERMEYER's allegiance.

55.    On March 22, 2010, BIOSSAT and OBERMEYER met to discuss matters regarding the ongoing investigation.  BIOSSAT informed OBERMEYER that Jeff GEORGE was "playing" both of them.  Jeff GEORGE advised BIOSSAT that he (Jeff GEORGE) was making plans to blame OBERMEYER, accusing him of stealing pills and selling them.   Conversely, OBERMEYER informed BIOSSAT that Jeff GEORGE was making plans to blame BIOSSAT. OBERMEYER told BIOSSAT he (OBERMEYER) wanted to take the money Jeff GEORGE had offered to go to Colombia.

56.    BIOSSAT said to investigators that Jeff GEORGE also planned to inform law enforcement how OBERMEYER receives kickbacks from patients, and how OBERMEYER sold 500 pills to MARQUEZ'S girlfriend.

57.    BIOSSAT reported that Jeff GEORGE planned to obtain depositions from all of these individuals in hopes of "locking them" into statements, to be able to impeach them later, if they turned against

DEA Form    - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| **REPORT OF INVESTIGATION** *(Continuation)* | 1. File No. G8-09-0006 | 2. G-DEP Identifier WCN3D |
|---|---|---|
| | 3. File Title GEORGE, JEFFREY | |

| 4. Page 12 of 23 | |
|---|---|
| 5. Program Code | 6. Date Prepared 03-29-2010 |

==him. BIOSSAT further advised everyone involved to blame the doctors for everything that concerned the pain clinics.==

58.     On March 10, 2010, BIOSSAT had dinner with Jeff and Chris GEORGE at their mother's (Denise HAGERTY'S) house. BIOSSAT said to the investigators that when he (BIOSSAT) and Chris GEORGE were away from everyone, outside, behind the house; Chris GEORGE began whispering to BIOSSAT. Chris GEORGE was standing very close to BIOSSAT. BIOSSAT stated Chris GEORGE told BIOSSAT "you need to take him out" refereeing to EDDY, "he needs to go away, Robby's a big problem".

59.     BIOSSAT stated he (BIOSSAT) has met with Jeff and Chris GEORGE to discuss "getting rid of Robby". BIOSSAT has informed Jeff and Chris GEORGE that the problem with killing EDDY is that the GEORGE brothers would become law enforcement's prime suspects.

60.     BIOSSAT discussed with the investigators Chris GEORGE's concern about a gun found in Chris GEORGE'S house during the search warrant on March 3, 2010. Chris GEORGE told BIOSSAT PAVNICK would declare ownership of the gun.

61.     The investigators asked BIOSSAT why Jeff and Chris GEORGE would ask him to commit murder. BIOSSAT replied "because that is what I did in the Marines". BIOSSAT was asked how much he (BIOSSAT) was going to get paid for killing EDDY. BIOSSAT stated a dollar amount was never given but he *was* offered money by both Jeff and Chris GEORGE.

**JACKSONVILLE INCIDENT**

62.     In late 2009 or early 2010, BIOSSAT was offered a job by Chris GEORGE. Chris GEORGE asked BIOSSAT to go to a pain clinic in Jacksonville Florida to talk to someone unknown to BIOSSAT. BIOSSAT refused the offer until he was given more information. BIOSSAT stated NOLAN then contacted BIOSSAT urging him to take the job. BIOSSAT again refused until he was provided with more information.

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

00118

# Boshers Statements

U.S. Department of Justice
Drug Enforcement Administration

| **REPORT OF INVESTIGATION** | | | Page 1 of 13 | |
|---|---|---|---|---|
| 1. Program Code | 2. Cross File | Related Files | 3. File No. ▮▮▮ | 4. G-DEP Identifier |
| 5. By: Susan C. Langston, GS<br>At: FORT LAUDERDALE DO | ☐ ▮▮▮ | | 6. File Title ▮▮▮ | |
| 7. ☐ Closed ☐ Requested Action Completed<br>☐ Action Requested By | ☐<br>☐ | | 8. Date Prepared<br>04-05-2010 | |
| 9. Other Officers: IRS SA Beth Watts | | | | |

| 10. Report Re: Service of Order to Show Cause / Immediate Suspension of Registration on DEA Reg. # FB0254918 and Interview of Beau BOSHERS, MD.  (PM30) |
|---|

### SYNOPSIS

On February 25, 2010, an Order to Show Cause and Immediate Suspension of Registration was issued by DEA for DEA Registration # FB0254918 belonging to Beau BOSHERS, MD, a physician practicing at AMERICAN PAIN, LLC, 1200 N. Dixie Highway, Lake Worth, FL 33460.  On March 3, 2010, IRS SA Beth Watts and GS Susan Langston served the Order to Show Cause and Immediate Suspension of Registration on BOSHERS.  At that time, BOSHERS was interviewed by SA Watts and GS Langston regarding his medical practice and employment at AMERICAN PAIN.

### DETAILS

1.     Reference is made to all other Reports of Investigation under this file title and number.

2.     On February 25, 2010, Michele M. Leonhart, acting in her capacity as the Deputy Administrator for the Drug Enforcement Administration, issued an Order to Show Cause and Immediate Suspension of Registration (OTSC/ISO) for DEA Registration # FB0254918 belonging to Beau BOSHERS, MD, 1200 N. Dixie Highway, Lake Worth, FL 33460.  The OTSC/ISO alleges that BOSHERS prescribes and dispenses inordinate amounts of controlled substances, primarily oxycodone, under circumstances where he knew or should have known the prescriptions were not for legitimate medical purposes and were issued outside the course of usual professional practice.  The OTSC/ISO immediately suspends Dr. BOSHERS' DEA Registration because his continued

| 11. Distribution:<br>Division<br><br>District ▮▮▮<br><br>Other ▮▮▮ | 12. Signature (Agent)<br>Susan C. Langston | 13. Date |
|---|---|---|
| | 14. Approved (Name and Title) | 15. Date |

DEA Form   - 6
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

## REPORT OF INVESTIGATION

*(Continuation)*

| | |
|---|---|
| 1. File No. | 2. G-DEP Identifier |
| 3. File Title | |

4.
Page  11  of  13

| | |
|---|---|
| 5. Program Code | 6. Date Prepared
04-05-2010 |

not know exactly but estimated it to be between 500,000 to 600,000
tablets.  BOSHERS said he needs to keep enough medicine in stock so his
patients can have six oxycodone 30-mg tablets per day plus at least one
oxycodone 15-mg tablet for break-through pain each day.

31.  GS Langston asked BOSHERS about his relationship with Chris GEORGE.
BOSHERS said GEORGE is a "nice guy and decent."  BOSHERS said GEORGE got
in trouble years ago with a felony charge for steroids.  BOSHERS said "it
was a kid - a childhood thing" and said GEORGE "doesn't do drugs or drink
and deep down he is a kind-hearted person."  BOSHERS said that when GEORGE
was "a kid," his father gave GEORGE a lot of money.  GEORGE later met Dr.
Underwood who practiced pain management in Oakland Park, FL.  Dr.
Underwood introduced GEORGE to pain management and encouraged him to open
his first clinic.  Dr. Underwood was later killed in an automobile
accident in Panama.  BOSHERS said he does not "hang out" with GEORGE on a
regular basis but he did go to the Daytona 500 with GEORGE.  BOSHERS and
GEORGE sometimes "talk about guy things" at the office but they rarely, if
ever, talk on the phone or get together during non-work hours.  Regarding
AMERICAN PAIN, BOSHERS said GEORGE "runs the place" but never directs
BOSHERS on how to do his job or what medications to prescribe to his
patients.

32.  GS Langston asked BOSHERS if he thought anything was suspicious about
car loads of people driving sometimes over a thousand miles to come to
AMERICAN PAIN and pay lots of money in cash for treatment and medication.
GS Langston asked BOSHERS to help the Investigators understand why so many
patients drive hundreds of miles to come to BOSHERS from states like
Kentucky, Tennessee, and West Virginia and why they come to AMERICAN
PAIN.  BOSHERS again explained that these people do not have access to
medical care or pain management doctors in their states and he is glad he
can help them.  BOSHERS said "they only sometimes come in car loads" and
the reason for the carpooling is to cut down on travel costs.  BOSHERS
said he does not have a window in his office so he cannot see any activity
in the parking lot of the clinic.  BOSHERS says he just stays in the
office and treats people with valid MRIs and does not pay attention to
what goes on in the parking lot.

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

00168

**Internal Revenue Service**
**Criminal Investigation Division**

**Memorandum of Interview**

| | | | |
|---|---|---|---|
| **In Re:** | BEAU BOSHERS | **Location:** | United States Attorney Office |
| **Investigation #:** | 1000237974 | | Ft. Lauderdale, Fl |
| **Date:** | July 8, 2011 | | |
| **Time:** | 10:10 a.m. – 11:35 a.m. | | |
| **Participant(s):** | BEAU BOSHERS, Defendant | | |
| | Mike Metz, Attorney | | |
| | AUSA Paul Schwartz | | |
| | FBI SA Jennifer Turner | | |
| | DEA SA Alfred Cortes, and | | |
| | IRS-CI SA Anabel Pacheco and David Keyes | | |

AUSA Schwartz provided a Proffer Letter, which BOSHERS reviewed with his attorney. Both signed the proffer letter. BOSHERS has the intention of pleading guilty and cooperating with the government in their investigation of BOSHERS and others. The agreement is that BOSHERS will plea to one count of money laundering, 18 USC 1957 which carries a maximum sentence of 10 years. The government could then file a 5K motion for downward departure based on BOSHERS's cooperation. Also, AUSA Schwartz showed both, Metz and BOSHERS, the Proposed Statement of Facts. This letter will be signed at a later time.

BOSHERS provided the following information:

1. BOSHERS knows Dr. Cynthia CADET "very well". BOSHERS believes that CADET is worried about who will care for her 2 small children in the event that she goes to jail; she is divorced from her husband who now lives in Africa.
2. BOSHERS lost his DEA number and therefore, cannot prescribe any controlled substances.
3. BOSHERS is currently practicing primary care, internal medicine, at the same location where the FBI went to talk to him in the past. BOSHERS has a couple of patients who he refers to other physicians for controlled substances.
4. BOSHERS stated that "today is my last day of practice". BOSHERS offered to surrender his medical license.
5. BOSHERS did not count the pills while working at American Pain.
6. When BOSHERS found out that Chris GEORGE was a convicted felon he confronted GEORGE. GEORGE told BOSHERS that he was convicted for steroids.

7. In November 2008, about a month after BOSHERS started working at American Pain, DEA came to the clinic to do an inspection and asked BOSHERS questions about the clinic's operations. BOSHERS stated "I should have quit back in November 2008 when DEA came in", he also stated that November 2008 was an "awakening".

8. When GEORGE interviewed BOSHERS for the job at American Pain, GEORGE explained how things were done at the clinic, the drugs that were prescribed and the "cocktail" that the doctors prescribed, and asked BOSHERS if he was willing to do it. BOSHERS said yes and he was hired. BOSHERS's only training in pain management at that point was his experience in working at the hospital in the Intensive Care Unit (ICU). While at the ICU, he never once prescribed Oxycodone.

9. GEORGE pushed the 2mg Xanax because that was the pill that they sold at the clinic, American Pain. The only good thing about the 2mg pill is that you can break it and it's cheaper to buy it instead of the smaller dosage pills (.5mg, 1mg, etc)

10. When BOSHERS confronted GEORGE about why so many out of state patients being seen at the clinic, GEORGE told BOSHERS that if they don't see those patients they will lose half of the business.

11. BOSHERS discussed with Dr. Jacob DRESZER the MRI in the patient's files; the MRIs all looked the same, like they were cut and paste.

12. Prior to working at American Pain, BOSHERS had only worked at a hospital.

13. BOSHERS recounted an incident where he and GEORGE were walking by where the doctors' in-boxes were. Each doctor box had patient files in it. GEORGE told BOSHERS that if he, BOSHERS, would increase the amount of pills that he prescribed to each patient, he would have as many patients as CADET did. BOSHERS explained that CADET's box was pretty full.

14. BOSHERS was paid $2,000 in cash for having his DEA number available so that the clinic could dispense medications i.e. Oxycodone. The rest of the doctors were paid only $1,000, but BOSHERS worked out a better deal for himself because "I knew there would be a problem" due to the inherit risk. Also, GEORGE told BOSHERS that if he did not increase the amount of pills he will replace him, BOSHERS.

15. BOSHERS treated a couple of the employees.

16. Patients complained to BOSHERS that the bottles of pills were 10-15 short. BOSHERS realized that employee were stealing pills from the patients' bottles from the time that the prescription was filled to when they arrived to his office for verification.

17. BOSHERS was also a patient of the clinic.  He has suffered for over 20 years of 2 herniated disks in the back and 2 in the neck. He had been seeing a chiropractor, going to therapy but never was prescribed Oxycodone, he had taken Percocet. BOSHERS started with 180 per month and then, went to 240 per month. BOSHERS never diverted a pill, he took them all. His pain continues, he says it is at a level 7, and that he has learned to deal with it.

U.S. Treasury Criminal Investigation Division

18. Department of Health mailed letters of complaints to BOSHERS's house. GEORGE's in-house attorney, Brad Bailley, handled those complaints.

19. BOSHERS explained that the incident in which he brought in GEORGE and introduced him to the undercover agent as his "resident expert". When BOSHERS discharged patients he always called Derik Nolan, just in case the patient will get angry because he was not getting his "cocktail". On the incident day, Nolan was not around so BOSHERS brought in George instead.

20. The interview concluded at approximately 11:35 a.m.

21. I prepared this memorandum on July 11, 2011.


Anabel Pacheco
Special Agent


I prepared this memorandum on July 11, 2011, after refreshing my memory from notes made during and immediately after the interview with BEAU BOSHERS.


Anabel Pacheco
Special Agent

U.S. Treasury Criminal Investigation Division

# Internal Revenue Service
## Criminal Investigation Division

# Memorandum of Interview

| | | | |
|---|---|---|---|
| **In Re:** | BEAU BOSHERS | **Location:** | United States Attorney Office |
| **Investigation #:** | 1000237974 | | Ft. Lauderdale, Fl |
| **Date:** | July 21, 2011 | | |
| **Time:** | 2:05 p.m. – 4:12 p.m. | | |
| **Participant(s):** | BEAU BOSHERS, Defendant | | |
| | Mike Metz, Attorney | | |
| | FBI SA Kurt McKenzie | | |
| | IRS-CI SA Anabel Pacheco and David Keyes | | |

BOSHERS provided the following information:

1. Dr. Cynthia CADET prescribed much more than BOSHERS felt comfortable giving to patients. Her prescriptions were usually 240 30mg oxy, 90 15mg oxy, and 90 2mg xanax. BOSHERS was concerned that CADET was over prescribing the xanax.

2. BOSHERS is living in a trailer at a campground in Jupiter, Florida. His wife of 1 year, Deborah Bennett, is leaving him. Bennett has been nurse for 20 years. He has 2 step-children; one is in Law school and the other in Medicine school.

3. He was born in Columbia, TN.

4. Education:
   a. Associate degree from Columbia State;
   b. In 2000, graduated with a bachelor degree in micro-biology from FAU (Florida Atlantic University).
   c. In 2004, he graduated from Ross University School of Medicine in Martinique, Dominica. BOSHERS did Real Estate work before going to FAU.
   d. From 2004 to 2007, he did his residency in internal medicine at Memorial Health University, in Savannah, GA.
   e. In 2007, he obtained his medical license in Florida, he was 43 years old.
   f. From 2007 to early 2009, he worked at St. Mary's Hospital in West Palm Beach, Fl as a hospitalist. During this time, BOSHERS worked 3 different jobs until late 2008 when he started working at AMERICAN PAIN.

5. BOSHERS estimated that he earned about $1.5 million while working at SOUTH FLORIDA PAIN/AMERICAN PAIN. He spent the earnings as follows:
   a. $600,000 in taxes

b. $90,000 in charity

c. $300,000 in attorney's fees

d. $100,000 in student loans

e. And the rest in school tuition and everything else

6. BOSHERS' home is in foreclosure, he paid $580,000 for it and now it's only worth about $400,000. His monthly payment was $8,000 a month, including Home Owners Association fees, interest, and insurance.

7. BOSHERS stated that they [the doctors] were so busy working at the clinic that they did not have too much time to talk.

8. Dr. WOLFE was Dr. CADET's boyfriend; he had been working at American Pain for about 2 weeks before it was closed down. Dr. WOLFE saw patients that were about 18-19 years old. BOSHERS read in the internet that Dr. WOLFE had lost his medical license for his involvement in some "shady" clinic.

9. In November 2008, when BOSHERS was working part-time at American Pain, DEA came to the clinic asking questions about the pharmacy.

10. When the office was at the Boca Raton location, Derik NOLAN told him that Channel 7 was filming outside. Dr. CADET's office had a window to the parking lot. She should have been able to see Channel 7 filming outside.

11. BOSHERS had conversations with Dr. Jacobo and Roni DRESZER about the patients coming in such bad conditions that they were not able to see them.

12. He saw patients having seizures in the waiting area; he and Dr. ARUTA helped some of them. BOSHERS had ICU training. He did not remember Dr. CADET assisting the patients having seizures.

13. BOSHERS indicated that he still has family members residing in Tennessee and some of them have substance abuse problems.

14. BOSHERS ordered his patients to get a blood work done if they had been coming to see him for 6 months. He told his patients not to come without the blood work done.

15. BOSHERS admitted to signing forms which he knew contained false information. He believes that Ethan BAUMHOFF was the person putting the false information in the forms.

16. BOSHERS also admitted to signing the Power of Attorney to his DEA license. He fought it but gave in anyway.

17. BOSHERS did not remember if at the time that he signed the forms they were blank or had information filled in already.

18. BOSHERS, Dr. Roni DRESZER, and Dr. Jacobo DRESZER complained to BAUMHOFF about the amount of patients, and asked BAUMHOFF to stop taking new patients.

19. At the Lake Worth office, BOSHERS remembers a lady from Del Rey Diagnostics working from a window in the front of the clinic and trying to take over the MRI business.

20. BOSHERS requested that his paychecks be made to GARDENS MEDICAL OFFICE which was his own company.

21. BOSHERS explained that the new patients took longer than the follow up patients.

22. BOSHERS heard that the patients loved Dr. CADET because she gave them the quantities of drugs that they wanted.

23. The interview concluded at approximately 4:12 p.m.


Anabel Pacheco
Special Agent


I prepared this memorandum on September 9, 2011, after refreshing my memory from notes made during and immediately after the interview with BEAU BOSHERS.


Anabel Pacheco
Special Agent

U.S. Treasury Criminal Investigation Division

# Burt Statement

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MISC. NO.: 09-616-Zloch

FILED UNDER SEAL

IN THE MATTER OF THE APPLICATION
OF THE UNITED STATES OF AMERICA
FOR AN ORDER AUTHORIZING THE
INTERCEPTION OF WIRE AND ELECTRONIC
COMMUNICATIONS OCCURRING ON A
CELLULAR TELEPHONE FACILITY BEARING
MOBILE EQUIPMENT IDENTIFIER (MEID)
359201013751269, WHICH IS CURRENTLY ASSIGNED
TELEPHONE NUMBER (561)722-7506.
_____/

## APPLICATION FOR THE INTERCEPTION OF
## WIRE AND ELECTRONIC COMMUNICATIONS

I, David A. Haimes, Assistant United States Attorney, Southern District of Florida, being

duly sworn, state:

1.    I am an investigative or law enforcement officer of the United States within the

meaning of Section 2510(7) of Title 18, United States Code, that is, an attorney authorized by law

to prosecute or participate in the prosecution of offenses enumerated in Section 2516 of Title 18,

United States Code, and therefore, am authorized to make application to a judge of competent

jurisdiction for an order authorizing the interception of wire and electronic communications.

2.    This application is for an Order pursuant to Section 2518 of Title 18, United States

Code, authorizing the initial interception of wire and electronic communications of CHRISTOPHER

Paul GEORGE (hereinafter CHRISTOPHER GEORGE), JEFFERY Frank GEORGE (hereinafter

JEFF GEORGE), Ethan Allen BAUMHOFF (hereinafter BAUMHOFF), Derrick NOLAN

(hereinafter NOLAN), and Dianna Marie PAVNICK (hereinafter PAVNICK), Cynthia C.M. CADET

local and other pharmacies. Many of these clinics accept only cash payments and do not accept private insurance, Medicare, Medicaid, or credit cards.

## CURRENT INVESTIGATION AND CRIMINAL USE
## OF THE TARGET TELEPHONE

16.   The South Florida High Intensity Drug Trafficking Area (HIDTA) group, consisting of the DEA, Federal Bureau of Investigation (FBI), and the Internal Revenue Service (IRS), as well as local law enforcement organizations, are investigating the criminal activities of the TARGET SUBJECTS and the target businesses.  As set forth in the previous section, the pill problem in South Florida is massive.  Based on my knowledge and experience, investigating these cases can be very difficult, especially obtaining sufficient evidence to establish the manner and means by which these clinics are violating the laws and dispensing controlled pain medications in massive quantities to thousands of patients who do not have a medical necessity, knowing that those patients lack the medical necessity for these medications.  The targets are generally more sophisticated than traditional, street level narcotics distributors, and the businesses they have established to dispense these controlled substances to addicts from around the Southeast United States have a facade that includes legitimate-looking store fronts, examining "physicians," certain procedures they follow to appear to comply with the laws (including some medical "requirements" such as an MRI), and sophisticated techniques to conceal the vast quantities of cash generated by these businesses.  The doctors who work at these clinics have been doing this long enough, and have been sufficiently trained in asking the bare minimum of questions of the patients, that it is difficult to establish clear cut violations of the law by them.  Without an insider or other means to obtain information regarding

17

# Dreszer, Jacobo Statement

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | | Page 1 of 8 |
|---|---|---|

| 1. Program Code ▇ | 2. Cross File ☐ | Related Files | 3. File No. ▇ | 4. G-DEP Identifier ▇ |
|---|---|---|---|---|
| 5. By: Alfred Cortes, SA<br>At: Miami Field Division<br>Enforcment Group 3 | ☐<br>☐<br>☐<br>☐<br>☐ | | 6. File Title ▇ ▇, ▇ | |
| 7. ☐ Closed ☐ Requested Action Completed<br>☐ Action Requested By: | | | 8. Date Prepared<br>02-07-2011 | |

9. Other Officers: SA Michael Burt, FBI SA Jennifer Turner, IRS CI David Keyes, AUSA Paul Schwartz and AUSA Larry Lavecchio.

10. Report Re: Interview of Dr. Jacobo DRESZER at the United States Attorney's Office on 02/04/11.

SYNOPSIS

On Friday, February 4, 2011, Dr. Jacobo DRESZER provided information into the criminal activities of Christopher GEORGE, as well as the AMERICAN PAIN/SOUTH FLORIDA PAIN clinics. This interview took place in the presence of Dr. DRESZER'S attorney Mr. Sebastian Catrone at the United States Attorney's Office located at 500 East Broward Boulevard in Fort Lauderdale, Florida. The following in substance and in part is synopsis of the information provided by Dr. Jacobo DRESZER.

DETAILS

1. Reference is made to all previous DEA-6 form Reports of Investigation written under the above captioned file title and number, regarding the illegal prescribing, distribution and trafficking of controlled pharmaceutical substances from various clinics in this Organized Crime Drug Enforcement Task Force investigation.

2. The contents of this report represent only a summary of the information and details as recalled by the preparer. The accounts represented in this report are subject to modifications and clarifications, as additional documentary information is obtained and/or the preparer's memory is further refreshed.

3. On 02/04/11, at approximately 1:57 p.m., while at the United States Attorney Office in Fort Lauderdale, Florida, Dr. Jacobo DRESZER,

| 11. Distribution:<br>Division ▇ ▇<br>District<br>Other ▇ | 12. Signature (Agent)<br><br>Alfred Cortes, SA | 13. Date<br>02-07-2011 |
|---|---|---|
| | 14. Approved (Name and Title)<br>Keith T Barker<br>GS | 15. Date<br>03-10-2011 |

| DEA Form    - 6<br>(Jul. 1996) | DEA SENSITIVE<br>Drug Enforcement Administration | |
|---|---|---|

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. | 2. G-DEP Identifier |
| (Continuation) | 3. File Title |
| 4. Page 2 of 8 | |
| 5. Program Code | 6. Date Prepared 02-07-2011 |

hereinafter referred to as DRESZER, was interviewed regarding his knowledge of the excessive pill distribution of Oxycodone within SOUTH FLORIDA PAIN (SFP)/AMERICAN PAIN, LLC (AP.)

4. DRESZER indicated that as a physician employed at SFP and AP, DRESZER did not request prior treatment records for patients that DRESZER examined. DRESZER indicated that approximately 98 percent of the patients at AP and SFP were not legitimate patients. DRESZER further added that these patients were either narcotics addicts or pill diverters, and that only 1 or 2 percent were sick with diseases.

5. DRESZER indicated that when DRESZER began DRESZER'S employment at SFP/AP, the operation was small, but grew very fast. DRESZER indicated that shortly before the search warrants were executed at AP in March 2010, Christopher GEORGE was pushing the physicians employed at AP to see 100 to 200 patients per day individually. DRESZER stated that DRESZER told GEORGE "I am a human being, not a machine. If you don't stop this, I will have to leave."

6. When asked why DRESZER continued to work for GEORGE, at SFP/AP, DRESZER stated "I was getting good money!"

7. DRESZER was told that essentially DRESZER was a drug dealer, to which DRESZER responded "Yes."

8. DRESZER indicated that DRESZER met GEORGE, after responding to a newspaper advertisement in the classified section. DRESZER stated that at the time DRESZER met GEORGE, DRESZER was employed at another pain clinic called THE ART OF PAIN, which was owned by Dr. Herry H. KIJNER. DRESZER indicated that DRESZER met KIJNER at the Coral Gables Hospital where KIJNER proposed DRESZER to come work for KIJNER at THE ART OF PAIN. DRESZER indicated that prior to THE ART OF PAIN and The Coral Gables Hospital, DRESZER was employed at the Gables Surgi Center in Coral Gables, Florida as an anesthesiologist.

9. DRESZER indicated that after approximately 4 or 5 months of working at THE ART OF PAIN, DRESZER realized that THE ART OF PAIN was not a legitimate pain clinic. DRESZER indicated that KIJNER, (referenced in

DEA Form - 6a
(Jul. 1996)

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

00263

**U.S. Department of Justice**
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| *(Continuation)* | 3. File Title | |
| 4. Page 3 of 8 | | |
| 5. Program Code | 6. Date Prepared 02-07-2011 | |

paragraph 8), instructed DRESZER how to be a pain management doctor. DRESZER indicated that KIJNER instructed DRESZER to prescribe the patients at THE ART OF PAIN 240 Oxycodone pills in a 30 milligram (mg) dosage, per patient visit. DRESZER indicated that DRESZER would review Magnetic Resonance Image reports of the patients examined by DRESZER, but not the MRI films.

10. DRESZER indicated that while employed at THE ART OF PAIN, KIJNER, (referenced in paragraphs 8 and 9), paid DRESZER a weekly salary of $5,000.00 United States Currency, (USC), by means of a check. DRESZER indicated that this salary was commensurate with what DRESZER earned as an anesthesiologist.

11. DRESZER indicated that DRESZER was aware that the Hollywood Police Department responded to THE ART OF PAIN on numerous occasions for complaints lodged against THE ART OF PAIN.

12. DRESZER indicated that DRESZER discontinued DRESZER'S employment at THE ART OF PAIN because KIJNER, (referenced in paragraphs 8, 9, and 10), was disrespectful to DRESZER even in public settings. DRESZER indicated that KIJNER would belittle DRESZER in front of staff members and patients.

13. DRESZER indicated that while employed by KIJNER, (referenced in paragraphs 8, 9, 10, and 12), at THE ART OF PAIN, DRESZER examined 5 to 6 patients a day.

14. DRESZER indicated that after ceasing to work for KIJNER, (referenced in paragraphs 8, 9, 10, 12 and 13), DRESZER was interviewed by GEORGE, for the position of physician at SFP.

15. DRESZER indicated that GEORGE, did not appear to be a legitimate medical clinic owner as GEORGE did not have a medical background.  DRESZER added that GEORGE did not ask DRESZER any questions about DRESZER'S medical expertise, medical training, or even request to see DRESZER'S medical license.

DEA Form - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. ████████ | 2. G-DEP Identifier ████ |
|---|---|---|
| *(Continuation)* | 3. File Title ████████████ ██ | |

| 4.  Page  4  of  8 | |
|---|---|
| 5. Program Code ████████ | 6. Date Prepared 02-07-2011 |

16. DRESZER indicated that GEORGE, asked DRESZER if DRESZER had any experience working in a pain clinic setting and DRESZER stated "Yes." DRESZER indicated that GEORGE asked DRESZER if DRESZER could begin working immediately and DRESZER stated "Yes."

17. DRESZER indicated that GEORGE, told DRESZER that GEORGE would pay DRESZER $75.00 USC per patient examined by DRESZER per day.

18. DRESZER indicated that GEORGE, told DRESZER that DRESZER would be treating patients, who were experiencing pain, and that DRESZER was going to be prescribing pain medication to the patients.

19. DRESZER indicated that GEORGE, told DRESZER to work one-half day at SFP and see how many patients DRESZER examined.  DRESZER indicated that DRESZER agreed to work one half day at SFP.  DRESZER indicated that DRESZER spoke to Dr. Eddie SOLIE, also employed at SFP, that day.  DRESZER stated SOLIE "Saw more patients than any other doctor."

20. DRESZER indicated that DRESZER asked SOLIE, (referenced in paragraph 19), how much SOLIE prescribed the patients and that SOLIE responded "180 to 240 Oxycodone 30mg pills."

21. DRESZER indicated that after the one half day trial period at SFP, DRESZER started working for GEORGE, full time.  DRESZER stated that even after commencing employment, GEORGE still did not ask to see DRESZER'S medical license.

22. DRESZER indicated that GEORGE, paid DRESZER via check for the one-half day DRESZER worked at SFP.

23. DRESZER indicated that DRESZER believed that up to that point, all of the doctors employed at SFP were prescribing and dispensing controlled substances under SFP physician Dr. Enoch JOSEPH'S DEA number.

24. DRESZER indicated that JOSEPH, (referenced in paragraph 23) was being used for JOSEPH'S DEA number.  DRESZER indicated that SFP Office Manager Ethan BAUMHOFF III eventually asked DRESZER to sign a power of attorney document allowing BAUMHOFF III to order controlled substances using

---

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| | | |
|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | 1. File No. ▮▮▮▮▮ | 2. G-DEP Identifier ▮▮▮▮ |
| | 3. File Title ▮▮▮▮▮▮▮ | |
| 4.<br>Page  7  of  8 | | |
| 5. Program Code ▮▮▮▮ | 6. Date Prepared 02-07-2011 | |

34. DRESZER indicated that GEORGE, pushed the doctors at AP to write more prescriptions for Oxycodone, as well as increase the number of patients examined per day, per doctor.  DRESZER indicated that GEORGE told DRESZER that the patients were complaining to GEORGE about the amount of Oxycodone the patients were being prescribed.  DRESZER indicated that GEORGE told DRESZER that DRESZER needed to increase the amount of Oxycodone prescribed to patients.

35. DRESZER indicated that DRESZER told his son, Dr. Roni DRESZER, (referenced in paragraph 32), that DRESZER was getting tired of the number of patients DRESZER examined each day.  DRESZER indicated that when Roni DRESZER was seeking employment as a physician, DRESZER indicated that DRESZER did not want Roni DRESZER working at AP as well.  DRESZER stated that DRESZER told Roni DRESZER "You shouldn't be here at AP."  DRESZER indicated that Roni DRESZER was a medical doctor, who had completed 4 years of general surgery residency.  DRESZER indicated that Roni DRESZER did not complete Roni DRESZER'S fifth year of medical residency at Drexel University because of academic problems.

36. When describing the patients at SFP/AP, DRESZER stated "The patients were savages, they don't even know how to read or write!"  DRESZER stated that DRESZER and BOSHERS, (referenced in paragraphs 31 and 32), were talking about the patients at AP on one occasion when BOSHERS stated to DRESZER "There is a lot of garbage here that doesn't legitimately deserve the drugs."

**INDEXING**

1. GEORGE, Christopher Paul: ▮▮▮▮  ▮▮▮▮

2. BAUMHOFF III, Ethan Allen: ▮▮▮▮  ▮▮▮▮

3. NOLAN, Derik J.: ▮▮▮▮  ▮▮▮▮

4. HASAN, Ossama Nabih: ▮▮▮▮  ▮▮▮▮

5. MARTINEZ, Pedro: ▮▮▮▮  ▮▮▮▮

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

00268

# Dreszer, Roni Statements

**U.S. Department of Justice**
Drug Enforcement Administration

## REPORT OF INVESTIGATION

Page 1 of 9

| 1. Program Code | 2. Cross File ☒   Related Files | 3. File No. | 4. G-DEP Identifier |
|---|---|---|---|

5. By: Michael H Burt, SA

At: Miami Field Division
Enforcement Group 3

6. File Title

7. ☐ Closed  ☐ Requested Action Completed
☐ Action Requested By:

8. Date Prepared
02-13-2011

9. Other Officers: DEA SA Al Cortes, FBI SA Jennifer Turner, IRS SA David Keyes, AUSA's Larry Lavecchio and Paul Schwartz and Defense Attorney Morie Halprin.

10. Report Re: Interview of Dr. Roni DRESZER on February 11, 2011.

### SYNOPSIS

On Friday, February 11, 2011, Dr. Roni DRESZER provided information into the criminal activities of Christopher GEORGE, as well as the AMERICAN PAIN/SOUTH FLORIDA PAIN clinics. This interview took place in the presence of Dr. DRESZER's defense attorney Mr. Morie Halprin at the United States Attorney's Office located at 500 East Broward Boulevard in Fort Lauderdale, Florida.

### DETAILS

1. Reference is made to all previous DEA-6 form Reports of Investigation written under the above captioned file title and number, regarding the illegal prescribing, distribution and trafficking of controlled pharmaceutical substances from various clinics in this Organized Crime Drug Enforcement Task Force investigation.

2. The contents of this report represent only a summary of the information and details as recalled by the preparer. The accounts represented in this report are subject to modifications and clarifications, as additional documentary information is obtained and/or the preparer's memory is further refreshed.

3. On Friday, February 11, 2011, at approximately 10:26 a.m., while at the United States Attorney Office in Fort Lauderdale, Florida, Dr. Roni DRESZER, hereinafter referred to as R. DRESZER, was interviewed regarding

| 11. Distribution: | 12. Signature (Agent) | 13. Date |
|---|---|---|
| Division | Michael H Burt, SA | 02-13-2011 |
| District | 14. Approved (Name and Title) | 15. Date |
| Other  TFO R. WIse/DEA WPB | Keith T Barker GS | 3-23-11 |

DEA Form    - 6
(Jul. 1996)

DEA SENSITIVE
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

CAN 3/23/11
CAST 3/23/11

00272

U.S. Department of Justice
Drug Enforcement Administration

| **REPORT OF INVESTIGATION** | 1. File No. ▬▬▬ | 2. G-DEP Identifier ▬▬▬ |
|---|---|---|
| *(Continuation)* | 3. File Title ▬▬▬▬▬ | ▬▬ |
| 4. Page 4 of 9 | | |
| 5. Program Code ▬▬▬ | 6. Date Prepared 02-13-2011 | |

management, but he (R. DRESZER) claims to have conducted "independent research" in the field of pain management.  R. DRESZER stated the Magnetic Resonance Image (MRI) of the patients were either of the neck or back and the majority of MRI reports indicated vertebrae disk bulge or herniation. R. DRESZER admitted he had never consulted with other treating physicians to substantiate a patient's complaint of pain.  R. DRESZER received "on the job-training" in pain management, while working at AP.  Also, he (R. DRESZER) shadowed his father (J. DRESZER) once he (R. DRESZER) began working at AP.  R. DRESZER was asked by investigators if he (R. DRESZER) ever consulted with other doctors within AP.  R. DRESZER stated there were conversations amongst the doctors about the "quality of patients" and their appearance, but nothing about the amount of pills being prescribed to the patients.

9.  R. DRESZER was asked how he knew what (dosage amounts) to prescribe to new and follow-up patients. R. DRESZER responded he received advice from his father (J. DRESZER) and "reading medication guidelines." Investigators asked R. DRESZER if there were discussions with other doctors regarding the media attention AP or SFP had been receiving.  R. DRESZER stated that he and other doctors in the clinic wanted the media to "get over it and just leave us alone".  Investigators asked R. DRESZER when he knew he was working at a "pill mill."  R. DRESZER responded that "within a month" of working at AP he (R. DRESZER) realized he was working in a pill mill, but stayed because the money was good.  R. DRESZER was asked if he (R. DRESZER) ever considered leaving AP. R. DRESZER stated he (R. DRESZER) thought of opening a pain clinic practice of his own so he could make it "cleaner" or "more legit."  R. DRESZER further stated he (R. DRESZER) would not take out-of-state patients like AP had done.

10.  R. DRESZER was asked by investigators how he was paid by GEORGE. R. DRESZER stated he was paid seventy-five dollars a patient for every patient R. DRESZER examined and payment was given in the form of a check.  Also, R. DRESZER was paid one thousand dollars in cash, per week, for the use of his dispensing license.  Within the first three to five months of working at AP, R. DRESZER realized that GEORGE made all the decisions for AP and that GEORGE was the true owner of the AP.

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

00275

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. ▮▮▮▮ | 2. G-DEP Identifier ▮▮▮▮ |
|---|---|---|
| *(Continuation)* | 3. File Title ▮▮▮▮▮▮▮▮ ▮▮ | |
| 4. Page  5  of  9 | | |
| 5. Program Code ▮▮▮▮ | 6. Date Prepared 02-13-2011 | |

11. R. DRESZER was asked who at AP ordered the medication for the
doctors. R. DRESZER responded, "Ethan BAUMHOFF". R. DRESZER stated he (R.
DRESZER) gave Ethan BAUMHOFF, hereinafter referred to as BAUMHOFF, power
of attorney to fill out DEA form 222s on his (R. DRESZER) behalf, so that
controlled substances could be order under his (R. DRESZER) DEA number.
R. DRESZER added that he (R. DRESZER) learned the rules and regulations
for the DEA form 222 and schedule II drugs from BAUMHOFF and a former
Florida Board of Pharmacy Member who came and talked to the AP doctors.
R. DRESZER was told by BAUMHOFF that an medicaton inventory was done twice
by BAUMHOFF and another female AP employee on a weekend or after office
hours. Later on, R. DRESZER claimed he was shown a document after the
medication inventory that amount of pills dispensed verses the amount of
pills order "matched up." R. DRESZER maintained that he (R. DRESZER)
never did the medication inventory himself. Investigators asked R.
DRESZER who worked in the pharmacy to which R. DRESZER responded, "Dana
ANGELINO, Erika UNDERWOOD, and Michael MILLS." R. DRESZER also added,
"Chris GEORGE went into the pharmacy to help out".

12. Investigators asked R. DRESZER about his (R. DRESZER) interactions
with Derik NOLAN. R. DRESZER related that NOLAN informed him (R. DRESZER)
that he (NOLAN) had been in trouble with selling pills in the past.
Investigators asked if R. DRESZER knew of anyone (employee or non-
employee) stealing pills from AP. R. DRESZER responded, "No." R. DRESZER
did advise investigators he (R. DRESZER) observed Steve MILLS, who was an
AP employee, to be under the influence of Xanax or alcohol.

13. Investigators asked R. DRESZER during his (R. DRESZER) time as a
surgical residency student what scheduled narcotics did he (R. DRESZER)
prescribe to patients post-surgery. R. DRESZER stated, "Perocets." **AGENTS
NOTE:** Perocets are a schedule II controlled substance used to relieve mild
to moderate pain. Perocets contain anywhere from 2.5 mg of oxycodone to
10 mg of oxycodone. R. DRESZER when on to say that he (R. DRESZER) has
never given a post-surgical patient any oxycodone 30 mg.

14. Investigators asked R. DRESZER about reviewing a patient's MRI prior
to prescribing them controlled substances. R. DRESZER explained that he
(R. DRESZER) never requested the MRI film taken by the MRI facility, which
is also used by the radiologist to complete the radiologist report used by

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| | |
|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | 1. File No. ▮▮▮▮   2. G-DEP Identifier ▮▮▮▮ |
| | 3. File Title ▮▮▮▮▮▮▮▮ ▮▮ |
| 4.  Page 6 of 9 | |
| 5. Program Code ▮▮▮ | 6. Date Prepared 02-13-2011 |

the treating doctor. R. DRESZER further elaborated that he (R. DRESZER) "doesn't have much experience reading MRIs". And that he (R. DRESZER) stated he (R. DRESZER) would have to rely on the radiologist report to the doctor before prescribing pills. R. DRESZER commented he had more experience with CAT Scans. R. DRESZER was asked if patients or AP employees presented him (R. DRESZER) with a preliminary MRI report for patients seeking to get pills. R. DRESZER stated it was common to get a preliminary MRI report. R. DRESZER stated he (R. DRESZER) would still prescribe oxycodone to patients pursuant to the preliminary MRI report. R. DRESZER noted that sometimes the preliminary MRI findings would contradict with the chief complaint of the patient.

15. Investigators asked R. DRESZER to describe the volume of patients he (R. DRESZER) would see on any given day. R. DRESZER stated the most he saw on one day was about 100 patients. R. DRESZER stated there was always "pressure" placed on the doctor to see more patients. R. DRESZER stated the average time he (R. DRESZER) examined a patient was approximately 5 to 6 minutes. R. DRESZER recalled that doctors (within AP) would often "compete for follow-ups" because a follow-up required the doctor to spend much less time with the follow-up patient , as opposed to a new patient. R. DRESZER informed investigators than he (R. DRESZER) told GEORGE that when a doctor sees a patient for the first time the same doctor should continue seeing that patient when possible. R. DRESZER added that patients "always asked to be up'd". **AGENTS NOTE:** The term "up'd" refers to an increase in oxycodone by the doctor for the patient. R. DRESZER stated he (R. DRESZER) would receive complaints from GEORGE, who received complaints from patients, that R. DRESZER was not prescribing them (the patients) what they believed to be enough oxycodone.

16. R. DRESZER informed investigators he (R. DRESZER) was aware of patients paying "bribes" to AP employees to "get moved ahead of the waiting line." R. DRESZER stated patients would complain to him (R. DRESZER) they had to pay $20.00 or more to move to the head of the line. R. DRESZER made the spontaneous comment, "I should have ran out the door."

17. Investigators asked R. DRESZER if he (R. DRESZER) ever benefited from receiving gifts from patients. R. DRESZER stated some patients brought "Kentucky soda" for the AP clinic employees, about half the of the

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

00277

U.S. Department of Justice
Drug Enforcement Administration

| **REPORT OF INVESTIGATION** | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| *(Continuation)* | 3. File Title | |
| 4.<br>Page  7  of  9 | | |
| 5. Program Code | 6. Date Prepared<br>02-13-2011 | |

patients tried to give R. DRESZER money as a tip for prescribing oxycodone, some patients brought in "moonshine" for the AP employees. R. DRESZER was asked if he (R. DRESZER) ever observed the waiting room at AP. R. DRESZER recalled, "Yes, on occasion." R. DRESZER recalled AP patients having seizures in the waiting room. According to R. DRESZER, an ambulance or emergency medical personnel would be called to render medical attention. R. DRESZER added it was often Dr. Beau BOSHERS and/or Cynthia CADET that would respond to the waiting room to help out the seizure patient.

18. Investigators asked R. DRESZER what he (R. DRESZER) did with his 1,049,032 dollar salary in calendar year 2009. R. DRESZER responded, "I wasn't smart with it." R. DRESZER explained he ate out a lot, went to strip clubs, gambled in Las Vegas, Atlantic City and Florida, purchased an 80,000 dollar car (the car R. DRESZER is referring to a Nissan GTR). R. DRESZER stated he "partied" with GEORGE on two occasions; once at a strip club and once at an Ultimate Fighting Championship at the Hard Rock Casino in Hollywood, Florida. R. DRESZER further explained that he (R. DRESZER) did not report his weekly cash salary of 1,000 dollars for being a dispensing doctor. R. DRESZER mentioned he (R. DRESZER) observed garbage cans full of cash money inside AP that the employees working the new patient or follow-up patient windows placed money in they received from the patients.

19. Investigators asked R. DRESZER about his (R. DRESZER) knowledge of EXECUTIVE PAIN and discharged patients. R. DRESZER explained he (R. DRESZER) became aware that AP patients were being referred to EXECUTIVE PAIN. Derik NOLAN informed R. DRESZER that there was a "detoxification specialist" at EXECUTIVE PAIN for AP patients who were identified as "intravenous drug users". R. DRESZER further stated that when he (R. DRESZER) would discharge a patient he (R. DRESZER) would call Derik NOLAN and NOLAN would refer the patient to EXECUTIVE PAIN. R. DRESZER stated he (R. DRESZER) would discharge approximately 10 to 15 patients a week for intravenous drug use, lying about medical history, not taking oxycodone or having oxycodone in their system, and/or using their medication too quickly or not as prescribed. R. DRESZER added that when a discharged patient refused to leave R. DRESZER's office, NOLAN was called to escort the patient out of AP. R. DRESZER stated NOLAN took a more sympathetic

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

## REPORT OF INVESTIGATION

Page 1 of 7

| 1. Program Code | 2. Cross File | Related Files | 3. File No. | 4. G-DEP Identifier |
|---|---|---|---|---|

| 5. By: Alfred Cortes, SA | 6. File Title |
|---|---|
| At: Miami Field Division, Enforcement Group 3 | |

| 7. ☐ Closed ☐ Requested Action Completed ☐ Action Requested By: | 8. Date Prepared 02-17-2011 |
|---|---|

9. Other Officers: AUSA Paul Schwartz, AUSA Larry Lavecchio, IRS CI David Keyes and DEA IA Carol Johnson.

10. Report Re: Interview of Dr. Roni DRESZER at the United States Attorney's Office in Fort Lauderdale, Florida on 02/17/2011.

### SYNOPSIS

On Friday, February 17, 2011, Dr. Roni DRESZER provided information into the criminal activities of Christopher GEORGE, as well as the AMERICAN PAIN/SOUTH FLORIDA PAIN clinics. This interview took place in the presence of Dr. DRESZER'S attorney Mr. Morie Halprin at the United States Attorney's Office located at 500 East Broward Boulevard in Fort Lauderdale, Florida. The following in substance and in part is a synopsis of the information provided by Dr. Roni DRESZER.

### DETAILS

1. Reference is made to all previous DEA-6 form Reports of Investigation written under the above captioned file title and number, regarding the illegal prescribing, distribution and trafficking of controlled pharmaceutical substances from various clinics in this Organized Crime Drug Enforcement Task Force investigation.

2. The contents of this report represent only a summary of the information and details as recalled by the preparer. The accounts represented in this report are subject to modifications and clarifications, as additional documentary information is obtained and/or the preparer's memory is further refreshed.

3. On 02/17/11, at approximately 9:30 a.m., while at the United States Attorney Office in Fort Lauderdale, Florida, Roni DRESZER, hereinafter

| 11. Distribution: | 12. Signature (Agent) | 13. Date |
|---|---|---|
| Division | Alfred Cortes, SA | 02-17-2011 |
| District | 14. Approved (Name and Title) Keith T Barker GS | 15. Date 3-14-11 |
| Other | | |

Form - 6
(Del. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

SARI 3/14/11
CAST 3/14/11   00281

U.S. Department of Justice
Drug Enforcement Administration

## REPORT OF INVESTIGATION
*(Continuation)*

| 1. File No. | | 2. G-DEP Identifier |
|---|---|---|
| ▓▓-▓▓▓▓ | | ▓▓▓▓ |

| 3. File Title |
|---|
| ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓   ▓▓▓ |

4.
Page   2   of   7

| 5. Program Code | 6. Date Prepared |
|---|---|
| ▓▓▓▓▓▓ | 02-17-2011 |

referred to as DRESZER, was interviewed regarding his knowledge of the excessive pill distribution of Oxycodone within AMERICAN PAIN, LLC (AP) and/or SOUTH FLORIDA PAIN, LLC (SFP).

4. DRESZER indicated that DRESZER associated with AP employees on a limited basis outside of work. DRESZER indicated that on one occasion, DRESZER went on a boating excursion with Ossama HASAN on the intracoastal waterway. DRESZER indicated that the boat was a 25 or 30 foot open-water fisherman type boat. DRESZER indicated that there was beer and women on the excursion.

5. DRESZER indicated that HASAN, (referenced in paragraph 4), was a patient of DRESZER'S at AP. DRESZER indicated that on one occasion, DRESZER was expecting an out-of-town paramour to visit DRESZER. DRESZER indicated that DRESZER'S paramour asked DRESZER if DRESZER knew of anyone who could get DRESZER some good cocaine. DRESZER indicated that DRESZER was aware through AP office rumors that HASAN sold cocaine, and subsequently, DRESZER asked HASAN to get DRESZER some cocaine. DRESZER indicated that HASAN, at a later date, provided DRESZER with approximately 10 grams of cocaine. DRESZER indicated that HASAN did not charge DRESZER for the cocaine. DRESZER was asked if DRESZER knew why HASAN would provide cocaine to DRESZER free of charge. DRESZER indicated that DRESZER believed that HASAN would later want something in return.

6. DRESZER indicated that DRESZER had used cocaine while in college. DRESZER added that DRESZER had also used cocaine approximately 20 to 30 times in the past 18 months. DRESZER indicated that DRESZER bought cocaine on a few occasions, but normally got the cocaine through friends. DRESZER admitted to also having experimented with ecstasy and marijuana during the same time frame.

7. DRESZER indicated that DRESZER did maintain a brief amorous relationship with a Brazilian AP employee named Victoria Pinto WARE also known as Victoria Pinto De LIMA SILVA.

8. DRESZER indicated that DRESZER had a gambling problem. DRESZER indicated that while employed by Christopher GEORGE at AP/SFP, DRESZER grossed approximately $1.2 million, United States Currency,

Form   - 6a
(Jul. 1996)

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. | | 2. G-DEP Identifier |
|---|---|---|---|
| *(Continuation)* | 3. File Title | | |
| 4. **Page 3 of 7** | | | |
| 5. Program Code | | 6. Date Prepared 02-17-2011 | |

(USC).  DRESZER indicated that DRESZER paid approximately $200,000.00
USC in earned income tax to the federal government.  DRESZER indicated
that DRESZER spent an additional $300,000.00 USC to $400,000.00 USC on
gambling ventures described as private poker games as well as at casinos
in Florida, New Jersey and Nevada.  DRESZER indicated that gambling debts
DRESZER owed due to losses at the private poker games were paid quickly,
usually within one or two days.  DRESZER indicated that DRESZER never owed
money to loan-sharks or bookmakers.  DRESZER indicated that on occasion,
DRESZER did hire escorts/prostitutes and strippers.  DRESZER had
previously indicated that DRESZER also used some of the money earned at AP
to place a down payment on an $80,000.00 USC Nissan vehicle, as well as
pay off some medical school loans.

9.  DRESZER indicated that DRESZER did not know any of the wholesale drug
representatives that would come to AP/SFP.  DRESZER was shown a Harvard
Pharmaceutical questionnaire, which was seized by the Federal Bureau of
Investigation on 03/03/10, and was asked Assistant United States Attorney
Paul Schwartz if DRESZER could identify DRESZER'S signature on the
questionnaire.  DRESZER indicated that the signature on the questionnaire
was DRESZER'S signature.  DRESZER, also acknowledged that the handwriting
on the questionnaire was DRESZER'S handwriting.  DRESZER indicated
that responses given on questionnaire were false.

10.  DRESZER indicated that Ethan Allen BAUMHOFF III brought DRESZER the
Harvard questionnaire (referred to in paragraph 9), to be completed.
DRESZER indicated that the questionnaire BAUMHOFF brought DRESZER was used
to determine how much of the controlled substances prescribed by DRESZER
was to out-of-state patients.  DRESZER said that portions of
the questionnaire already had responses pre-filled into the spaces for
each question.  DRESZER indicated that DRESZER told BAUMHOFF that the
responses on the questionnaire were lies.  DRESZER indicated that
BAUMHOFF stated to DRESZER "Don't worry about it, we are not lying."
DRESZER however, reiterated that this was a lie to keep the supply of
drugs coming to AP.

11.  DRESZER indicated that DRESZER recalled having conversations with
other physicians employed at AP about some of the requirements of
wholesale drug suppliers.  DRESZER indicated that wholesale drug suppliers

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

00283

U.S. Department of Justice
Drug Enforcement Administration

| | |
|---|---|
| **REPORT OF INVESTIGATION**<br>*(Continuation)* | 1. File No. █████████    2. G-DEP Identifier ████████ |
| | 3. File Title<br>████████  ████████ ██ |
| 4.<br>Page  4  of  7 | |
| 5. Program Code<br>████████ | 6. Date Prepared<br>02-17-2011 |

would require AP to order drugs other than Schedule 2 narcotics or the wholesalers would cease selling AP Oxycodone.  DRESZER added that AP physician, DR. Beau BOSHERS would also prescribe blood pressure medication in addition to the painkiller medication.  DRESZER said this was all a ruse.

12. DRESZER indicated that DRESZER discussed the need for a medical crash cart, which was to be stocked with supplies for First Aid treatment. DRESZER indicated that the medical crash cart was to be used on patients at AP when patients passed out.  DRESZER indicated that BAUMHOFF agreed, but only purchased an external heart defibrillator.

13. DRESZER indicated that after being employed at SFP/AP, it took only a few weeks to realize that DRESZER was not working at a legitimate pain clinic.  DRESZER indicated that this was also confirmed when DRESZER observed a photograph, posted in the front office, in view of the staff members, of a person suspected to be an undercover police officer.  DRESZER indicated that the photograph also contained a caption that the officer may be wired.  DRESZER indicated that DRESZER recalled having a conversation with BOSHERS about the patient, who may be an undercover police officer.  DRESZER indicated that DRESZER continued DRESZER'S employment at AP because of the money DRESZER was being paid.

14.  DRESZER indicated that DRESZER recalled a conversation with GEORGE, in which GEORGE told DRESZER that GEORGE would increase DRESZER'S pay from $75.00 USC per patient to $100.00 USC per patient, provided that DRESZER examined more than 100 patients per day and increased the amount of Oxycodone that was prescribed to the patients per visit.

15. DRESZER indicated that DRESZER had conversations with GEORGE, BOSHERS and with Jacobo DRESZER about how things were getting crazy at AP. DRESZER stated "Too many people raised red flags to the police."  DRESZER indicated that people, (referring to law enforcement), who are looking into us will look harder.

16. DRESZER indicated that DRESZER had conversations at AP with GEORGE, BOSHERS, Jacobo DRESZER, Michael ARUTA and Derik NOLAN about WSVN Channel

| | | |
|---|---|---|
| ● | **DEA SENSITIVE**<br>Drug Enforcement Administration | |

DEA Form  - 6a
(Jul. 1996)

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | ███████████ | ███████████ |
| | 3. File Title | |
| | ██████████████████████████ █████ | |

| 4. Page 5 of 7 | |
|---|---|
| 5. Program Code ████████ | 6. Date Prepared 02-17-2011 |

7 Investigative News Reporter Carmel Cafiero. DRESZER indicated that the subjects referenced in this paragraph discussed Cafiero's investigative reports on Channel 7 regarding pill mills. DRESZER indicated that all of them were in agreement that Cafiero's news reports made AP look bad. DRESZER indicated that Cafiero needed to leave AP alone because Cafiero was bad for business. DRESZER indicated that on one occasion, GEORGE and NOLAN chased Cafiero away from AP property, while Cafiero was attempting to film an investigative news segment.

17. DRESZER described NOLAN as a guy with a sordid past. DRESZER indicated that NOLAN was the guy who kept things orderly at AP. DRESZER indicated that NOLAN kept the AP staff in line and dealt with the police.

18. DRESZER indicated that on approximately 7 occasions, police officers would appear at AP regarding individuals, who had been arrested for "doctor shopping." DRESZER indicated that the police officers would have AP staff members sign affidavits indicating that AP was unaware that the arrested individual was a "doctor shopper."

19. DRESZER indicated that the Florida Department of Health filed several complaints with AP regarding DRESZER. DRESZER indicated that a pharmacy in Tennessee or Kentucky alleged that DRESZER was prescribing too much Oxycodone. DRESZER indicated that the complaint against DRESZER required DRESZER to produce information on AP patients associated with the complaint. DRESZER indicated that the complaints were forwarded to GEORGE, who passed them along to Bradford Beilly, who was retained by GEORGE to represent AP. DRESZER indicated that for these complaints against DRESZER, the result was a finding of no probable cause for the complaint against DRESZER.

20. DRESZER indicated that DRESZER was aware that FAYE IMAGING was a mobile Magnetic Resonance Image (MRI) facility operated on a trailer by Pete TYNDALE. DRESZER indicated that the mobile MRI trailer was located in the rear parking lot of a gentleman's club. DRESZER indicated that DRESZER was aware that the mobile MRI facility was operational 24 hours a day, 7 days a week. DRESZER indicated that a patient of DRESZER'S told DRESZER that for an additional $200.00 USC, a patient could get their MRI results quicker.

A Form - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

00285

U.S. Department of Justice
Drug Enforcement Administration

## REPORT OF INVESTIGATION
*(Continuation)*

| 1. File No. | 2. G-DEP Identifier |
|---|---|
| ███████ | ████ |

| 3. File Title |
|---|
| ██████  ████  ██████  ████ |

| 4. Page 6 of 7 | |
|---|---|
| 5. Program Code ███████ | 6. Date Prepared 02-17-2011 |

21. DRESZER indicated that there was no legitimacy for the MRI reports. DRESZER indicated that the purpose for AP requiring the MRI report was to insulate the doctors at AP from scrutiny. DRESZER indicated that many of the MRI reports that DRESZER saw looked the same. DRESZER indicated that the reports appeared to be "cut and pasted" from other reports. DRESZER indicated that DRESZER voiced these concerns about the MRI reports to BOSHERS, GEORGE and Jacobo DRESZER. DRESZER indicated that Dr. ZIMMERMAN wrote most of the MRI report findings and they all looked the same.

22. DRESZER indicated that Amanda Paige THOMSON of DELRAY DIAGNOSTICS had a reception window for MRI's at the AP location in Lakeworth, Florida.

23. DRESZER indicated that referral prescriptions for MRI's were pre-printed for neck and back scans of the patient. DRESZER said that AP charged a $50.00 USC deposit to the patient for the office visit to ensure that the patient would return to AP with the MRI.

24. DRESZER indicated that DRESZER was aware that GEORGE was involved in illegal steroid dealing.

25. DRESZER indicated that only approximately 2 or 3 patients were reduced in the amounts of Oxycodone the patient was prescribed by DRESZER. DRESZER indicated that DRESZER never prescribed Suboxone or Methadone to patients since DRESZER was not qualified for detoxification.

## INDEXING

1. GEORGE, Christopher Paul: ████  ████

2. NOLAN, Derik J.: ████  ████

3. BOSHERS, BEAU Richard: ████  ████

4. ARUTA, Michael J.: ████  ████

5. DRESZER, Jacobo: ████  ████

6. HASAN, Ossama Nabih: ████  ████

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

00286