# George, Chris Statement

U.S. Department of Justice
Drug Enforcement Administration

## REPORT OF INVESTIGATION

Page 1 of 9

| 1. Program Code | 2. Cross File | Related Files | 3. File No. | 4. G-DEP Identifier |
|---|---|---|---|---|

5. By: Michael H Burt, SA

At: Enforcement Group 3
Miami Field Division

7. ☐ Closed ☐ Requested Action Completed
☐ Action Requested By:

6. File Title

8. Date Prepared
07-07-2011

9. Other Officers: Internal Revenue Service Special Agent David Keyes and Assistant United State
Attorney Paul Schwartz.

10. Report Re: Interview of Christopher GEORGE on July 6, 2011.

### SYNOPSIS

On Wednesday, July 6, 2011, Christopher GEORGE provided information into
the criminal activities of doctors, employees, and pharmaceutical
suppliers associated or affiliated with SOUTH FLORIDA PAIN and/or AMERICAN
PAIN, as well as EXECUTIVE PAIN. This interview took place at the West
Palm Beach Field Office of the Federal Bureau of Investigation
(FBI) located at 505 South Flagler Drive, Suite 500, West Palm Beach,
Florida.

### DETAILS

1. Reference is made to all previous DEA-6 form Reports of Investigation
(ROI) written under the above captioned file title and number, regarding
the illegal prescribing, distribution and trafficking of controlled
pharmaceutical substances from various clinics in this Organized Crime
Drug Enforcement Task Force investigation. Specific reference is made
DEA-6 ROI entitled "Interview of Dr. Sherri PINSLEY on May 12, 2011,"
written by Special Agent (SA) Michael Burt on May 16, 2011.

2. The contents of this report represent only a summary of the information
and details as recalled by the preparer. The accounts represented in this
report are subject to modifications and clarifications, as additional
documentary information is obtained and/or the preparer's memory is
further refreshed.

| 11. Distribution: | 12. Signature (Agent) | 13. Date |
|---|---|---|
| Division | Michael H Burt, SA | 07-07-2011 |
| District | 14. Approved (Name and Title) | 15. Date |
| Other | Keith T Barker   GS | 07-07-2011 |

DEA Form    - 6
(Jul. 1996)

### DEA SENSITIVE
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

CAST

00336

**U.S. Department of Justice**
Drug Enforcement Administration

| | |
|---|---|
| **REPORT OF INVESTIGATION** | 1. File No. ▬▬ |
| *(Continuation)* | 2. G-DEP Identifier ▬▬ |
| | 3. File Title ▬▬ |
| 4. **Page 2 of 9** | |
| 5. Program Code ▬▬ | 6. Date Prepared 07-07-2011 |

3. On Wednesday, July 6, 2011, at approximately 10:28 a.m., while at the FBI West Palm Beach Field Office, Florida, Christopher GEORGE, hereinafter referred to as GEORGE, was interviewed regarding his knowledge of the criminal activities of doctors, employees, and pharmaceutical suppliers associated or affiliated with SOUTH FLORIDA PAIN (SFP) and/or AMERICAN PAIN (AP), hereinafter referred to as AP, as well as EXECUTIVE PAIN, hereinafter referred to as EP.

4. GEORGE was asked to describe his interactions with Dr. Cynthia CADET, hereinafter referred to as CADET. GEORGE stated CADET was well liked by the patients, never received complaints from the patients, and some patients referred to her as a "good doctor." GEORGE added that CADET saw the least amount of patients and she wrote the most amount of notes in the patient charts. GEORGE then conceded he could not recall CADET referring patients out to medical specialist and/or attempting other types of treatment modalities; rather CADET would write patients prescriptions for oxycodone and alprazolam just like the other four doctors at AP. Agents asked GEORGE to explain further the meaning of a "good doctor" at AP. GEORGE admitted he did not like "dealing with the patients," so CADET kept the patients happy by giving them what they wanted (referring to large doses of oxycodone). GEORGE acknowledged to agents that the patients at AP were "drug addicts," "pill-seekers" and "drug dealers." GEORGE wanted to keep the patients happy (by giving them the drugs they wanted) because he (GEORGE) wanted them (the patients) to keep coming back so he (GEORGE) could continue to take their money. GEORGE was asked how CADET received "Doctor of the Year" at AP. GEORGE explained that the "Doctor of the Year" award was between Dr. Beau BOSHERS, hereinafter referred to as BOSHERS, and CADET. GEORGE picked CADET for doctor of the year because he thought if he picked BOSHERS, Dr. Jacobo DRESZER, Dr. Roni DRESZER, and Dr. Michael ARUTA would be upset. Since CADET was well liked by the other doctors, GEORGE thought the other doctors would not harbor any ill feelings if CADET received the award. GEORGE stated the decision to give CADET the award was made by himself (GEORGE), Derik NOLAN (NOLAN) and Ethan BAUMHOFF.

5. Agents asked GEORGE to describe his interaction with Steven GOODMAN, hereinafter referred to as GOODMAN, the owner of MEDICAL ARTS. GEORGE stated he (GEORGE) didn't believe that MEDICAL ARTS was run well by

DEA Form - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

00338

# George, Jeff Statement

**U.S. Department of Justice**
Drug Enforcement Administration

| REPORT OF INVESTIGATION | | Page 1 of 13 |
|---|---|---|

| 1. Program Code | 2. Cross File ☒ | Related Files | 3. File No. G8-09-0006 | 4. G-DEP Identifier HDN8D |
|---|---|---|---|---|
| 5. By: Robert P Wise, TFO  At: WEST PALM BEACH R. O. | | | 6. File Title GEORGE, Jeffrey | |
| 7. ☐ Closed ☐ Requested Action Completed ☐ Action Requested By: | | | 8. Date Prepared 11-03-2010 | |

9. Other Officers: DEA SA Victor Gobbi  DEA SA Mike Burt & IRS SA David Keyes

10. Report Re: 11-1-10 Interview of Jeffrey GEORGE

## SYNOPSIS

On November 2, 2010, Jeffrey GEORGE met investigators at the Assistant United States Attorney's Office (AUSA) to discuss the criminal activities of Christopher GEORGE (CG) and businesses related with CG.

## DETAILS

1. Investigators asked GEORGE to describe the origins of pain clinics. GEORGE stated how he met Todd WATSON, the owner of ONE STOP MEDICAL. GEORGE explained he was introduced to WATSON through Doctor Daniel OVERSTREET, who worked for MACROLIFE, a company that dispensed steroids.

2. GEORGE advised investigators he purchased MACROLIFE from Gabe NICHOLS for fifty thousand dollars, to dispense steroids. GEORGE stated OVERSTREET was making one to two thousand dollars a week prescribing steroids. OVERSTREET was also working part-time at WATSON'S pain clinic - ONE STOP MEDICAL.

3. Investigators asked GEORGE how many meetings he had with OVERSTREET prior to the opening of SOUTH FLORIDA PAIN (SFLP). GEORGE stated he met OVERSTREET on four to six different occasions. GEORGE was asked

| 11. Distribution: Division MIAMI FLD DIV | 12. Signature (Agent)  Robert P Wise, TFO | 13. Date 11-03-2010 |
|---|---|---|
| District ▉ | 14. Approved (Name and Title)  Joseph M Dubois  GS | 15. Date 11-04-2010 |
| Other ▉ | | |

DEA Form - 6 (Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

00406

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | | 1. File No.<br>G8-09-0006 | 2. G-DEP Identifier<br>HDN8D |
|---|---|---|---|
| *(Continuation)* | | 3. File Title<br>GEORGE, Jeffrey | |
| 4.<br>Page  10  of  13 | | | |
| 5. Program Code | | 6. Date Prepared<br>11-03-2010 | |

doing this."   GEORGE alleged BIOSSAT obtained the pills from
OBERMEYER at ECP, which were then sold to LEWIS.

59.  GEORGE was asked if OBERMEYER had ever done this before.  GEORGE
stated yes, OBERMEYER gave five to six thousand pills to NOLAN on two
different occasions.  OBERMEYER also gave pills to people who worked
in the barbershop next door to ECP.

60.  Investigators asked GEORGE how the diversions were listed on the
daily inventories.  GEORGE stated OBERMEYER told GEORGE he
(OBERMEYER) would handle covering up the pills' disappearance.

61.  GEORGE was asked if he instructed OBERMEYER to give pills to
BIOSSAT.  GEORGE answered "yes, 1200 pills on two different
occasions."  GEORGE stated "I made five-thousand dollars each time
for a total of ten-thousand dollars."

62.  Investigators asked GEORGE why he allowed BIOSSAT to do this.
GEORGE answered "to help him out."  GEORGE was asked what OBERMEYER
gained in these transactions.  GEORGE replied "nothing, but this
wasn't out of the ordinary."

63.  GEORGE was asked if he knew the pills belonged to the doctors and
if so, how was he going to cover up this diversion.  GEORGE replied
"we knew the pills belonged to the doctors, and OBERMEYER stated he
would cover it up in the computers."  GEORGE explained that "everyone
knew there were no inspections, I just figured it would be hard to
find."  GEORGE stated he has had phone conversations with CG
discussing how the disappearance of drugs is the doctors' problem.

64.  GEORGE was asked if the doctors ever conducted audits of their
pill inventory.  GEORGE emphasized "no, never."

65.  Investigators asked GEORGE who was responsible for dispensing
medications at ECP.  GEORGE stated "OBERMEYER and Alli RUIZ."  GEORGE
was asked if RUIZ had knowledge of the drug diversions going on at
ECP.  GEORGE stated "I don't know.  I never talked to her."

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

# Harrington Statement



# DEPARTMENT OF THE TREASURY
## Internal Revenue Service
## Criminal Investigation

## Memorandum of Interview

| | | | |
|---|---|---|---|
| **Investigation #:** | 1000233976 | **Location:** | **Ft Lauderdale USAO and** |
| **Investigation Name:** | Christopher GEORGE, et al | | **IRS Plantation Office** |
| **Date:** | June 16, 17, 21 & 30, 2010 | | |
| **Time:** | Various | | |
| **Participant(s):** | Andrew HARRINGTON, Subject/Interviewee | | |
| | Donnie Murrell, Defense Attorney | | |
| | Robin Waugh, AUSA | | |
| | Jennifer Turner, FBI Special Agent | | |
| | Michael Burt, DEA Special Agent | | |
| | Alfred Cortez, DEA Special Agent | | |
| | Robert Wise, PBSO Detective | | |
| | David Keyes, IRS Special Agent | | |
| | Sergio Ramil, IRS Special Agent | | |
| | Richard Serrano, IRS Special Agent | | |

1.  This memorandum relates to information provided by Andrew HARRINGTON during four separate interview sessions that occurred on June 16, 2010, June 17, 2010, June 21, 2010, and June 30, 2010.

2.  On June 16, 2010, HARRINGTON and his criminal defense attorney Donnie Murrell arrived at the Fort Lauderdale USAO for the scheduled meeting. At no time during the interview was HARRINGTON or his attorney ever told by anyone representing the U.S. government that the information provided by HARRINGTON could/would not be used against him. Present during the interview were AUSA Waugh, SA Serrano, SA Turner, and SA Burt. AUSA Waugh and SA Turner were not present for the entire duration of the interview.

3.  During the June 16, 2010 interview, it was agreed that it would not be necessary for the defense attorney and/or the prosecutor to be present during future meetings with HARRINGTON as it was apparent that it would take a number of interview sessions to debrief HARRINGTON.

4.  On June 17, 2010, HARRINGTON met with the investigating agents at the IRS Plantation office. Present during the interview were SA Serrano, SA Burt, SA Keyes, and Det. Wise.

5.  On June 21, 2010, HARRINGTON met with the investigating agents at the IRS Plantation office. Present during the interview were SA Serrano, SA Burt, SA Keyes, and SA Ramil. SA Keyes and SA Ramil were not present for the entire

had a boyfriend named Alex LNU. Alex LNU was a hairstylist and would cut CG's hair. Alex LNU would bring in groups of "patients" 5 or more at a time. NOLAN instructed HARRINGTON and other employees that when Alex LNU and his people arrive, they were to send them back to NOLAN. NOLAN insured that these "patients" were moved in ahead of other "patients" to see the doctors. NOLAN had other people bringing in "crews" to get pills. All of NOLAN's people were treated differently than the other "patients". These "patients" were moved to the front of the line so as not to have to wait. Oftentimes they were allowed in the employee area or would come in thru the back. HARRINGTON believed that NOLAN was receiving pills from these "patients", which NOLAN subsequently sold. HARRINGTON overheard employees talking about NOLAN and other employees running crews through the business to obtain pills. HARRINGTON learned from Dana Deangelo that Alex LNU had been arrested in the past for selling pills (Oxycodone).

49. Harrington mentioned that in addition to many of the American Pain Employees being "patients", during 2008 and 2009, there were several employees from South Beach Rejuvenation that were "patients" at American Pain. These employees were Mike Renda, Jason Leve, and Matt Siss. HARRINGTON stated that Renda and Levy nearly always showed up at American Pain with a large black male. Renda told HARRINGTON that he was also seeing the doctors at JG's clinics. Siss told HARRINGTON that he should be a "patient" as well and that he would pay HARRINGTON, $600.00 for whatever prescriptions he could get. Siss would sell the pills.

## Executive Pain

50. In the spring of 2009, CG took HARRINGTON for a ride to the location where Executive Pain was established. At that time, Executive Pain had not yet opened. CG had rented the building and told HARRINGTON that he was keeping it as a "backup" location in case he had to move out of Boca Raton. CG later decided to open a new clinic, Executive Pain in the facility and put the business in Dianna PAVNICK's name. PAVNICK managed the business for CG.

51. HARRINGTON worked at Executive Pain for approximately four to six weeks. HARRINGTON was paid approximately $2,000 to $3,000 in cash by PAVNICK during the time he worked at Executive Pain. HARRINGTON identified other persons working at the clinic were PAVNICK, Denise HAGGERTY (CG mother), Scott Wilson, Kevin Nolan (later on) and Dr. Beretsky. HARRINGTON stated that while he was employed at Executive Pain, he never observed a patient not be accepted/taken to see a doctor. HARRINGTON recalled that while he was employed at Executive Pain, each patient received a prescription for 180 to 240 Oxycodone pills.

52. CG told HARRINGTON that discharged patients from American Pain were sent to Executive Pain. CG instructed NOLAN to send discharged "patients" to Executive Pain. NOLAN would write his name on a card, which was given to the discharged "patient" to give to the employee at Executive Pain. PAVNICK knew the "patients"

were discharged from American Pain and would see to it that a doctor at Executive Pain saw the "patients".

53. American Pain would send the discharged "patients" file to Executive Pain minus any information indicating that the "patient" had been discharged. As a result, it appeared as if this was a new "patient" being transferred to Executive Pain. HARRINGTON believes that the doctors at Executive Pain were unaware that these "patients" had been discharged by American Pain. HARRINGTON stated that CG and PAVNICK had numerous conversations in his presence about the number of "patients" that were seen by both clinics. During these conversations, CG regularly commented to PAVNICK that the "patients" seen at Executive Pain were discharged by American Pain.

54. HARRINGTON did not know how much money was being made at Executive Pain but he believed that PAVNICK was making some money since she purchased new cars, and paid for extensive plastic surgery and dental work (approx $80,000).

## Boca Drug

55. In or around March 2009, HARRINGTON expressed to CG that he was interested in starting a business and CG told HARRINGTON that he was interested in opening a pharmacy in the local area. CG indicated that he wanted to locate an existing business (a shelf corporation) that has been open for some time. CG conducted research via the internet and located Appurtenance Biotechnology, a business name in Tampa, FL that was for sale. CG called an attorney named Nick Spradlin in Tampa, FL who had the business for sale. HARRINGTON provided the telephone number (813) 435-3176 as a contact number for Spradlin. CG negotiated the purchase of the business and paid approximately $2,200 to $2,400 for the business. HARRINGTON believed CG paid the money using a credit card.

56. After the purchase of the business, HARRINGTON was added as a managing Member of the LLC. In or around April/May 2009, the name Boca Drug was added as the DBA for Appurtenance Biotechnology, LLC. CG looked at several possible locations for the business and ultimately picked the location at 7400 N. Dixie Highway in Boca Raton. CG picked this location because he wanted a location near I-95 that would be easy for his customers to find. After CG selected the location, HARRINGTON met with the leasing agent (a female named Katy) and signed the lease. The monthly rent payment was $1,600 and they had to pay three months security deposit. HARRINGTON did not recall if CG paid the deposit at the time HARRINGTON signed the lease.

57. HARRINGTON stated that despite the fact that CG was not listed on the business documents for Boca Drug, CG made all decisions regarding the day-to-day operations of the business. CG hired all of the pharmacists, as well as any other employees. CG decided what drugs were to be ordered/purchased and set the selling price of all drugs dispensed. CG instructed HARRINGTON to always order Malinkrodt Oxycodone tablets whenever possible even if they cost more. CG told HARRINGTON that there is always a high demand for this specific pill because it is

# Hutson Statement

U.S. Department of Justice
Drug Enforcement Administration

| **REPORT OF INVESTIGATION** | | | | | | Page 1 of 15 | |
|---|---|---|---|---|---|---|---|
| 1. Program Code | | 2. Cross File | Related Files | 3. File No.<br>G8-09-0006 | | 4. G-DEP Identifier<br>HDN8D | |
| 5. By: Robert P Wise, TFO<br>At: West Palm Beach RO | | ☒ ▮▮▮▮▮▮▮ | | 6. File Title<br>GEORGE, Jeffrey | | | |
| | | ☐ | | | | | |
| 7. ☐ Closed ☐ Requested Action Completed<br>☐ Action Requested By: | | ☐<br>☐<br>☐ | | 8. Date Prepared<br>03-04-2011 | | | |
| 9. Other Officers: DEA SA Mike Burt, IRS SA David Keyes | | | | | | | |
| 10. Report Re: Interview of Christopher HUTSON on March 04, 2011 | | | | | | | |

## SYNOPSIS

On March 4, 2011, Christopher HUTSON met investigators at the Assistant United States Attorney's Office. HUTSON provided information pertaining to criminal activities of Jeffrey and Christopher GEORGE.

## DETAILS

1. HUTSON was asked what he was doing for work. HUTSON stated he opened a mobile oil change company.

2. HUTSON was asked to discuss the incident that took place in Jacksonville, FL. HUTSON stated "I would like to say the stuff in the police report about me is bullshit". HUTSON claims there is video from inside the clinic, which shows HUTSON did not do what the witnesses said.

3. Investigators asked HUTSON if he was lead to believe he was going to Jacksonville to take pictures. HUTSON stated "The whole drive to Jacksonville I kept talking to Chris GEORGE to make sure I wasn't going to get in trouble because I know Chris GEORGE'S temperament".

| 11. Distribution:<br>Division ▮▮▮ ▮▮▮<br><br>District ▮▮▮<br><br>Other ▮▮▮ ▮▮▮ | 12. Signature (Agent)<br>Robert P Wise, TFO<br><br>14. Approved (Name and Title)<br>Daniel G Escobar<br>GS | 13. Date<br>03-04-2011<br><br>15. Date<br>04-12-2011 |
|---|---|---|
| DEA Form    - 6<br>(Jul. 1996) | **DEA SENSITIVE**<br>**Drug Enforcement Administration** | |

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| **REPORT OF INVESTIGATION** | 1. File No. G8-09-0006 | 2. G-DEP Identifier HDN8D |
|---|---|---|
| *(Continuation)* | 3. File Title GEORGE, Jeffrey | |
| 4. Page 7 of 15 | | |
| 5. Program Code | 6. Date Prepared 03-04-2011 | |

PAVNICK was doing. Chris GEORGE told HUTSON the doctor who wrote the prescription did not have medications stored under his name, so PAVNICK had to rewrite all the prescriptions under another doctor. HUTSON watched PAVNICK forge the doctor's signature to the back of all the daily prescriptions.

31.     HUTSON was asked what he knew about Jeff GEORGE instructing SOUTH BEACH REJUVENATION (SBR) employees to go to EAST COAST PAIN (ECP). HUTSON stated he went to SBR and heard Jeff GEORGE tell the employees "If you all are bitching about money go to the pain clinic. Tell the doctor you were prescribed 240 Oxycodone from a previous doctor. Then turn around and sale the pills". Jeff GEORGE told everyone if they went to the clinic they needed a MRI.

32.     Investigators asked HUTSON where he went to get the MRI. HUTSON stated the MRIs were made by SBR employees, mainly John "Robby" EDDY. HUTSON was asked to explain the first time he went to the clinic.

33.     HUTSON stated he was nervous, the first doctor HUTSON saw was Rachael GITTENS the other was Enock JOSEPH. HUTSON was asked to describe the visit with GITTENS. HUTSON stated he was nervous, "I had a fake MRI and thought she was going to ask me a lot of questions and I would fuck up". HUTSON stated GITTENS asked HUTSON where the pain was. HUTSON stated his lower back. HUTSON stated GITTENS asked if HUTSON saw other doctors, HUTSON stated he did see other doctors. HUTSON stated GITTENS looked at his chart in which HUTSON had written he had received 240 Oxycodone. HUTSON stated GITTENS wrote me a prescription for 240 Oxycodone.

| DEA Form - 6a (Jul. 1996) | **DEA SENSITIVE** Drug Enforcement Administration |
|---|---|

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| **REPORT OF INVESTIGATION** | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| *(Continuation)* | G8-09-0006 | HDN8D |
| | 3. File Title | |
| | GEORGE, Jeffrey | |

4.
Page  10  of  15

5. Program Code

6. Date Prepared
03-04-2011

Gino MARQUEZ, EDDY and Anthony NAYA all had a crew of people doctor shopping for them. HUTSON stated LEVE was making an additional eighteen to twenty thousand dollars a month selling pills.

45.    Investigators asked HUTSON to describe his MRI business.  HUTSON stated Chris GEORGE wanted HUTSON to open the MRI office so Chris GEORGE could send patients there. HUTSON stated the MRIs he was providing didn't show anything wrong with these people.  HUTSON stated when they took the MRIs to Chris GEORGE'S clinic the doctors would not prescribe pills.

46.    HUTSON stated NOLAN called HUTSON complaining about the MRIs. NOLAN told HUTSON to get a different doctor to read the MRIs because the MRIs HUTSON was making were too legitimate.

47.    HUTSON was asked how his timeshare business began.  HUTSON stated he ran into MARQUEZ and learned what he did.  HUTSON stated he borrowed money from Chris GEORGE and rented an office in Boca Raton. HUTSON stated he hired Mark SHANDRAW who got everything up and running.

48.    HUTSON stated he hired a title company to look legitimate. Investigators asked HUTSON how much INTERNATIONAL MARKETING GROUP (IMG) grossed. HUTSON stated in four months we made three million dollars. HUTSON stated he was able to pay Chris GEORGE back all the money.

49.    HUTSON was asked how he started LA HEALTH.  HUTSON stated in 2008 he saw Jeff GEORGE making a lot of money and wanted to do the same thing but in California. HUTSON stated MARQUEZ and HUTSON went to California and met a doctor.

(Jul. 1996)

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

# Martinez Statements

**U.S. Department of Justice**
Drug Enforcement Administration

| REPORT OF INVESTIGATION | | | | Page 1 of 9 | |
|---|---|---|---|---|---|
| 1. Program Code | | 2. Cross File ☒  Related Files | | 3. File No. | 4. G-DEP Identifier |
| 5. By: Michael H Burt, SA At: Miami Field Division Enforcement Group 3 | | ☐ ☐ ☐ ☐ ☐ | | 6. File Title | |
| 7. ☐ Closed ☐ Requested Action Completed ☐ Action Requested By: | | | | 8. Date Prepared 11-05-2010 | |
| 9. Other Officers: DEA SA Victor Gobbi, DEA TFO Robert Wise, FBI SA Jennifer Turner, IRS SA Davi Keyes, AUSA's Paul Schwartz, Stryder Dixon and Attorney Valentine Rodriguez | | | | | |
| 10. Report Re: Interview of Pedro Martinez on November 5, 2010. | | | | | |

## SYNOPSIS

On Friday November 5, 2010, Pedro MARTINEZ provided information into the criminal activities of Christopher GEORGE as well as the AMERICAN PAIN clinic. This interview took place at the United States Attorney's Office in Fort Lauderdale, Florida.

## DETAILS

1. Reference is made to all previous DEA-6 form Reports of Investigation (ROI) written under the above captioned file title and number, regarding the illegal prescribing, distribution and trafficking of controlled pharmaceutical substances from various clinics in this Organized Crime Drug Enforcement Task Force (OCDETF) investigation.

2. On Friday, November 5, 2010, at approximately 10:20 a.m. while at the United States Attorney Office in Fort Lauderdale, Florida, Pedro MARTINEZ, hereinafter referred to as PM, was interviewed regarding his knowledge of the excessive pill distribution of Oxycodone within SOUTH FLORIDA PAIN, LLC and/or AMERICAN PAIN, LLC.

3. PM stated his current age is thirty-four years of age, he (PM) was born in Indiana, and his highest level of education is the 10th grade. PM stated he first met Derik NOLAN in 1998 while working at Buckeye Plumbing and had maintained an acquaintance with NOLAN. PM mentioned that he (PM) would see NOLAN out in the bars after work and knew that NOLAN was from

| 11. Distribution: Division | 12. Signature (Agent) Michael H Burt, SA | 13. Date 11-05-2010 |
|---|---|---|
| District | 14. Approved (Name and Title) Robert M Schaefer GS: | 15. Date 11-05-2010 |
| Other | | |

DEA Form - 6
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| **REPORT OF INVESTIGATION**<br>*(Continuation)* | 1. File No. ███████ | 2. G-DEP Identifier ███████ |
|---|---|---|
| | 3. File Title ████████████████ ███ | |
| 4.<br>Page  4  of  9 | | |
| 5. Program Code ███████ | 6. Date Prepared<br>11-05-2010 | |

began pulling file folders for patients. PM described the waiting room at SPF as "a mess". According to PM customers, were having seizures in the waiting room. DN knew just about everyone that came into the clinic and DN was "like the boss to the patients". DN would meet customers in private, DN would get into fights with customers in the parking lot and DN also received oral sex from customers that came to the clinic, according to PM. PM stated that people (patients) would pull DN aside in an attempt to bribe him (DN). PM heard people (patients) failing drug test, but paying DN $100.00 to let them be seen by a doctor. PM stated it was obvious that DN would "sponsor" patients into SPF and gave them preferential treatment in the pain clinic. PM also stated that DN was always yelling at the customers to "keep it down" (referring to the noise inside the clinic). When asked if the doctors could hear what DN was yelling PM responded, "they (the doctors) had too hear what was going on".

11. PM was asked about his interaction with the doctors. PM responded he (PM) would sometimes approach a doctor if he could not read their handwriting on a prescription. PM was asked if the doctors could view the crowds in the waiting room. PM stated when doctors went to lunch they could see everything going on in the waiting room and also when a doctor was done with a patient file they (the doctor) had to walk/return the patient file to the reception area. By doctors returning the files, they (the doctors) could see "large crowds" and the "zoo" that was assembled in the waiting room of SPF. PM recalled one of the doctors saying "holy-shit" (referring to the large crowds in the waiting room) in his presence. PM stated he observed urine in condoms and soda bottles in the bathroom used by the patients.  Furthermore, PM stated to agents that he was aware that doctors were paid $75.00 for a follow-up patient and $100.00 for a new patient. PM mentioned that while at the second Cypress Creek location, he (PM) knew BOSHERS, ARUTA, R. DRESZER and J. DRESZER were not verifying the prescriptions of the patients filling their prescriptions from the "in-house" pharmacy.

12. PM mentioned he could testify he (PM) was working the day that a female was kicked out by DN for using a cell phone camera to capture video inside the pain clinic. This video was shown to PM from a "*You Tube*" website in which he (PM) recognized the incident in question.

DEA Form        - 6a
(Jul. 1996)

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | | Page 1 of 9 |
|---|---|---|

| 1. Program Code ███████ | 2. Cross File ☒ Related Files ████████ ☐ ☐ ☐ ☐ ☐ | 3. File No. ██-███████ | 4. G-DEP Identifier |
|---|---|---|---|
| 5. By: Michael H Burt, SA  At: Miami Field Division  Enforcement Group 3 | | 6. File Title ██████████████████ ███ | |
| 7. ☐ Closed ☐ Requested Action Completed  ☐ Action Requested By: | | 8. Date Prepared  11-16-2010 | |

9. Other Officers: SA Alfred Cortes, IRS SA David Keyes and AUSA Paul Schwartz

10. Report Re: Interview of Pedro MARTINEZ on November 15, 2010.

## SYNOPSIS

On Monday, November 15, 2010, Pedro MARTINEZ provided information into the criminal activities of Christopher GEORGE as well as the AMERICAN PAIN clinic. This interview took place at the United States Attorney's Office in Fort Lauderdale, Florida.

## DETAILS

1. Reference is made to all previous DEA-6 form Reports of Investigation (ROI) written under the above captioned file title and number, regarding the illegal prescribing, distribution and trafficking of controlled pharmaceutical substances from various clinics in this Organized Crime Drug Enforcement Task Force (OCDETF) investigation.   Specific reference is made to DEA-6 form ROI, dated November 5, 2010, written by SA Burt, entitled, "Interview of Pedro MARTINEZ on November 5, 2010."

2. The contents of this report represent only a summary of the information and details as recalled by the preparer. The accounts represented in this report are subject to modifications and clarifications, as additional documentary information is obtained and/or the preparer's memory is further refreshed.

3. On Monday, November 15, 2010, at approximately 10:45 a.m. while at the United States Attorney Office in Fort Lauderdale, Florida, Pedro MARTINEZ, hereinafter referred to as PM, was interviewed regarding his knowledge of



| 11. Distribution:  Division ████████████  District ███  Other ████████████ | 12. Signature (Agent)  Michael H Burt, SA | 13. Date  11-16-2010 |
|---|---|---|
| | 14. Approved (Name and Title)  Stephen V Kepper  SA    A/GS | 15. Date  11-16-2010 |

DEA Form    - 6
(Jul. 1996)

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| | | 1. File No. | | 2. G-DEP Identifier |
|---|---|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | | | | |
| | | 3. File Title | | |
| 4. Page   7   of   9 | | | | |
| 5. Program Code | | 6. Date Prepared 11-16-2010 | | |

user and that NOLAN would tell PM to "call your guy" (referring to Juan CHARLARCA) so that NOLAN could obtain cocaine.  PM also mentioned that CHARLARCA had a laptop in which fake MRI's were made.

18. PM observed CG collect several small garbage bags of cash that were collected from each window (new patient or follow-up) and transfer all that cash into one large garbage bag of cash at the end of each day.  PM recalled CG being robbed twice of approximately $200,000 dollars.  PM stated that on one occasion Erika UNDERWOOD (EU) was with him (CG) at Walgreens when the money was taken out of his (CG) car.  PM went on to say that she (EU) would spend all day with him (CG) in his office.  PM observed NOLAN "get on to" EU for not doing her job which was making photocopies and filing folders.

19.  PM was asked to describe interactions between himself and any of the medical staff at AP or any observations he (PM) may have had between CG and any doctors.  PM stated that at first most of the doctors dealt directly with NOLAN, but when EB was hired it was EB that dealt directly with the doctors.  PM remembered CG not having much direct interaction with the doctors.  PM recalled that ARUTA "hated to see new patients" because they required the doctor to spend more time with the patient collecting information.  PM observed patient visits with ARUTA lasting five minutes or less.  It was advantageous for a doctor to see the follow-up patients because this increased their number of patients seen thus maximizing their pay.  PM remembered J. DRESZER complaining about seeing new patients so much so that PM recalled J. DRESZER taking new patient files from his bin and putting them in other doctors bin. PM recalled a specific instance at the Boca Raton location in which J. DRESZER confronted ARUTA over ARUTA not seeing enough new patients.  J. DRESZER believed ARUTA was stealing follow-up patients from J. DRESZER's bin.  PM witnessed a confrontation between J. DRESZER and ARUTA in which the two doctors had to be separated after arguing over the follow-up patients.  PM overheard J. DRESZER telling ARUTA,"you got to stop taking all the follow-ups and start taking some of the new patients".  PM witnessed Roni DRESZER (J. DRESZER's son) "hold back" J. DRESZER and calm his father down. PM stated that CADET seemed out of place with the type of patients that came in to AP.  PM stated she was going through a divorce and she lived somewhere in Broward county.

DEA Form      - 6a
(Jul. 1996)

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

00695

# Meek Statement

U.S. Department of Justice
Drug Enforcement Administration



| REPORT OF INVESTIGATION | Page 1 of 7 |
|---|---|

| 1. Program Code | 2. Cross File | Related Files | 3. File No. | 4. G-DEP Identifier |
|---|---|---|---|---|
| ▓▓▓▓▓ | ☐ ☐ ☐ ☐ ☐ | | ▓▓▓▓▓ | |

| 5. By: Carol Johnson, IRS<br>At: Miami Field Division<br>Office, DIG-2 | 6. File Title ▓▓▓▓▓▓▓▓▓▓ |
|---|---|

| 7. ☐ Closed  ☐ Requested Action Completed<br>☐ Action Requested By: | 8. Date Prepared<br>03-09-2011 |
|---|---|

9. Other Officers: SA Michael Burt, FBI Special Agent Jennifer Turner, FBI Special Agent Kurt McKenzie, and Assistant, United States Attorney (AUSA) Paul Schwartz

10. Report Re: Interview of Dr. Robert John Meek on March 09, 2011

**SYNOPSIS**

On March 09, 2011, Dr. Robert John Meek agreed to an interview at the Assistant, United States Attorney's Office in Fort Lauderdale, Florida. The interview was conducted by Drug Enforcement Administration Special Agent Michael Burt, Federal Bureau of Investigations (FBI) Special Agent Jennifer Turner, FBI Special Agent Kurt McKenzie, Assistant, United States Attorney (AUSA) Paul Schwartz, and Intelligence Analyst Carol Johnson. This report details information regarding Dr. Meek's involvement in the daily operations at AMERICAN PAIN and EXECUTIVE PAIN Clinics located in South Florida.

**DETAILS**

1. Reference is made to all previous reports of investigations under this file title and number.

2. On March 09, 2011, Dr. Robert John Meek agreed to an interview at the Assistant, United States Attorney's Office in Fort Lauderdale, Florida. The interview was conducted by Drug Enforcement Administration Special Agent Michael Burt, Federal Bureau of Investigations (FBI) Special Agent Jennifer Turner, FBI Special Agent Kurt McKenzie, Assistant, United States Attorney (AUSA) Paul Schwartz, and Intelligence Analyst Carol Johnson. This report details information regarding Dr. Meek's involvement in the daily operations at AMERICAN PAIN and EXECUTIVE PAIN Clinics located in South Florida. Present with Dr. Robert John Meek, hereinafter referred to as MEEK, was his attorney, Kevin Kulick.

| 11. Distribution: | 12. Signature (Agent) | 13. Date |
|---|---|---|
| Division ▓▓▓ ▓▓▓ | *Carol Johnson* Carol Johnson, IRS | 04-07-2011 |
| District | 14. Approved (Name and Title)<br>CARMEN LAPONTE<br>GS | 15. Date<br>04-08-2011 |
| Other ▓▓ ▓▓ ▓▓▓ | | |

DEA Form   - 6
(Jul. 1996)

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. ▮▮▮▮ | 2. G-DEP Identifier ▮▮ |
|---|---|---|
| *(Continuation)* | 3. File Title ▮▮▮▮▮▮▮▮▮▮ | ▮▮ |
| 4. Page  5  of  7 | | |
| 5. Program Code ▮▮▮ | 6. Date Prepared  03-09-2011 | |

22. MEEK said Christopher GEORGE did not ask to see any references but did ask about MEEK's DEA registration. MEEK said Christopher GEORGE requested that MEEK shadow Dr. Cynthia CADET at AMERICAN PAIN for a while to get an idea of how things were done. According to MEEK, Christopher GEORGE said that some of his doctors didn't interact with the patients but handed out prescriptions, whereas Dr. Cynthia CADET actually talked to the patients, hence the reason for shadowing Dr. CADET.

23. Investigators asked MEEK about his tour with Dr. Cynthia CADET. MEEK said he shadowed Dr. CADET for about 1 hour. Dr. CADET took one exam room and grabbed a chart. Investigators asked MEEK if Dr. CADET was able to see the waiting room area. MEEK told investigators that Dr. CADET was able to physically see the patients while passing by the waiting room.

24. MEEK said Dr. Cynthia CADET told MEEK to make sure he logged every patient seen because that is how the doctors were paid. Dr. CADET said this was the most important sheet of paper MEEK would encounter daily.

25. MEEK said that Dr. CADET did not receive any prior patient treatment records from the patients. MEEK also said that Dr. CADET did not discuss attempts at medication reductions but Dr. CADET just talked to the patients. MEEK went on to say that though Dr. CADET liked to leave early, she saw just as many patients as the other doctors.

26. During the end of the interview, Christopher GEORGE told MEEK that he did not have an opening at AMERICAN PAIN but sent MEEK to a friend, Dianna PAVNICK, at the EXECUTIVE PAIN Clinic.

27. Investigators asked MEEK if he ever met Dr. Beau BOSHERS. MEEK said he met DR. Beau BOSHERS at EXECUTIVE PAIN when Dr. BOSHERS was filling in at the clinic. MEEK described Dr. BOSHERS as a bit of a jerk. MEEK said he saw a lot of patients because of money motives but commented that Dr. BOSHERS saw three times as many patients. MEEK said he heard from patients that Dr. BOSHERS would make comments to the patients like "I see you're coming for your candy". MEEK also said patients thought that Dr. BOSHERS was a jerk as well. (**ANALYST NOTE:** According to MEEK, Dr. BOSHERS was referring to medication as candy).

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

00712

# Mills, Mike Statements

**U.S. Department of Justice**
Drug Enforcement Administration

## REPORT OF INVESTIGATION

Page 1 of 10

| 1. Program Code | 2. Cross File | Related Files | 3. File No. ▉-▉ | 4. G-DEP Identifier ▉ |
|---|---|---|---|---|
| 5. By: Stephen V. Kepper, Agen At: MIAMI FIELD DIVISION | ☐ ☐ ☐ ☐ | | 6. File Title ▉ ▉ ▉ | |
| 7. ☐ Closed  ☐ Requested Action Completed  ☐ Action Requested By: | ☐ ☐ | | 8. Date Prepared 03-09-2010 | |
| 9. Other Officers: SA Darren Glanz | | | | |

10. Report Re: Interview of Michael MILLS at AMERICAN PAIN LLC on March 3, 2010

SUMMARY:

1.    On the morning of March 3, 2010, SA's Stephen Kepper and Darren Glanz interviewed Michael James MILLS (DOB 09-11-1978), an employee of AMERICAN PAIN LLC in Lake Worth, Florida. This interview took place at AMERICAN PAIN and started at approximately 8:30 a.m. The following paragraphs are a summary of what SA's Kepper and Glanz discussed with MILLS during this interview.

DETAILS:

1.    Michael MILLS stated that he began working at AMERICAN PAIN in or around March 2009. MILLS stated that he had been recognized at AMERICAN PAIN for his work ethic and had been recognized as the "employee of the year." MILLS stated that he does not have an official title at AMERICAN PAIN, but many people there know him as the "go to guy" or the "jack of all trades." MILLS clarified these descriptive phrases by saying that he has many different responsibilities at AMERICAN PAIN. Some of the responsibilities MILLS has are opening the office in the morning, answering phones, dealing with patient discharges, investigating "doctor shopping" clients who come to the clinic, making copies, filling prescriptions, and subsequently giving these filled prescriptions to doctors/patients. MILLS also told agents that his nickname at the office was "Captain Discharge." MILLS also stated that he is paid weekly by check and, when he started working at AMERICAN PAIN, he was receiving

| 11. Distribution: Division ▉ ▉ | 12. Signature (Agent) Stephen V. Kepper, SA | 13. Date 03-09-2010 |
|---|---|---|
| District | 14. Approved (Name and Title) Robert M. Schaefer, GS | 15. Date 03-09-2010 |
| Other ▉ | | |

DEA Form      - 6
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

**REPORT OF INVESTIGATION**

*(Continuation)*

| 1. File No. | 2. G-DEP Identifier |
|---|---|
| 3. File Title | |

| 4.<br>Page  6  of  10 | |
| 5. Program Code | 6. Date Prepared<br>03-09-2010 |

conversation, MILLS also stated that he thinks GEORGE has an ownership
role in EXECUTIVE PAIN, which is located on Okeechobee Blvd in Palm Beach,
FL. MILLS stated that he knows a lot of patients at AMERICAN PAIN are
referred to EXECUTIVE PAIN.

15.   During this interview, MILLS spoke with agents about prescriptions
being filled at AMERICAN PAIN. MILLS stated that he had been filling
prescriptions at AMERICAN PAIN since July 2009. MILLS stated that
currently he and ERICA are the primary employees who fill prescriptions
for the patients. Based on MILLS' role as a "script filler," he believes
that out of all the doctors employed at AMERICAN PAIN, Dr. CADET is the
one who prescribes the most medicines (and/or dosage amounts). MILLS
stated that Dr. CADET is the doctor most frequently referred to by
patients at AMERICAN PAIN. MILLS further stated that Dr. CADET is the
doctor who is most sympathetic towards patients who over exaggerate their
pain and want the maximum amount of medicine. (Agent's Note: MILLS stated
on multiple occasions during this interview that Dr. CADET prescribes the
most medicines and/or is the most lenient towards patients.)

16.   During this interview, SA Kepper asked MILLS about the business
culture at AMERICAN PAIN and whether or not he sees patients being
"tapered" off of their medicines or at least tapered downward in the
amount of medicines (or dosage amounts) they are receiving on a monthly
basis. MILLS stated that he typically see patients being "tapered" upward
to higher medicine/dosage amounts, but he does not see doctors "tapering"
patients downward.

17.   When talking about prescription medicines, MILLS stated that AMERICAN
PAIN charges approximately 40 cents for each Xanax tablet; $2 for each 30
milligram Roxicodone tablet, and $1.50 for each 15 milligram Roxicodone
tablet. MILLS stated that in a typical visit, a patient can easily spend
hundreds of dollars on prescriptions being filled. During this part of the
interview, MILLS estimated that approximately 80% of AMERICAN PAIN
patients have their prescriptions filled on-site at the clinic, provided
that the clinic has medicines available on that particular day. MILLS
stated that because of supply-and-demand issues, AMERICAN PAIN is
frequently running out of medicines for their patients. MILLS stated that
the standard practice at AMERICAN PAIN is to not allow refills on a

DEA Form    - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

00733

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    03/25/2011

On January 28, 2011, MIKE MILLS (MILLS), ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, previously employed at AMERICAN PAIN (AP) was interviewed at the United States Attorney's Office.

MILLS graduated high school and was in the Marines for six years from 1996 - 2002. While in the Marines, MILLS' wife filed domestic violence charges against him. He started doing drugs, was given a psychological evaluation by the Marines and subsequently received a less than honorable discharge. MILLS took some college courses while in the Marines, but is not a college graduate. MILLS had jobs in plumbing, commodities, construction, and at Lowe's.

MILLS went to the same school DERIK NOLAN (NOLAN) in New York. NOLAN was a jock in high school and MILLS did not socialize with him, but his sister dated NOLAN in high school. NOLAN is living with his cousin, KELLY LAST NAME UNKNOWN (LNU) in Boca Raton, Florida.

MILLS father, STEPHEN MILLS (STEPHEN) worked at the follow-up patient window at AP. His brother RYAN MILLS (RYAN) then started working at AP at the missed appointment window.

MILLS started working at AP in March 2009 filing and answering phones. NOLAN was in charge of hiring and security while ETHAN BAUMHOFF handled ordering medication and ran the office. CHRIS HANEY worked the new patient window, DARYL MICHAEL STEWART or PETE MARTINEZ worked the pharmacy window and DREW HARRINGTON (HARRINGTON) worked discharges. MILLS eventually took over the discharges from HARRINGTON.

A few of the AP patients were in electronic wheelchairs. The Boca Raton location did not have wheelchair access, so when someone came to the clinic in a wheelchair, they had to put a board at the back door to create a ramp.

MILLS put approximately 500 patient files together over a period of approximately three months. During that time, he estimated that maybe five patients brought prior medical records with them. He also administered urine drug tests, even though he

Investigation on   01/28/2011   at Fort Lauderdale, Florida

File # ▓▓▓▓▓▓▓▓▓▓▓▓   Date dictated

by  SA Jennifer J. Turner

01053

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of <u>   MIKE MILLS                            </u>  , On <u>01/28/2011</u>  , Page <u>    3    </u>

MILLS noticed how the appearance of some patients changed while they were patients at AP.  He recalled one girl who resembled Miley Cirrus.  The patient was attractive, but months later she looked terrible and her hair was thinning.

MILLS usually opened the clinic at the Boca location each morning and was usually the last one to leave at night.

GEORGE AND STEPHEN MILLS hated one another.  MILLS stated GEORGE talked shit about his dad.  His brother RYAN and his wife are Mormon and RYAN's wife thought the clinic was shady and did not like RYAN working at AP.

==The physicians argued all the time about new patients. MILLS recalled JACOBO DRESZER and MICHAEL ARUTA (ARUTA) argue as well as JACOBO DRESZER and BOSHERS.  The physicians would say things like, "Why are you taking my patient?" or "Why am I seeing less patients than him?"==  ARUTA did not like to see new patients because follow-up patients were quicker.  RONI DRESZER worked very fast with his patients while his father, JACOBO DRESZER was slow.

MILLS believes JACOBO DRESZER was the meanest doctor at AP with ARUTA as the second meanest.  ARUTA called some women fat and they would come crying out of his office.  ARUTA told women that if they lost weight and stopped drinking Mountain Dew, their back wouldn't hurt.

The physicians referred to the patients as retarded. BOSHERS would say the patients came all the way down to South Florida and they needed to take a shower because they smelled like sewage.  Patients would ask BOSHERS for more pills.  When patients asked DR. JACOBO DRESZER for more pills, he would discharge them.

DANA ANGELINO (ANGELINO) originally worked in the pharmacy, but NOLAN fired her because she was always angry and complaining.  ERIKA UNDERWOOD (UNDERWOOD) also helped ANGELINO, but she would often leave the clinic with GEORGE.  UNDERWOOD was a lingerie model and taught MILLS how to fill meds.  PETE MARTINEZ helped ANGELINO, but he left, so DARYL STEWART took over.

MILLS started working in the pharmacy in mid-June or early July 2009 after BAUMHOFF told him he had to help out in the pharmacy.  After MILLS filled a prescription, it was taken to the doctor and the doctor initialed the original prescription he wrote in the upper or lower corner.  If the doctors were very busy, the

# Mills, Ryan Statement

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription     09/19/2011

      RYAN MILLS was interviewed at the office of the United States Attorney in Fort Lauderdale, Florida.  During the interview MILLS was accompanied by his attorney ROBERT L. WILLIAMS.  Also present and participating in this interview were Internal Revenue Service (IRS) Special Agent David Keyes, Drug Enforcement Administration (DEA) Special Agent Michael Burt, and Assistant United States Attorney Paul Schwartz.  After being advised of the identity of the interviewing Special Agents and the nature of the interview, MILLS provided the following information:

      RYAN MILLS worked at a patient check-in window at AMERICAN PAIN for approximately five months.  During that time, MILLS noticed that at least two thirds to three quarters of the patients were from Kentucky, Tennessee, Ohio, Virginia, North Carolina or Georgia.  The patients told MILLS that they could not get pain medication in the states that they were from.  AMERICAN PAIN was popular with the patients because they knew they could get the drugs they wanted.  MILLS soon realized that the clinic was a pill mill.  His father STEPHEN MILLS also warned him that the clinic was "dirty".  MILLS often saw people paying other people's clinic visit fees.  Many of the patients arrived in groups in vans in order to buy their drugs.  MILLS knew that PETE MARTINEZ "sponsored" patients who went to the clinic by paying for their visits.  MILLS saw CHRIS GEORGE's friends come to the clinic to obtain prescriptions.  These people expected "VIP treatment" because they were GEORGE's friends.

      MILLS could tell that most of the patients at the clinic were drug addicts just by looking at them.  MILLS asked new patients for an MRI, a urine sample, and for their visit fee.  The urine collection cups displayed whether or not the patients had drugs in their system so MILLS collected the urine samples, the read and recorded the results.  MILLS was aware that many patients provided someone else's urine for the test.  A cleaning lady at the clinic once told him that she found a condom full of urine underneath a chair in the clinic's waiting room.  If a patient was discharged from the clinic, CHRIS GEORGE told the employees to give them a business card for EXECUTIVE PAIN and refer them to that clinic.  DERIK NOLAN also handed out EXECUTIVE PAIN business cards to employees and told them to give out the cards.  Patients often gave MILLS tips in order to move them up on the waiting list to see

Investigation on   06/07/2011   at  Fort Lauderdale, Florida

File # ▮▮▮▮▮▮▮▮▮▮▮▮▮                         Date dictated   09/19/2011

by   SA Kurt L. McKenzie:klm, SA Ira Fair

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Ryan Mills_____ , On 06/07/2011 , Page ___2___

a doctor.  He made between $20,0000 and $25,000 dollars in tips during the time he worked at the clinic.

While working at the clinic, MILLS had very little interaction with the doctors who worked there.  MILLS once overheard Dr. RONNIE DRESZER say that he had seen ninety nine patients in eight hours, and that he didn't want more because it didn't "look good".  MILLS knew that many of the patients did not like Dr. ARUTA because he was rude to them.  MILLS heard that ARUTA would tell overweight patients that they were fat and insult them in other ways.  MILLS was also a patient and received prescriptions from the clinic.  The majority of the workers at the clinic were also patients of the clinic and received prescriptions there.  MILLS sold the drugs he obtained to SAM HASAN.  MILLS believes that HASAN also sponsored patients to come to the clinic by paying for their clinic visit fees.

MILLS injured his knee and went to FAYE IMAGING to get an MRI.  MILLS knew about FAYE IMAGING because DERIK NOLAN had told employees to refer patients there.  He paid FAYE IMAGING $250 to do the MRI.  FAYE IMAGING faxed the results of the test back to AMERICAN PAIN.  MILLS put together his own patient file at the clinic.  He made the file seem as if his injury was worse than it was, and put false drug test results in it to make it seem as if he was already using prescription medication.  MILLS saw Dr. CADET and then later saw Dr. BOSHERS in order to get his prescriptions.  Patients often requested to see Dr. CADET because it was known that she wrote prescriptions for a lot of pills.  MILLS once overheard a conversation between Dr. CADET, Dr. BOSHERS, and Dr. ARUTA, that CADET was prescribing more than two hundred and forty pills at a time.  This was more than the other doctors at the clinic.  CADET said that she was going to cut back.  During MILLS' visit to Dr. CADET, she looked through his file and took his blood pressure, but never did an examination of his knee.  MILLS lied to CADET and told her that he felt more pain than he was actually feeling, and also told CADET that he was already using prescription drugs.  CADET never counseled him about the dangers of the medication.  She wrote him a prescription for two hundred and ten 30 milligram Oxycodone tablets and 15 milligram Xanax tablets.  The entire visit took approximately five minutes.

ETHAN BAUMHOFF did not allow clinic employees to fill their prescriptions at the clinic.  Due to this restriction, MILLS went to IRA's DISCOUNT PHARMACY in order to fill his prescription.

# Nolan, Derik Statement

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription  06/24/2011

DERIK NOLAN (NOLAN), ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Florida, was proffered at the United States Attorney's Office after signing a Kastigar Letter in the presence of his attorney.  Also present were Assistant United States Attorneys Lawrence Lavecchio and Paul Schwartz as well as Special Agent David Keyes of the Internal Revenue Service and Special Agent Michael H. Burt of the Drug Enforcement Administration.

NOLAN lives with his girlfriend, TRACEY KOHANI (phonetic) in Palm Beach Gardens, Florida, exact address unknown.

NOLAN attended Palm Beach Community College for one year then studied as a plumber's apprentice for two additional years. NOLAN owned STREAMLINE CONSTRUCTION when he met CHRIS GEORGE (GEORGE) and JEFF GEORGE (JEFF).  The GEORGE's installed hurricane shutters for NOLAN's construction company.  After STREAMLINE, NOLAN was hired by JOHN GEORGE to work for MAJESTIC HOMES in 2006.

In 2007 NOLAN went to jail for driving on a suspended license and was fired from MAJESTIC.  After serving time in jail, he started NOLAN CONSTRUCTION CONSULTING installing sliding doors in condominiums.  He was working with CHRIS HANEY (HANEY) for about a month or so when GEORGE called him to build out SOUTH FLORIDA PAIN's (SFP) location on Oakland Park Boulevard in Fort Lauderdale. NOLAN believes the build cost GEORGE $5,000 - $10,000.

After he completed the build, GEORGE occasionally asked NOLAN to fill in at SFP.  By the summer of 2008, NOLAN was working security full-time at SFP.  His job was to throw unruly patients out of the clinic and protect others because people were stealing the patient's pills as they left the clinic.  NOLAN had to hire additional security guards.

NOLAN was paid $1,000 cash per week when he was first hired.  He also had a $1,000 per week expense account for miscellaneous expenditures including paying plumbers, the cleaning lady, supplies, etc.  Later he made $2,000 - $3,000 per week with $1,000 on the books, $1,000 cash and approximately $1,000 in tips/kickbacks from the guys who worked at the front windows.

Investigation on  06/23-07/15/2011  Fort Lauderdale, Florida

File # ▓▓▓▓▓▓▓▓▓▓▓▓  Date dictated

by  SA Jennifer J. Turner

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ____DERIK NOLAN_____ , On 06/23/2011 , Page ___6___

EDDIE failed one question on the lie detector test, and
believed the money was at JEFF GEORGE's house.  They went to JEFF
GEORGE's house and saw EDDIE's car parked outside.  They went
through EDDIE's car and found a black semi-automatic gun in the
center console.  They also found $20,000 in cash in the trunk that
was labeled.

NOLAN described DR. CADET as not being very smart.  AP
patients liked DR. CADET.  He recalled telling CADET to speed up
her appointments and spend less time with the patients.  She said
ok and spent less time with her patients.  He helped DR. CADET find
a real estate agent because she needed a day off work to find a
house, but the clinic couldn't afford to loose her for the day.

The physicians at AP told NOLAN to stop giving them new
patients because they took too much time.  Each doctors saw
approximately 100 patients per day.  After the patients were done
with their appointment, the patient charts were placed in milk
crates waiting to be filed.  GEORGE had NOLAN review the patient
files to see if their medication was increased or decreased.
GEORGE told NOLAN to make sure the doctors did not write more than
240 Oxy 30's per visit.  NOLAN recalls reviewing the files 4-5
times and reported back to GEORGE.  He does not recall physicians
decreasing the amounts of pills they prescribed to the patients,
but does remember complaints from some patients that RONI DRESZER
was writing for low quantities of Oxycodone.

AP employees were told to discharge patients with obvious
track marks or those who failed drug tests because if they didn't,
the cops would come down on AP.  Patients brought condoms filled
with clean or dirty urine so they could pass their drug test.

NOLAN did not know GEORGE opened EXECUTIVE PAIN (EP)
until after it was already opened.  GEORGE gave NOLAN EP business
cards and told NOLAN to send patients who were discharged from AP
to EP for "detox" or a second opinion.  NOLAN put his initials on
the business card so EP employees would know NOLAN referred the
patients.  Patients with track marks would say they were cat or
squirrel scratches.

The GEORGE brothers paid for trips for NOLAN and others.
In 2007, NOLAN, JEFF GEORGE, and GINO MARQUEZ went to the Playboy
Mansion for a Halloween party dressed as gangsters.  JEFF GEORGE
was dating a playmate at the time.

# Dianna Pavnick Statements

**U.S. Department of Justice**
Drug Enforcement Administration

## REPORT OF INVESTIGATION

Page 1 of 6

| 1. Program Code | 2. Cross File | Related Files | 3. File No. | 4. G-DEP Identifier |
|---|---|---|---|---|
| 5. By: Margarita Bey, IRS<br>At: MFD/ODO/INTEL | ☐<br>☐<br>☐<br>☐ | | 6. File Title | |
| 7. ☐ Closed ☒ Requested Action Completed<br>☒ Action Requested By: S/A MICHAEL | ☐ | | 8. Date Prepared<br>03-05-2010 | |

9. Other Officers: DEA S/A Michael Burt and Hollywood Police Department Detective Dana Doklean

10. Report Re: Interview of Diana PAVNICK during Search Warrant Executed on 03/03/2010, at residence located in 3485 Lago De Talavera, Wellington, FL

### SYNOPSIS

On March 3, 2010, a Search Warrant was executed at the residence of Christopher GEORGE and Diana PAVNICK, located at 3485 Lago De Talavera, Wellington, Florida. GEORGE and PAVNICK are the owners of AMERICAN PAIN and EXECUTIVE PAIN, both clinics involved in excessively prescribing Schedule II narcotic control substances to local and out of state clients. PAVNICK showed up at the residence shortly after the execution of the Search Warrant and consented to an interview with Law Enforcement personnel.

### DETAILS

1.  On March 3, 2010, at approximately 7:00 am, Federal and Local agents executed a Search Warrant at the residence of Christopher GEORGE located at 3485 Lago De Talavera, Wellington, FL.

2.  The contents of this report represent only a summary of the information and details as recalled by the individual interview. The accounts represented in this report are subject to modifications and clarifications, as additional documentary information is obtained and/or the individual's memory is further refreshed.

3.  On March 3, 2010, at approximately 7:28 am, Drug Enforcement Administration (DEA) Agent Michael Burt, Hollywood Police Department Detective Dana Doklean, and DEA Intelligence Research Specialist Margarita Bey interviewed Diana PAVNICK in front of her residence in

| 11. Distribution:<br>Division<br>District<br>Other | 12. Signature (Agent)<br>Margarita Bey, IRS | 13. Date<br>03-10-2010 |
|---|---|---|
| | 14. Approved (Name and Title)<br>CARMEN L. APONTE, GS | 15. Date<br>03-10-2010 |

DEA Form     - 6
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

## REPORT OF INVESTIGATION
*(Continuation)*

| 1. File No. | 2. G-DEP Identifier |
|---|---|
| 3. File Title | |

4.
Page  4  of  6

5. Program Code

6. Date Prepared
03-05-2010

mentioned that the cost of an MRI on some of those states could reach $2,000 versus $200 in South Florida. She also mentioned that doctors on those states are afraid of prescribing Oxycodone for fear of DEA's sanctions and are not willing to prescribe Schedule II narcotics. In addition, she rationalized that clinics and doctors in Northern states have waiting lists to see patients making it difficult for those patients seeking pain treatment. Also, those patients are so desperate that they are willing to drive thousands of miles, once a month, to get their medication at EXECUTIVE PAIN. Furthermore, PAVNICK stated that she has knowledge of patients traveling to South Florida in pairs, (sometimes more than two), and sharing the cost of travel, since it is cheaper to get treatment in South Florida. She did not think that there was anything unusual about that. She mentioned that some of the patients are really hurt and that EXECUTIVE PAIN provides the help they need. PAVNICK was asked if she knew the term "Sponsor", which she responded she did not know the term. She was also asked if she had knowledge of patients selling their medication at the EXECUTIVE PAIN parking lot. PAVNICK denied having knowledge and added that her security personnel has never made her aware of people selling narcotics in the parking lot.

9.   According to PAVNICK, EXECUTIVE PAIN provides detoxification treatment to those patients that become addicts from the pain medication they are taking. Nevertheless, she could only think of two patients receiving detoxification treatment since the clinic opened a year ago. PAVNICK stated that the physicians working at EXECUTIVE PAIN usually referred their patients for physical therapy, back to their primary doctors and/or a Magnetic Resonance Image (MRI). When asked where those patients are referred to, she stated that they tell their patients to look the information up in the phonebook. PAVNICK emphatically stated that they referred their patients to get help, and that they keep very good records on their patients in addition to follow ups with their primary doctors. Conversely, they (EXECUTIVE PAIN) do not require any geographical information from their patients.

10.  Agents asked PAVNICK what she considered to be a high quantity when prescribing Oxycodone. She responded that 240 units of Oxycodone

---

DEA Form     - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription     07/14/2011

DIANNA MARIE PAVNICK (PAVNICK) GEORGE, ██████████████, proffered at the United States Attorney's Office, Fort Lauderdale, Florida with her attorney, Jim Eisenberg.  Present during the proffer were AUSAs Paul Schwartz and Larry Lavecchio; Drug Enforcement Administration Special Agent (SA) Michael H. Burt, IRS SA David J. Keyes, and HIDTA analyst Dara Shapiro.

PAVNICK was living in North Port, Florida in 2005 when she met her husband, CHRISTOPHER GEORGE (GEORGE) at a gym.  GEORGE started coming to the club where PAVNICK worked and they started dating about a year later.

PAVNICK and GEORGE come to the east coast of Florida after GEORGE's brother, JEFF GEORGE (JEFF) talked to GEORGE about opening up a clinic.  JEFF had a steroid business at the time.  PAVNICK worked at SOUTH FLORIDA PAIN (SFP) taking patient's vital signs.  PAVNICK is a certified nursing assistant.  She received her training from Holy Health Care in Massassachusettes when she was 17 or 18 years old.  PAVNICK did not work at SFP when it moved to Cypress Creek Road in Fort Lauderdale; instead she went back to work at the clubs.  PAVNICK only visited the SFP, later AMERICAN PAIN (AP), in Boca Raton and Lake Worth a few times.

PAVNICK described some of the patients as average looking and others as dirt bags who looked and smelled like they slept on the street.  In the beginning, SFP did not require patients to have MRI reports.  The first physician at SFP was DR. OVERSTREET (OVERSTREET).  OVERSTREET said patients did not need an MRI, and that if a patient says he is in pain, they needed to believe the patient.  There wasn't any medical equipment at SFP other than a blood pressure cuff.  After OVERSTREET died, JEFF brought DR. RACHEL GITTENS to SFP.  Patients were prescribed a variety of medications including Mobic, Alprazolam, Endocent, Oxy 15s and 30s, and anti-inflammatories.

SFP moved to Cypress Creek Road because the cops "chased" them out of the Oakland Park Boulevard location.  The police did not want local or out-of-state people coming to their clinic to get drugs.

---

Investigation on    07/14/2011    at  Fort Lauderdale, Florida

File # ██████████████                              Date dictated

by   SA Jennifer J. Turner

FD-302a (Rev. 10-6-95)

████████████████

Continuation of FD-302 of ___DIANNA MARIE PAVNICK_____, On _07/14/2011___, Page __4__

       PARAGON and SUNRISE hired LOU FISHER (FISHER) to inspect EP.  FISHER passed EP for the PARAGON inspection, but failed EP for the SUNRISE inspection just two months later.  FISHER told PAVNICK that if she hired him as a consultant for $2,500, he could give her a compliance program and help her out; leading PAVNICK to believe that if she paid him, EP would ultimately pass the SUNRISE inspection.

       BAUMHOFF told PAVNICK that PARAGON stopped sending pills to AP and EP because the DEA questioned them about things and PARAGON got "geeked up".  PARAGON stopped sending EP medication sometime before the clinic was shut down.

       EP ordered pills from HARVARD, now EXPERT MED.  GLORIA (GLORIA) LNU was EP's pharmaceutical representative from HARVARD.  GLORIA told PAVNICK if she wanted to continue receiving the quantities of pills HARVARD was sending her every week, she had to buy $100.00 worth of non-controlled drugs per doctor, per month.  GLORIA told her if she did not buy these additional medications, HARVARD would have to decrease her limit.  GLORIA further explained that it looked better when she (GLORIA) did her reporting for the month.

       HARVARD required all of the physicians at EP sign a questionnaire including the number of patients seen at the clinic, the number of patients who were from out of state, and the number of patients who received controlled substances.  PAVNICK lied on the form, knowing if she put the correct answers, HARVARD might discontiue selling EP drugs.  BAUMHOFF faxed the HARVARD forms to EP for EP to fill out.

       While PAVNICK was out of the office for surgery, HAGGERTY had all of the physicians sign the questionnaire with the exception of DRs ATREIDIS and MEEK who did not sign them initially.  When PAVNICK returned to the office, she saw ATREIDIS and MEEK completed and signed the questionnaire.  PAVNICK whited-out their answers, wrote an incorrect answer over the white-out (so HARVARD would continue sending EP pills), and faxed the form to HARVARD.

# Jerry Sandlin Statement

**U.S. Department of Justice**
Drug Enforcement Administration

| REPORT OF INVESTIGATION | | | | Page 1 of 2 | |
|---|---|---|---|---|---|
| 1. Program Code | 2. Cross File ☒ | Related Files | 3. File No. | | 4. G-DEP Identifier |
| 5. By: Milton G Galanos, SA<br>At: Louisville DO | ☒<br>☐<br>☐<br>☐<br>☐ | | 6. File Title | | |
| 7. ☐ Closed  ☐ Requested Action Completed<br>☐ Action Requested By: | | | 8. Date Prepared<br>11-29-2011 | | |
| 9. Other Officers: SA's Mike Burt and FBI Jennifer Turner | | | | | |

10. Report Re: Proffer of Jerry SANDLIN on 11-28-2011

## DETAILS

1.  Reference is made to all previous Reports of Investigation under this case file.

2.  On November 28, 2011, at approximately 3:00 p.m., Jerry SANDLIN was Proffered at the Offices of the DEA.  SANDLIN was represented by his attorney, Johnathan Ricketts, telephone 502-645-8338.  SA's Milton Galanos, Mike Burt (DEA Miami) and Jennifer Turner (FBI Miami) conducted the Proffer.

3.  Jerry explained that he was involved in an automobile accident and seeked medical attention at PROGRESSIVE MEDICAL, Louisville, KY.  Jerry was prescribed Lortabs, but the medication did not ease his chronic back pain.  As a result, he and Teresa (SANDLIN) began to travel to Florida to seek medication for their medical ailments.  They came across AMERICAN PAIN CLINIC which was always crowded with people.  Jerry said in order to expedite their visit with the doctor, he would offer the receptionist $20.00 or $50.00.  Jerry stated Dr. CADET was his primary care physician at the clinic and she prescribed large doses of Oxycodone that he consumed.

4.  Jerry was asked who else traveled along with them to Florida.  Jerry stated he and Teresa traveled alone.  They drove all night, but if they got tired they would stop at a rest area.

| 11. Distribution:<br>Division<br>District<br>Other | 12. Signature (Agent)<br>Milton G Galanos, SA | 13. Date<br>11-29-2011 |
|---|---|---|
| | 14. Approved (Name and Title)<br>Arnold L Fitzgerald<br>GS | 15. Date<br>11-30-2011 |

| DEA Form      - 6<br>(Jul. 1996) | DEA SENSITIVE<br>Drug Enforcement Administration |
|---|---|

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

01069

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. ▮▮▮▮▮▮ | 2. G-DEP Identifier ▮▮▮▮▮▮ |
|---|---|---|
| *(Continuation)* | 3. File Title ▮▮▮▮▮▮ | |

| 4. Page 2 of 2 | |
|---|---|
| 5. Program Code | 6. Date Prepared 11-29-2011 |

5.  Jerry was asked where he obtained his medication once the clinics were shut down.  Jerry stated he was no longer taking medication for his back.

6.  At that time it was apparent that Jerry was not following the agreement of the Proffer, so the interview was terminated.


**INDEXING**

1. Teresa SANDLIN –  ▮▮▮▮▮▮

2. Jerry SANDLIN – ▮▮▮▮▮▮

3. AMERICAN PAIN CLINIC: ▮▮▮▮▮▮

4. PROGRESSIVE MEDICAL: ▮▮▮▮▮▮

---

DEA Form     - 6a
(Jul. 1996)

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

01070

# Shackelford Statement

## Internal Revenue Service
## Criminal Investigation

# Memorandum of Interview



| | | | |
|---|---|---|---|
| **In Re:** | DERIK NOLAN | **Location:** | 2000 Springdale Boulevard #108 Palm Springs, FL 33461 |

**Investigation #:** 1000230676
**Date:** March 3, 2010
**Time:** 7:05 am - 8:53am
~~9:53am - 11:27am~~
**Participant(s):** April Horst Shackelford, Witness
Christopher Lee Shackelford, Witness' Husband
Julie Nicholson, Special Agent IRS CI
Jason Leighton, Special Agent IRS CI

1.    Special Agents Nicholson and Leighton arrived at 2000 Springdale Boulevard, #108, Palm Springs, Florida to interview April Michelle Nellums.  The door was opened by a male who subsequently identified as Christopher Lee Shackelford.  Nicholson and Leighton identified themselves as special agents with Internal Revenue Service, Criminal Investigation and presented their credentials for inspection.  Nicholson explained the agents wished to speak to April Michelle Nellums.  Christopher Shackelford invited the agents into the residence.  Moments later, a female emerged from the back of the residence.  The agents identified themselves as special agents with Internal Revenue Service, Criminal Investigation and presented their credentials for inspection.  Nicholson explained that the agents wished to interview Nellums regarding her employment at Executive Pain and she agreed to an interview.  The information contained in this memorandum was provided by April Horst Shackelford (fka April Michelle Nellums).

2.    April Michelle Nellums married Christopher Lee Shackelford on January 8, 2010 and is now known as April Horst Shackelford (Shackelford).  She was born January 19, 1982 and her social security number is 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.  She has lived at 2000 Springdale Boulevard, #108, in Palm Springs, Florida since April 2009.  She and her husband are renting the unit.  Her cellular telephone number is 561-767-6998.  She does not have a land line.  Shackelford moved from Tallahassee, Florida to West Palm Beach, Florida.

3.    Shackelford was employed at Executive Pain (Executive), 4047 Okeechobee Boulevard in West Palm Beach, Florida from June 2009 until October 23, 2009.  She found an advertisement on Craig's List for a receptionist/office help position at a busy doctor's office.  The advertisement did not indicate the name of the potential employer.

17.     The prescriptions given to a new patient at the first doctor visit usually consisted of:  180 Roxycodone 30mg pills, 60 to 90 Roxycodone 15mg pills and 30 Zanax pills. Returning patients received a greater quantity of Roxycodone 30mg pills but the quantity of Roxycodone 15mg stayed the same.

18.     Returning patients almost never tested positive for Zanax on Executive's follow up drug tests.  On average, the drug tests of two returning patients each week showed no Roxycodone in their system.  One of Frye's drug tests came back negative for Roxycodone.

19.     Shackelford received no instructions on what to say if questioned by police. Shackelford's husband is a Palm Springs police officer.  He occasionally picked her up from work while wearing his uniform.  Pavnick told Shackelford not to respond to any police or media inquiries.  The inquiries were to be referred to Pavnick so the clinic did not violate the privacy rights of the patients.  Pavnick was not always as concerned with protecting patient privacy.  Shackelford discovered patient information was routinely thrown in the trash.  She told Pavnick and Pavnick instructed employees to shred patient information.  Shackelford noticed that stacks of patient files were left in the doctors' rooms.  She told Pavnick that the rooms were not monitored at all times and other patients left waiting in the rooms could view the patient files.

20.     There were at least eight surveillance cameras inside Executive.  Four cameras were positioned in the room that Shackelford worked in one was positioned to view her desk and the cash drawer.  There was a camera in the waiting room and one in the hallway that led to the bathroom but it did not cover the bathroom door.  The camera images were simultaneously displayed on a television screen in Pavnick's office.  She does not recall any cameras located on the exterior of Executive.

21.     Executive discharged a patient when the patient was caught doctor shopping. An outside pharmacy called Executive and told them the patient had recently filled a prescription from another doctor/clinic for the same or similar medications.  Executive patients could be discharged if the patient's drug test came back negative for Roxycodone a second time.  Two to four patients a week were discharged for this. The first time the test came back negative, Wilson told the patient to take his/her medications as prescribed.  Ian was placed in charge of subsequent drug testing for that patient.  If the patient tested negative for Roxycodone a second time, Ian advised Wilson and Wilson discharged the patient.  Patients could also be discharged for bringing forged MRI's into the clinic.  ==Wilson referred the discharged patient to American.==  Shackelford witnessed some patients that were discharged by Executive, return to Executive Pain and see an Executive doctor.

22.     Executive saw a great number of patients referred by American.  American referrals were usually patients with track marks.

At approximately 8:53am, Shackelford asked if she could eat breakfast.  The agents offered to leave the premises and return later to allow Shackelford to take care of her morning routine.  Shackelford agreed and the agents left the premises.  The agents returned to the premises at 9:53am.  Upon their return, the agents identified

# Sollie Statement

```
0001
 1                IN THE CIRCUIT COURT OF THE
                17TH JUDICIAL CIRCUIT, IN AND FOR
 2                  BROWARD COUNTY, FLORIDA
 3                       CASE NO. 08-64249(03)
 4
 5   SOUTH FLORIDA PAIN, LLC, a Florida
     limited liability company,
 6
 7        Plaintiff,
 8   vs.
 9   EDDIE SOLLIE, an individual, and
     EDDIE SOLLIE, M.D., LLC d/b/a "SOUTH
10   FLORIDA PAIN CENTER," a Florida limited
     liability company,
11
          Defendant.
12   _____/
13
14                1144 Southeast 3rd Avenue
                   Fort Lauderdale, Florida
15                    April 15, 2009
                   1:30 p.m. - 2:45 p.m.
16
17
18
19                --------------------
20           CONTINUED      DEPOSITION
21                     OF
22              DR. EDDDIE SOLLIE
23                --------------------
24
25
0002
 1   APPEARANCES:
 2   BRADFORD J. BEILLY, ESQUIRE
          BRADFORD J. BEILLY, P.A.
 3       1144 Southeast 3rd Avenue
          Fort Lauderdale, Florida 33316
 4   Appearing on Behalf of the Plaintiff
 5
 6   DONNA M. BALLMAN, ESQUIRE
          DONNA M. BALLMAN, P.A.
 7       4801 South University Drive, Suite 3010
          Fort Lauderdale, Florida 33328
 8   Appearing on Behalf of the Defendant
 9
10
11
12            Also Present:
```

16  letter says.
17       Q.   It's on October 22nd, correct?
18       A.   Correct.
19       Q.   So, you expected to terminate your
20  employment sometime around November 21st, 22nd,
21  thereabouts?
22       A.   Around those days to see -- well, my
23  expectation was to see the patients that had
24  follow-up appointments.  So, it may be longer than
25  the 22nd.
0049
1        Q.   In fact, at Mr. George's deposition, we
2   identified this.
3                 I'm just showing you Exhibit 11, as
4   your e-mail, which shows it was approximately around
5   the 24th that you had left.
6        A.   Correct.  At that time, I felt that I
7   could not wait for any patients that still needed to
8   return.
9        Q.   And you were not terminated by Mr. George,
10  correct?
11       A.   No.
12       Q.   He never said, don't come here?
13       A.   No.
14       Q.   Turn your attention to your affidavit,
15  Paragraph 11.
16       A.   Okay.
17       Q.   You said that there was a certain incident
18  with a patient that occurred on November 15th?
19       A.   Correct.
20       Q.   Do you recall, without identifying the
21  name of the patient, the patient?
22       A.   Yes, very clearly.
23       Q.   Would you be able to identify that patient
24  if there was an applicable HIPPA waiver?
25       A.   Probably.
0050
1        Q.   Do you know the name?
2        A.   I would recognize the patient, yes.
3        Q.   But if we were actually to get a HIPPA
4   waiver, would you be able to identify the person's
5   name?
6        A.   I'm not sure.
7        Q.   You just remember physically what the
8   patient looked like?
9        A.   Yes.
10       Q.   And you refused to see that patient, as
11  you describe in this?
12       A.   That's correct.
13       Q.   Because he had tested positive for

```
14   narcotics?
15        A.    Illegal narcotics.   Okay?   We prescribe
16   narcotics.
17        Q.    Right.   So, actually testing positive for
18   narcotics would not be a ground for refusing to see
19   a patient?
20        A.    Correct.
21        Q.    So, this affidavit needs to be modified
22   with the term, illegal narcotics?
23        A.    Correct.
24        Q.    What was the illegal narcotic that that
25   patient tested positive for?
0051
 1        A.    Cocaine, amphetamines, pot, marijuana.
 2        Q.    You said you didn't want do see that
 3   patient?
 4        A.    Absolutely not.
 5        Q.    Then what happened?
 6        A.    I dismissed the patient.   And I witnessed
 7   the patient going into another physician's office.
 8        Q.    Do you know whether that patient received
 9   a prescription from that other physician?
10        A.    According to the physician, yes.
11        Q.    Who was the physician?
12        A.    Dr. Joseph.
13        Q.    At that moment in time, you felt that you
14   had been constructively terminated?
15        A.    No.  I didn't say that.
16        Q.    Read your affidavit.
17        A.    That just shows that at that point, it was
18   obvious that the relationship could not continue.
19        Q.    But you used specific words in this
20   affidavit, quote, unquote, constructive termination.
21              I considered this effective notice of
22   my constructive termination of the service
23   agreement.
24        A.    Okay.
25        Q.    At that moment on November 15th?
0052
 1        A.    Yes.
 2        Q.    Yes, you think that is what I want to
 3   here, or yes, that's what you felt at that time?
 4        A.    With all do respect, I'll only answer my
 5   questions as I see them, not because somebody wants
 6   me to say something.
 7        Q.    What do you mean by, constructive
 8   termination?
 9        A.    The business relationship at that time,
10   obviously split ways.  They were going to run their
11   business as they felt was their way of doing it.  I
```

# Stewart Statement

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    10/27/2010

      DARYL MICHAEL STEWART (STEWART), having previously been
interviewed and having signed a Kastigar Letter, was interviewed
at the United States Attorney's Office.  Also present during the
interview was STEWART's attorney, Joe McSorley, Drug Enforcement
Administration SA Michael Burt and Assistant United States
Attorney Paul Schwartz.

      STEWART is currently employed at ██████████████████
████████████████████████████; telephone
number ████████████████████████; cellular telephone number
███████████, facsimile number ████████████████.

      DERIK NOLAN (NOLAN) has a blue Oxycodone pill tattooed
into the tribal tattoo he has on his arm.  NOLAN called STEWART
about a month ago and wanted to meet.  NOLAN wanted to know if
STEWART talked to law enforcement.  NOLAN told STEWART that if he
saw ETHAN BAUMHOFF (BAUMHOFF) on the street, "What's another
battery charge?" referring to the fact that he would beat up
BAUMHOFF.

      NOLAN asked STEWART if STEWART was wearing a wire, and if
STEWART met with the government again.  STEWART told him no, to
which NOLAN said if you lie to me about your cooperation with the
government, "I'll get you anywhere".  NOLAN drove CHRIS GEORGE's
(GEORGE) black Mercedes to the meeting.

      GEORGE reviewed patient files and talked to the doctors
if they were prescribing low amounts of drugs to AMERICAN PAIN
(AP) patients.  STEWART was the last stop on the patients trip
through the clinic because he dispensed the pills.  On one
occasion, GEORGE looked at a patient file and said, "This patient
got 120 pills, what's up with that?"  Then, GEORGE would go talk
to the doctor about the low amounts.  GEORGE reviewed the patient
files at least a couple of times a week.  GEORGE did this both at
AP and EXECUTIVE PAIN (EP).

      GEORGE wanted to know if his doctors were good writers,
and wanted them to write for 240 individual units of Oxycodone.
While at the Boca Raton location, STEWART recalls instances when
patients would return for a follow-up visit and the doctor would
write for more pills.

Investigation on   10/27/2010   at   Fort Lauderdale, Florida

File # ████████████████████                    Date dictated _____

by   SA Jennifer J. Turner

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

00955

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___DARYL MICHAEL STEWART_____, On 10/27/2010 , Page __2____

     The physicians had windows in their exam rooms that overlooked the parking lot with the exception of DR. ARUTA. The physicians were able to observe patients in the waiting room. On one occasion when DR. RONNIE DRESZER came out of his office to hand STEWART a file, he said something to the effect of, "Holy cow! Look at these people."

     Six security guys worked at the Lake Worth location of AP. If a doctor through a patient out of the clinic due to track marks, NOLAN was called into the exam room to throw the patient out.

     STEWART obtained a conceal to carry permit and wore a gun concealed in the small of his back while working at AP, but eventually stopped.

     When NOLAN approached STEWART about becoming a patient at AP in order to sell his pills to NOLAN, NOLAN told STEWART he would see DR. BOSHERS. STEWART does not recall taking a prescription to obtain an MRI to NPI, however NPI administered an MRI of his back.

     CHRIS HANEY (HANEY) was responsible for distributing prescriptions for MRI referrals at the Boca Raton location. DR. BOSHERS pre-signed these prescriptions and then they were copied. At AP's Cypress Creek location, there were pre-signed MRI prescriptions for various parts of the body that were pre-signed by the physician(s) and then copied.

     STEWART recalled DR. BOSHERS approached HANEY on one occasion and told HANEY that an MRI revealed there was nothing wrong with the patient. BOSHERS then went to HANEY's file cabinet where the Xeroxed pre-signed MRI and CT Scan prescriptions were kept and got a CT Scan prescription for the patient.

     PAIGE LAST NAME UNKNOWN (LNU) from DELRAY DIAGNOSTICS would bring food and alcohol to the employees of AP as a thank you for referring patients to their MRI facility.

     STEWART had conversations with BOSHERS about the amount of people going to AP, the large number of new patients, and the number of pills they were prescribing. BOSHERS told STEWART he would ask his patients how many pills they took in a day. If a patient told him five, then BOSHERS would question why they were

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___DARYL MICHAEL STEWART___ , On _10/27/2010_ , Page ___3___

getting the amount of pills they received every month.  Regardless of the answer, BOSHERS would continue to write the prescriptions anyway.  BOSHERS told STEWART some of the patients did not need the amounts and dosage units BOSHERS was prescribing.

BOSHERS and STEWART talked about why the patients drove so many hours to be treated at AP and agreed that it was because AP was fast and because they prescribed high quantities of pills. BOSHERS admitted he knew some of the patients sell their Oxys on the street, take them intravenously, and sort them.

STEWART remembers shooting guns with GEORGE at an open range somewhere in Fort Lauderdale.  STEWART knew GEORGE was a convicted felon.  The first time STEWART went shooting with GEORGE, CHRIS HUTSON (HUTSON), an unknown friend of HUTSON's, ZACK LNU, and DREW HARRINGTON (HARRINGTON) went shooting together. BAUMHOFF had the shotguns in his gun safe.  STEWART took the guns to the range and returned them to ETHAN BAUMHOFF's (BAUMHOFF) house when they were done.

The second time STEWART went shooting with GEORGE, HUTSON, HARRINGTON, and others went to the shot gun range while STEWART went to the pistol range.  STEWART again took the guns back to BAUMHOFF's house when they were done.

The third time STEWART recalls GEORGE going shooting, GEORGE went to BAUMHOFF's house to pick up the guns, but STEWART did not go to the range.

STEWART and BAUMHOFF were at GEORGE's house when STEWART saw GEORGE give BAUMHOFF a Sig Sauer handgun.  GEORGE told them not to tell PAVNICK that GEORGE was giving or selling BAUMHOFF the gun since PAVNICK bought it for GEORGE.

GEORGE referred to EP as a "dump location" where AP "flunkies" with track marks would go.  Sometimes the patients had to pay at both AP and EP.  On one occasion, while STEWART was at EP, he got a referral card from a patient who had been to AP.  The patient was seen by possible DR. BERETSKY at EP and got a prescription for pills.

The bathrooms at EP were disgusting.  They found urine in the bathroom every day.  When employees found urine in the bathroom, they would try to determine who the last patient was to use the restroom.  These conversations were had among the employees